UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

THE DIOCESE OF ROCHESTER,

Case No. 19-20905
Chapter 11 Case

Debtor.

THE CONTINENTAL INSURANCE
COMPANY, successor by merger to Commercial
Insurance Company of Newark, and Fireman's
Insurance Company of Newark, New Jersey

Adv. Proc. No.: 23-02014

Plaintiff,

v.

THE DIOCESE OF ROCHESTER,

Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF: (I) THE DIOCESE OF ROCHESTER'S MOTION TO DISMISS THE ADVERSARY COMPLAINT OF THE CONTINENTAL INSURANCE COMPANY; AND (II) THE DIOCESE OF ROCHESTER'S OBJECTION TO THE APPLICATION OF THE CONTINENTAL INSURANCE COMPANY FOR ALLOWANCE AND PAYMENT OF ALLEGED ADMINISTRATIVE EXPENSE PRIORITY CLAIMS**

BOND, SCHOENECK & KING, PLLC

By: /s/ Stephen A. Donato
Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
Grayson T. Walter, Esq.
Jeffrey D. Eaton, Esq.
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Email: sdonato@bsk.com
        csullivan@bsk.com
        gwalter@bsk.com
        jeaton@bsk.com

*Attorneys for The Diocese of Rochester*

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................. 1

Factual Background ..................................................................................................... 4

Argument ...................................................................................................................... 7

    I.    The Motion to Dismiss Should be Granted ................................................... 7

        a.   Applicable legal standard for the Motion to Dismiss the Complaint. ............................ 7

        b.   New York law requires a signed contract under these circumstances. ............................ 8

        c.   The Proposed CNA Settlement Agreement contains numerous conditions precedent that must be satisfied before a binding contract is formed. .................................................. 10

           i.   There is no enforceable contract because the Proposed CNA Settlement Agreement was never executed by the Diocese, and nearly 100 DOR Entities who are necessary parties to any insurance buy back. ........................... 12

          ii.   This Court has not approved the Proposed CNA Settlement Agreement. .................. 14

         iii.   No plan of reorganization to implement the Proposed CNA Settlement Agreement has been confirmed and no post-confirmation trust has been formed. ............................. 15

        d.   The Bankruptcy Code requires approval of the Proposed CNA Settlement Agreement in order to enforce it. ............................................................................................................ 15

        e.   Even if the Diocese is bound by the Proposed CNA Settlement Agreement, CNA cannot establish that a breach has occurred or that CNA has suffered any damages. ............... 18

    II.   The Court Should Sustain the Diocese's Administrative Claim Objection. .................. 21

        a.   Applicable legal standard for allowance of an administrative claim. ............................ 21

        b.   CNA is not entitled to an administrative expense because it has not conferred a benefit on the Diocese's estate. ........................................................................................ 23

        c.   CNA is not entitled to an administrative expense because the Diocese's conduct has not harmed CNA. ............................................................................................. 25

Conclusion ...................................................................................................................... 26

16879230.11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*34-06 73, LLC v. Seneca Ins.*,
198 N.E.3d 1282 (N.Y. 2022)..................................................................................8

*34-06 73, LLC v. Seneca Ins.*,
39 N.Y.3d 44 (2022) ...............................................................................................18

*Achtman v. Kirby, McInerney & Squire, LLP*,
464 F.3d 328 (2d Cir. 2006).....................................................................................8

*Am. Prairie Constr. Co. v. Hoich*,
594 F.3d 1015 (8th Cir. 2010) ................................................................................16

*Amcan Holdings, Inc. v. Can. Imperial Bank of Commerce*,
70 A.D.3d 423 (1st Dep't 2010) ...............................................................................9

*In re Ames Dep't Stores, Inc.*,
306 B.R. 43 (Bankr. S.D.N.Y. 2004).......................................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................8

*Bedoya v. Rodriguez*,
186 A.D.3d 1308 (2d Dep't 2020) .....................................................................10, 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................8

*Brois v. DeLuca*,
154 A.D.2d 417 (2d Dep't 1989) .............................................................................10

*In re Carmichael*,
109 B.R. 849 (Bankr. N.D. Ill. 1990) .................................................................22, 24

*Coe v. Coca-Cola Co.*,
2023 WL 7524396 (W.D.N.Y. Nov. 14, 2023) ..........................................................9

*Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc,)*,
536 F.2d 950 (1st Cir. 1976)...................................................................................22

*In re Diocese of Camden, New Jersey*,
653 B.R. 309 (Bankr. D. N.J. 2023) ...................................................................13, 18

16879230.11
Case 2-23-02014-PRW,  Doc 9,  Filed 12/22/23,  Entered 12/22/23 14:35:05,
Description: Main Document , Page 3 of 32

*In re Drexel Burnham Lambert Grp., Inc.*,
  134 B.R. 482 (Bankr. S.D.N.Y. 1991) ...........................................................22, 23

*In re Englewood Cmty. Hosp. Corp.*,
  117 B.R. 352 (Bankr. N.D. Ill. 1990) .............................................................22, 23

*In re Enron Corp.*,
  279 B.R. 79 (Bankr. S.D.N.Y. 2002) ..............................................................22, 24

*Felipe v. 2820 W. 36th St. Realty Corp.*,
  20 A.D.3d 503 (2d Dep't 2005) ..............................................................................10

*Fischl v. Armitage*,
  128 F.3d 50 (2d Cir. 1997)......................................................................................23

*Galarneau v. D'Andrea*,
  184 A.D.3d 1064 (3d Dep't 2020) ............................................................................8

*In re Iridium Operating LLC*,
  478 F.3d 452 (2d. Cir. 2007)...................................................................................16

*Jordan Panel Sys. v. Turner Const. Co.*,
  45 A.D.3d 165 (1st Dep't 2007) .........................................................................9, 12

*Kapson Const. Corp. v. ARA Plumbing & Heating Corp.*,
  227 A.D.2d 484 (2d Dep't 1996) ............................................................................10

*Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*,
  98 A.D.3d 403 (1st Dep't 2012) ...............................................................................8

*Metro. Steel Indus., Inc. v. Citnalta Const. Corp.*,
  302 A.D.2d 233 (1st Dep't 2003) .......................................................................9, 12

*In re Mid Region Petroleum, Inc.*,
  1 F.3d 1130 (10th Cir. 1993) ..................................................................................22

*In re O'Brien Env't Energy, Inc.*,
  181 F.3d 527 (3d Cir. 1999).....................................................................................22

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
  86 N.Y.2d 685 (2d Dep't 1995) ........................................................................10, 15

*In re Patient Educ. Media, Inc.*,
  221 B.R. 97 (Bankr. S.D.N.Y. 1998) ......................................................................22

*PRLP 2011 Holdings, LLC v. Manuel Mediaville, Inc. (In re Manuel Mediaaville, Inc.)*,
  568 B.R. 551 (B.A.P. 1st Cir. 2017) (per curiam) .............................................16, 17

16879230.11

*Reading v. Brown*,
    391 U.S. 471 (1968) ............................................................................25

*Scheck v. Francis*,
    26 N.Y.2d 466 (1970) ....................................................................9, 12

*In re Sinclair*,
    92 B.R. 787 C.B.C.2d 54 (Bankr. S.D. Ill. 1988) ...............................23

*StarVest Partners II, LP v. Emportal, Inc.*,
    101 A.D.3d 610 (1st Dep't 2012) ...................................................9, 12

*In re The Roman Catholic Diocese of Rockville Centre*,
    Case No. 20-12345 (S.D.N.Y.) ...............................................1, 17, 18

*In re Theatre Row Phase II Assocs.*,
    385 B.R. 511 (Bankr. S.D.N.Y. 2008) ...............................................25

*Trs. Amalgamated Ins. Fund v. McFarlin's*,
    789 F.2d 98 (2d Cir.1986) ..................................................................22

*West Hills Auto Repair v. State*,
    32 A.D.3d 849 (2d Dep't 2006) ..........................................................10

*Wilson v. Triller, Inc.*,
    598 F. Supp. 3d 82 (S.D.N.Y. 2022) ....................................................8

**Statutes**

11 U.S.C. § 503(a) ...................................................................................21

11 U.S.C. § 503(b)(1)(A) ....................................................................21, 22

Bankruptcy Act ........................................................................................25

Bankruptcy Code Section 507(a) ...........................................................21

Code § 503(a)(1) ......................................................................................25

RSA [Docket No. 1790] .............................................................................6

**Other Authorities**

Bankruptcy Rule 9019 ...................................................................... *passim*

Bankruptcy Rules Rule 7012(b) .................................................................7

Civil Rules Rule 12(b)(6) ...........................................................................7

16879230.11

Diocese Policies **as if this Agreement never existed**................................................................7, 19

Federal Rules of Bankruptcy Procedure Rule 7012(b) ...................................................................1

Hearing Transcript, at page 28 2-5 ...........................................................................................18

(ii) *Objection to the Application of the Continental Insurance Company for Allowance and Payment of Alleged Administrative Expense Priority Claims* [Docket No. ___] (the "Administrative Claim Objection")..................................................1, 21

Rule 9019(a)......................................................................................................................15

16879230.11

Case 2-23-02014-PRW,    Doc 9,    Filed 12/22/23,    Entered 12/22/23 14:35:05,
Description: Main Document  , Page 6 of 32

The Diocese of Rochester (the "Diocese"), by and through its undersigned counsel, hereby submits this Memorandum of Law (this "Memorandum") in support of its: (i) *Motion to Dismiss the Adversary Complaint of The Continental Insurance Company* [Adv. Pro. 23-02014, Docket No. 8] (the "Motion to Dismiss") pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and (ii) *Objection to the Application of the Continental Insurance Company for Allowance and Payment of Alleged Administrative Expense Priority Claims* [Docket No. 2406] (the "Administrative Claim Objection") filed contemporaneously herewith.

## PRELIMINARY STATEMENT

The Diocese respectfully submits that the *Complaint* [Adv. Pro. 23-02014, Docket No. 1] (the "Complaint") and *Application for Allowance and Payment of Administrative Expense Priority Claims for Debtor's Breach of Continental Settlement Agreement* [Docket No. 2314] (the "Administrative Expense Application") filed by Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey, and Fireman's Insurance Company of Newark, New Jersey ("CNA"), are part of a baseless and ultimately futile attempt to limit CNA's litigation exposure in this Chapter 11 Case by relying upon an unexecuted, non-binding, and unenforceable proposed settlement agreement[1] that, while negotiated in good faith, has been resoundingly opposed by creditors and the subject of pointed criticism by this Court. Through both the Complaint and the Administrative Expense Application, CNA asserts claims of breach of contract and anticipatory breach of contract against the Diocese. However, CNA has failed to meet its burden to demonstrate that an enforceable contract was ever formed between

---

[1] The unexecuted Settlement Agreement, Release and Policy Buyback (the "Proposed CNA Settlement Agreement") which forms the basis for CNA's claims, was first submitted to the Court as an Exhibit to a Bankruptcy Rule 9019 motion filed by the Diocese on May 20, 2022 [Adv. Pro. 19-02021, Docket No. 190] and is also attached as Exhibit A to CNA's Administrative Expense Application.

CNA, the Diocese, and approximately 100 of its parishes and other related Catholic entities (collectively, the "<u>DOR Entities</u>") who are all necessary parties to any insurance settlement agreement.

Under New York law, for CNA to recover upon its claims, there must be an enforceable contract between the parties. However, CNA and the DOR Entities did not enter into such a contract. Instead, they unequivocally expressed their intent that the Proposed CNA Settlement Agreement would only become effective and binding on the parties thereto, if, among other things, the Court approved the proposed settlement and the parties formally signed and executed the proposed settlement agreement. The Court has not approved the proposed settlement and none of the DOR Entities ever signed the proposed settlement agreement. Accordingly, by its clear terms, the Proposed CNA Settlement Agreement has never become effective or binding, and CNA cannot now try to hold the Diocese liable for any alleged breach.

In addition, the Proposed CNA Settlement Agreement contains numerous conditions precedent, which must be satisfied before it could ever become a binding obligation of the DOR Entities. At least four conditions precedent have not occurred: (1) the Proposed CNA Settlement Agreement has not been signed by the DOR Entities; (2) the Court has not entered an order approving the Proposed CNA Settlement Agreement pursuant to Bankruptcy Rule 9019; (3) a plan of reorganization plan consistent with the terms of the Proposed CNA Settlement Agreement has not been confirmed; and (4) a post-confirmation trust has not been established to receive any settlement payments among CNA. Even if all other conditions precedent were satisfied, without bankruptcy court approval, a debtor-in-possession cannot be bound to a settlement agreement.

Assuming, *arguendo*, that CNA could establish the formation of an enforceable contract, CNA has failed to properly allege breach or damages. CNA attempts to argue that the Diocese's

entry into the RSA and filing of the Joint Plan with the Committee constitutes a breach, or anticipatory breach, of the Proposed CNA Settlement Agreement. However, even if the unexecuted, and unapproved proposed agreement were binding on the Diocese, the Proposed CNA Settlement Agreement would not prohibit the Diocese from pursuing alternatives to settlement with CNA in the event that the Proposed CNA Settlement Agreement were not approved by the Court and/or if other conditions precedent were ultimately not satisfied. Given the Court's frosty reception to the proposed settlement, the fact that the settlement would likely result in pursuit of a cram-down plan, and the downright hostile reaction of the Committee, it was entirely reasonable for the Diocese to seek an alternative chapter 11 exit strategy. Indeed, the Proposed CNA Settlement Agreement even contemplates that a plan inconsistent with CNA's deal may be proposed or confirmed and specifies termination of the Proposed CNA Settlement Agreement as the remedy for such an eventuality.

Further, CNA's attempt to seek damages for attorneys' fees in connection with pursuing Court approval of its settlement and any difference between the $63.5 million it agreed to pay pursuant to the Proposed CNA Settlement Agreement and any future amount it is required to pay pursuant to a confirmed plan of reorganization are too speculative in nature and presuppose that the Court would approve its settlement deal and that all other contingencies necessary to effectuate the settlement would occur. CNA failed to plead or otherwise meet its burden to show that the Court approved the Proposed CNA Settlement Agreement, that the "Settlement Agreement Effective Date" ever occurred, or that the Diocese has taken or failed to take any action in violation of any legal duty which caused CNA damages.

Finally, CNA has not satisfied its burden to have any alleged claim against the Diocese treated as an administrative expense of the Diocese's estate. For the following reasons, the Court

3

should grant the Diocese's Motion to Dismiss and issue an order dismissing each claim asserted by CNA with prejudice, sustaining the Administrative Claim Objection, and denying the Administrative Expense Application.

## **FACTUAL BACKGROUND**

For more than four (4) years, the Diocese has been committed to the goals of this Chapter 11 Case: (a) to arrive at a fair and equitable distribution to creditors, which are comprised primarily of survivors of sexual abuse; and (b) to facilitate the Diocese's successful exit from bankruptcy so that it may continue the mission of the Catholic Church in Western New York.

On November 14, 2019, the Diocese commenced Adversary Proceeding No. 19-02021 (the "Insurance Adversary Proceeding") by filing a complaint against CNA and several other insurers for breach of contract and declaratory judgment, seeking a declaration of the rights, duties, and liabilities of the parties pursuant to the terms of their respective insurance policies and damages.

On March 10, 2020, the Court entered an order referring the Insurance Adversary Proceeding to mediation [Adv. Proc. 19-02021, Docket No. 39].

On May 27, 2021, the Diocese filed a motion to approve proposed settlement agreements with LMI and Interstate [Docket No. 1101; Adv. Proc. 19-02021, Docket No. 99] (the "First Settlement Motion") seeking approval of the First Settlement Agreement. On July 12, 2021, the Court entered an order which denied the Diocese's motion and directed all parties to return to mediation [Docket No. 1213; Adv. Proc. 19-02021, Docket No. 153].

Mediation resumed and continued through May 2022. During these many months of mediation, the Diocese pushed to achieve a global deal with the Committee and the insurers but was unfortunately unsuccessful in achieving universal agreement on a settlement. In March of 2022, with no deal having been reached, the Committee refused to extend the stipulated stay of litigation against parishes and other related Catholic entities. In response, the Diocese commenced

16879230.11

an adversary proceeding seeking a preliminary injunction to prevent litigation from disrupting continuing work toward a global resolution.

In an attempt to break the stalemate in mediation, and to show the Court that the Diocese was committed to resolving this Chapter 11 Case and compensating survivors, the Diocese determined that it would pursue settlement with the insurers, without Committee participation. During May 2022, the Diocese negotiated proposed settlement agreements with LMI, Underwriters, Interstate, and CNA which would have provided aggregate settlement proceeds of $107,250,000 to the Diocese's estate, to fund a post-confirmation trust. CNA's proposed contribution to the aggregate settlement proceeds totaled $63.5 million. The DOR Entities proposed to provide an additional $40,500,000, to make a total of $147,750,000 available to compensate holders of Abuse Claims.

On May 20, 2022, the Diocese filed its *Motion to Approve Proposed Insurance Settlements to Fund Survivor Compensation Trust*, seeking to authority to enter into the proposed settlement agreements with each of the insurers [Adv. Pro. 19-02021, Docket No. 190] (the "Settlement Approval Motion"). The Committee objected to the Settlement Approval Motion [Docket No. 1555]. The parties have engaged in preliminary discovery and negotiations regarding the Settlement Approval Motion but, as of the date of this Memorandum, the Court has not heard or ruled upon the Settlement Approval Motion and all discovery and response deadlines have been stayed indefinitely pending further court order.[2]

On May 23, 2022, the Court issued a decision [Adv. Proc. 22-02075, Docket. No. 48] (the "May 23 Decision"), which denied the Diocese's request for an injunction enjoining state court litigation against the parishes and, more importantly for present purposes, expressed skepticism

---

[2] The Court recently denied a motion by the Committee seeking to dismiss the Second Settlement Motion as Moot.

about the Diocese's likelihood of successfully reorganizing and its ability to confirm a plan over objections from the Committee. Specifically, the Court observed that the Diocese's pursuit of insurance settlements without the support of survivors represented by the Committee would require confirmation of a cram-down plan which would make the reorganization much more difficult. Therefore, the Court found that it could not conclude that a successful reorganization was likely. *See* May 23 Decision, pg. 12. The Court's signal that a cram-down plan was unlikely to be successful made clear that the Diocese would need to explore options to exit bankruptcy that would have the support of the Committee.

Following additional mediation efforts, and guided by the Court's admonishments in the May 23 Decision, the Diocese and the Committee were able to reach an agreement on a restructuring support agreement (the "RSA") on November 1, 2022. Pursuant to the RSA, the Diocese and the Committee agreed to pursue a plan of reorganization in which Abuse Claims would be satisfied from a trust to be funded by (i) the DOR Entities' contribution in the amount of $55,000,000; (ii) the proceeds received from any settling insurers pursuant to insurance settlement agreements; and (iii) the assignment of insurance claims against non-settling insurers to the trust.

On November 3, 2022, the Diocese filed a motion seeking entry of an order by the Court approving the RSA [Docket No. 1790] (the "RSA Approval Motion"). The insurers and the U.S. Trustee objected to the RSA Approval Motion. As of the date of this Memorandum, the Court has not heard or ruled upon the RSA Approval Motion and all discovery response deadlines are stayed pending further Court order.

In early 2023, the Diocese and Committee agreed to insurance settlements with LMI, Interstate, and Underwriters, leaving CNA as the sole major non-settling insurer. There are presently two competing plans before the Court. The joint plan filed by the Diocese and the

6

Committee, as amended [Docket No. 2217] (the "Joint Plan") which incorporates the terms of settlement with the Committee as set forth in the RSA, and CNA's plan which largely mirrors the Joint Plan except that it limits CNA's exposure to a single payment of $75 million.

On November 7, 2023, CNA filed the Complaint and Administrative Expense Application.

On December 18, 2023, the Diocese sent to CNA a notice, in which the Diocese reiterated to CNA its position that the Proposed CNA Settlement Agreement was not a binding or enforceable contract [Docket No. 2390] and therefore could not serve as the basis for an administrative expense claim. In an abundance of caution, the Diocese also provided to CNA notice pursuant to section 5.2 of the Proposed CNA Settlement Agreement, that the Diocese is invoking its right to terminate the agreement if, in fact, it is found to be legally enforceable. Pursuant to section 5.3 of the Proposed CNA Settlement Agreement, upon such termination, "all parties shall retain all of their Interests, rights, and obligations relating to the Diocese Policies **as if this Agreement never existed**." Proposed CNA Settlement Agreement, § 5.3 (emphasis added).

On December 19, 2023, the Court held a preliminary hearing to consider approval of both disclosure statements for both the Joint Plan and the CNA plan and scheduled an adjourned hearing for further consideration on January 30, 2024. At such hearing, the Court indicated that a confirmation hearing was unlikely to be heard before late April 2024, at the earliest.

## ARGUMENT

### I.      *The Motion to Dismiss Should be Granted.*

The Diocese respectfully submits that the Motion to Dismiss should be granted because there is no enforceable contract between the DOR Entities and CNA.

#### a.      Applicable legal standard for the Motion to Dismiss the Complaint.

Pursuant to Rule 7012(b) of the Bankruptcy Rules, Rule 12(b)(6) of the Civil Rules applies in adversary proceedings. To survive a motion to dismiss under Rule 12(b)(6), a complaint "must

16879230.11

contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint's factual content must allow the court to draw a reasonable inference that the defendant is liable for the conduct alleged, establishing more than "a sheer possibility that a defendant has acted unlawfully." *Id.*; *see Twombly*, 550 U.S. at 555 (emphasizing that the courts do not accept conclusory allegations as true). Conclusory allegations and legal conclusions masquerading as facts will not suffice to defeat a motion to dismiss. *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006). Thus, a pleading must cross the "line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Where the allegations in the complaint "are 'merely consistent with' a defendant's liability," they "stop[] short of th[at] line." *Id.* (quoting *Twombly*, 550 U.S. at 557).

To state a claim upon which relief can be granted for breach of contract or anticipatory breach of contract, a plaintiff must first allege sufficient facts establishing the existence of a binding and enforceable contract. *See 34-06 73, LLC v. Seneca Ins.*, 198 N.E.3d 1282, 1287 (N.Y. 2022) ("[T]o plead a cause of action for breach of contract, a plaintiff usually must allege that: (1) **a contract exists**; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.") (citations omitted) (emphasis added).

### b. New York law requires a signed contract under these circumstances.

A binding and enforceable contract exists under New York law only if the plaintiff establishes "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, 98 A.D.3d 403, 404 (1st Dep't 2012); *Galarneau v. D'Andrea*, 184 A.D.3d 1064, 1065-66 (3d Dep't 2020); *Wilson v.*

8

*Triller, Inc.*, 598 F. Supp. 3d 82, 94 (S.D.N.Y. 2022); *Coe v. Coca-Cola Co.*, 2023 WL 7524396, at *7 (W.D.N.Y. Nov. 14, 2023).

When two parties clearly and unequivocally express their intent to be bound by an agreement only after it has been reduced to writing and signed, but the parties subsequently fail to either reduce the agreement to writing or sign it, there is neither the requisite mutual assent nor the intent to be bound by the agreement necessary to give rise to a binding and enforceable contract. *See Scheck v. Francis*, 26 N.Y.2d 466, 469-70 (1970) ("It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed."); *Jordan Panel Sys. v. Turner Const. Co.*, 45 A.D.3d 165, 169 (1st Dep't 2007) (explaining that New York courts "will give effect to a party's clearly stated intention not to be contractually bound until it has executed a formal written agreement").

Under such a situation, there is no basis for a claim for breach of contract and dismissal of any such claim is the necessary and appropriate form of relief. *StarVest Partners II, LP v. Emportal, Inc.*, 101 A.D.3d 610, 612 (1st Dep't 2012) ("Dismissal of the breach of contract counterclaims is required where, as here, the parties have agreed that there would be no binding agreement until their execution of a written contract, but no such contract was ever executed."); *Amcan Holdings, Inc. v. Can. Imperial Bank of Commerce*, 70 A.D.3d 423, 426 (1st Dep't 2010) ("Generally, where the parties anticipate that a signed writing is required, there is no contract until one is delivered."); *Metro. Steel Indus., Inc. v. Citnalta Const. Corp.*, 302 A.D.2d 233, 233 (1st Dep't 2003) ("Plaintiff's breach of contract claim was properly dismissed since it is undisputed that the parties were aware that there would be no binding agreement until their execution of a written subcontract, which never occurred.").

9

c. <u>The Proposed CNA Settlement Agreement contains numerous conditions precedent that must be satisfied before a binding contract is formed.</u>

The Proposed CNA Settlement Agreement contains numerous conditions precedent, which have not been satisfied, including some which are highly unlikely ever to be satisfied as noted by the Court in its May 23 Decision. "A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Bedoya v. Rodriguez*, 186 A.D.3d 1308, 1309 (2d Dep't 2020) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (2d Dep't 1995) (quoting Calamari and Perillo, Contracts § 11-2 at 438 [3d ed])). A condition precedent can be a condition to the formation or existence of a contract. *See Oppenheimer* 86 N.Y.2d 685 at 690. Where a written agreement is based upon the satisfaction of a condition precedent, "no contract arises unless and until the condition occurs." *Id., see also Kapson Const. Corp. v. ARA Plumbing & Heating Corp.*, 227 A.D.2d 484, 484 (2d Dep't 1996). Where the clear written intent of the parties indicates that any agreement is subject to the occurrence of certain conditions precedent, and such conditions do not occur, the parties are not bound. *See West Hills Auto Repair v. State*, 32 A.D.3d 849, 850 (2d Dep't 2006) (Where acceptance of an offer was expressly conditioned upon the approval of the Comptroller of the State of New York and claimant presented no evidence showing that the Comptroller approved the agreement, claimant failed to make a *prima facie* showing that the agreement was in existence or was breached when the offer was rescinded by the state."); *see also Felipe v. 2820 W. 36th St. Realty Corp.*, 20 A.D.3d 503, 504 (2d Dep't 2005) ("[I]t is undisputed that the defendant did not subsequently mail a fully-executed copy of the contract to the plaintiffs' attorney, as expressly required under paragraph 17 of the rider to the contract. Because the delivery requirement was a condition precedent to the formation of any binding agreement, it could not be waived by the defendant."); *Brois v. DeLuca*, 154 A.D.2d 417,

16879230.11

417 (2d Dep't 1989) (affirming order granting defendant's motion to dismiss plaintiff's claim for breach of contract because condition precedent requiring delivery of an executed copy of the underlying agreement was never satisfied).

The Proposed CNA Settlement Agreement provides, at section 8.21, that "[t]his Settlement Agreement shall be effective on the Settlement Agreement Effective Date." Proposed CNA Settlement Agreement, § 8.21. The "Settlement Agreement Effective Date" is defined as follows:

> the day following the date on which **all** of the following have occurred: (i) all Parties have executed this Settlement Agreement; (ii) the [settlement] Approval Order shall have become a Final Order; (iii) the Plan Confirmation Order shall have become a Final Order; (iv) the Trust shall have been created pursuant to the Plan; and (v) solely in the event Continental elects to set off more than Two Million Dollars ($2,000,000) in Defense and Indemnity Costs against the Settlement Amount pursuant to section 2.3.4, (x) Continental shall have provided written notice of the Diocese of the amount of such setoff, (y) the Diocese shall not have exercised its right pursuant to Section 5.2 to terminate this Settlement Agreement on account of such proposed setoff, and (z) ten (10) days shall have elapsed from the date of Continental's delivery of such notice to the Diocese.

Proposed CNA Settlement Agreement, § 1.1.41 (emphasis added).

CNA fails to allege that the Settlement Agreement Effective Date has occurred, which it cannot, because several conditions precedent have not occurred. Specifically: (1) the Proposed CNA Settlement Agreement was never signed by the DOR Entities; (2) the Court has not entered a final order pursuant to Bankruptcy Rule 9019 approving the Proposed CNA Settlement Agreement; (3) no plan of reorganization implementing the Proposed CNA Settlement Agreement has been confirmed; and (4) no trust to receive CNA's settlement payment has been formed.

11

      i.   There is no enforceable contract because the Proposed CNA Settlement Agreement was never executed by the Diocese, and nearly 100 DOR Entities who are necessary parties to any insurance buy back.

CNA has failed to allege sufficient facts showing the existence of a binding and enforceable contract and the Court should dismiss CNA's Complaint accordingly. The DOR Entities and CNA clearly and unequivocally expressed their intent that the Proposed CNA Settlement Agreement would be effective, if at all, only upon the parties formally executing a written copy of the same. However, none of the DOR Entities executed a written copy of the Proposed CNA Settlement Agreement. Indeed, the Diocese's Settlement Approval Motion specifically seeks this Court's authorization before doing so. To allow CNA's claims to proceed any further would undermine the clearly stated intent of the parties and is contrary to New York law, under which "the concept of freedom of contract includes the freedom to avoid oral agreements, a freedom that 'is especially important when business entrepreneurs and corporations engage in substantial and complex dealings." *Jordan Panel Sys.*, 45 A.D.3d at 174 (internal citations omitted). Indeed, it is the policy of New York law "to allow sophisticated parties operating in the business world to decide when and how they wish to enter into legally enforceable contracts." *Id.*; *see also Scheck v. Francis*, 26 N.Y.2d at 469-70.

Where, as here, the parties intended a contract to be binding on them only upon the execution of a written agreement, which never occurred, and where, as here, the parties expressly contemplated Court approval as a precursor to executing the proposed settlement, there can be no claim for breach of contract or anticipatory breach of contract, and dismissal of those claims is both appropriate and warranted. *See StarVest Partners II, LP*, 101 A.D.3d at 612; *Metro. Steel Indus., Inc.*, 302 A.D.2d at 233.

At the time it was negotiating the Proposed CNA Settlement Agreement with CNA, the Diocese was keenly aware of the fight playing out between the Diocese of Camden, New Jersey

("Camden") and its insurers, in Camden's bankruptcy case pending in the Bankruptcy Court for the District of New Jersey, Case No. 20-21257 (the "Camden Bankruptcy"). On January 5, 2022, Camden filed a motion seeking approval of insurance settlement agreements. That motion was opposed by Camden's Official Committee of Tort Claimant Creditors ("Camden TCC"). On April 11, 2022, Camden announced a settlement with the Camden TCC that required Camden to withdraw from its previous insurance settlements. As a result, certain insurance carriers sued the Camden Diocese for breach of contract, seeking to have such damages allowed as an administrative claim.

The Diocese here intentionally approached its proposed settlements differently, in order to avoid the issues encountered by Camden. Most importantly, the Diocese made clear that it would not be bound by the Proposed CNA Settlement Agreement until it delivered an executed copy of that agreement to CNA, and then made its execution of the agreement contingent on receiving the prior approval of this Court. In its submission for approval, the Settlement Approval Motion described each of the Insurer settlements as "proposed insurance settlements" in the title and throughout the pleading. *See* Settlement Approval Motion, ¶¶ 6, 7, 38, 39, 47, 50, 51, 52, 54, 57, 58, 60, 61, 62, 64, 65, 66, 67, 68, 72, 74, 76, 80, 82, 83, 84, 85, 89, 90, 91, 92, 93. Indeed, in its prayer for relief the Diocese makes clear that it is seeking, among other things, an order "**authorizing the Diocese to enter into** the proposed settlement agreements . . . ." *Id.* The Proposed CNA Settlement Agreement was not signed because the Diocese was awaiting this Court's approval before binding itself to any of the proposed settlements to avoid the issues Camden was forced to litigate.

CNA further contends that the Proposed CNA Settlement Agreement lacked a "fiduciary out" to cancel the proposed settlement. CNA also was clearly aware of the litigation in Camden

and would not agree to traditional "fiduciary out" language. Ultimately, the Diocese was able to get comfortable with the lack of traditional "fiduciary out" language given the many conditions precedent to effectiveness set forth in the Proposed CNA Settlement Agreement, including, importantly, the requirement of Court approval.

Moreover, even if the Proposed CNA Settlement Agreement could be deemed to be binding, it provides the Diocese with a right to terminate and return the parties to the status quo ante if the Court does not approve the settlement within eighteen (18) months, so in the event of substantial opposition and/or a better offer, the Proposed CNA Settlement Agreement might cause delay, but would not permanently bind the Diocese. As a matter of an abundance of caution, the Diocese sent CNA a notice invoking this termination right on December 18, 2023 [Docket No. 2390].

Absent a fully executed Proposed CNA Settlement Agreement, there can be no legally binding contract, and consequently, no claim for breach of contract or anticipatory breach of contract.

ii.  This Court has not approved the Proposed CNA Settlement Agreement.

The Proposed CNA Settlement Agreement provides that it "shall be effective on the Settlement Agreement Effective Date." Proposed CNA Settlement Agreement, § 8.21. Several specific events were required to occur in order to trigger the Settlement Agreement Effective Date, including entry of a final order pursuant to Bankruptcy Rule 9019 approving the Proposed CNA Settlement Agreement. *See id.* at § 1.1.41.

Court approval of the Proposed CNA Settlement Agreement is a specific condition precedent that was required to occur before any duty to perform arose. The condition precedent must occur in order for the Proposed CNA Settlement Agreement to be enforceable. CNA does not allege in its Complaint that a final order was ever entered pursuant to Rule 9019 approving the

14

Proposed CNA Settlement Agreement. As this Court is aware, no decision has been made on the Settlement Approval Motion. As such, this condition precedent has not occurred, and CNA cannot bind the Diocese to the Proposed CNA Settlement Agreement prior to its occurrence. *Bedoya*, 186 A.D.3d at 1309 (2d Dep't 2020); *see also Oppenheimer*, 86 N.Y.2d at 690 (2d Dep't 1995).

iii. <u>No plan of reorganization to implement the Proposed CNA Settlement Agreement has been confirmed and no post-confirmation trust has been formed.</u>

The Proposed CNA Settlement Agreement required as a condition precedent, entry of a final order confirming a plan of reorganization that is consistent with the Proposed CNA Settlement Agreement and the creation of a post-confirmation trust. Proposed CNA Settlement Agreement, §§ 1.1.41 & 8.21. No such plan has been confirmed. Without the occurrence of a condition precedent, no contract is formed. *See Oppenheimer* 86 N.Y.2d 685 at 690. Based upon the December 19 hearing, even if the proposed agreement is a binding contract, the Diocese's December 18, 2023 termination notice will take effect before this condition to the Proposed CNA Settlement Agreement could occur given the Court's guidance that a confirmation hearing will not be held before late April 2024.

No post-confirmation trust has been formed, which is an additional condition precedent to the effectiveness of the Proposed CNA Settlement Agreement. As a result of numerous outstanding conditions precedent, CNA's breach of contract and anticipatory breach of contract claims fail as a matter of New York state law. *Id.*

d. <u>The Bankruptcy Code requires approval of the Proposed CNA Settlement Agreement in order to enforce it.</u>

CNA contends that the Proposed CNA Settlement Agreement is enforceable against the DOR Entities despite not having received Court approval pursuant to Bankruptcy Rule 9019 of the settlement. "[T]he overwhelming majority of courts to interpret Rule 9019(a) have determined

that a compromise or settlement is enforceable only if it has been approved by the bankruptcy court. *See, e.g., Am. Prairie Constr. Co. v. Hoich*, 594 F.3d 1015, 1024 (8th Cir. 2010) ("It is a recognized principle of bankruptcy law that a bankruptcy court is required to approve any compromise or settlement proposed in the course of a Chapter 11 reorganization before such compromise or settlement can be deemed effective."); *see also In re Iridium Operating LLC*, 478 F.3d 452, 455 (2d. Cir. 2007) ("Before pre-plan settlements can take effect, however, they must be approved by the bankruptcy court pursuant to Bankruptcy Rule 9019.").

A settlement cannot bind a debtor-in-possession absent court approval. The application of that rule to the facts of this matter yields the same result – the DOR Entities cannot be bound to the Proposed CNA Settlement Agreement. Despite the lack of Court approval of the Proposed CNA Settlement Agreement, CNA suggests that the *Manuel Mediaville*[3] case provides a basis in case law for enforcing the settlement against the DOR Entities. *See* Complaint, ¶ 40.

The facts in the *Manuel Mediaville* case are distinguishable from the situation with CNA and the DOR Entities. Following extended negotiations, the debtors in *Manuel Mediaville* fully executed a comprehensive settlement agreement with PRLP 2011 Holdings LLP ("PRLP"), a secured creditor holding a promissory note, secured by, among other things, mortgages on most of the debtors' real properties, and assignments of rental proceeds from the commercial real estate. *Manuel Mediaville*, 568 B.R. at 561-62. The debtors then failed to seek court approval of the settlement. *Id.* at 563. PRLP subsequently filed a motion to enforce the settlement agreement with the debtors. *Id.* at 565. The BAP analyzed the settlement agreement pursuant to Puerto Rico law to determine whether or not a contract was formed prior to analyzing whether the lack of bankruptcy court approval pursuant to Bankruptcy Rule 9019 rendered the contract unenforceable.

---

[3] *See PRLP 2011 Holdings, LLC v. Manuel Mediaville, Inc. (In re Manuel Mediaaville, Inc.)*, 568 B.R. 551, 573 (B.A.P. 1st Cir. 2017) (per curiam).

16879230.11

In *Manuel Mediaville*, the court reached the conclusion that an executed agreement to settle and present the settlement to the bankruptcy court constituted a binding contract under Puerto Rico law and the fight was over whether that binding agreement required the debtors to present it to the court for approval. The court found the debtors' conduct to be disingenuous.

> Although arguing that "the entire negotiations were subject to final essential complimentary documents," they stated that "the transaction had to be stayed and reviewed under the new circumstances of the [December 30, 2015 Decision]." In this response, the Debtors essentially admitted to breaching their obligation to submit the Settlement Agreement to the bankruptcy court and request its approval.

*Id.* at 571. This is directly distinguishable from the situation with the Proposed CNA Settlement Agreement.

Here, as was analyzed and discussed extensively above, for numerous reasons, the Proposed CNA Settlement Agreement is not an enforceable contract under New York state law because the agreement was never executed and the failure of numerous conditions precedent. Accordingly, while Court approval would be required in order to make the Proposed CNA Settlement Agreement enforceable, in the absence of such approval, there is nothing to enforce. Moreover, if the Diocese could be said to have any obligations under the Proposed CNA Settlement Agreement prior to Court approval, those would extend only to preparing and filing the Settlement Approval Motion, which the Diocese has already done.

Other diocesan cases have recently determined that there is no breach of contract and consequently no administrative claim where a proposed settlement agreement is not approved by the bankruptcy court. In the *Diocese of Rockville Centre* bankruptcy case, Chief Judge Glenn was clear about his view on a potential administrative claim:

> THE COURT: If the insurers think they're going to get an administrative claim, because you've reached a settlement that isn't approved by the Court, forget it.

17

…

THE COURT: I'm just telling you, if this case survives, and there's a settlement that comes on for approval, and it's not approved, you're not getting into[sic] approved. No one should have the expectation, no insurer should have an expectation, because you've negotiated an agreement with the Diocese, that is later rejected by this Court, that you're sometime, somehow, going to have an administrative claim. Get it clear, it's not going to happen.

[INSURER COUNSEL]: I understand, Your Honor. My point on what was said about Camden and Rochester, it wasn't the settlement agreement the Diocese entering into a settlement agreement that caused an admin claim; it was the Diocese'[s] later conduct in repudiating the settlement agreements that caused –

THE COURT: There isn't going to be a repudiation of an agreement that isn't approved by the Court. You understand that clearly?

*In re The Roman Catholic Diocese of Rockville Centre*, Case No. 20-12345 (S.D.N.Y.), Sept, 26 Hearing Transcript, at page 28 2-5; 10-25, p. 29 1-2. Because the Proposed CNA Settlement Agreement has never been approved, the Court should grant the Diocese's Motion to Dismiss. Further, in the Camden Bankruptcy, Judge Poslusny expressed skepticism that the insurers could prevail in establishing that the appropriate measure of damages for their administrative claim was the difference between their $30 million proposed settlement and any higher amount that they are ultimately forced to pay, noting specifically that the proposed settlement the insurers relied upon to suggest that their liability should be capped had been denied. *See In re Diocese of Camden, New Jersey*, 653 B.R. 309, 345 (Bankr. D. N.J. 2023).

    e.   <u>Even if the Diocese is bound by the Proposed CNA Settlement Agreement, CNA cannot establish that a breach has occurred or that CNA has suffered any damages.</u>

Assuming, *arguendo*, that CNA was able to establish that the Proposed CNA Settlement Agreement is a binding contract, CNA has failed to prove a breach, or that it has suffered damages, both of which are required elements for the establishment of a breach of contract claims. *See 34-*

*06 73, LLC v. Seneca Ins.*, 39 N.Y.3d 44, 52 (2022). While CNA complains that the Diocese's entry into the RSA and pursuit of the Joint Plan is inconsistent with the Proposed CNA Settlement Agreement, the plain truth is that nothing in the Proposed CNA Settlement Agreement prohibits the actions undertaken by the Diocese with respect to the RSA and Joint Plan. Accordingly, the Diocese is not, by entering into the RSA or filing the Joint Plan, in breach of any obligation under the Proposed CNA Settlement Agreement. Additionally, the damages alleged by CNA are speculative and would arise, if at all, only upon the occurrence of an event (court approval of the Proposed CNA Settlement Agreement) that may never happen.

Further, the termination provision within the Proposed CNA Settlement Agreement provides the appropriate remedy for CNA, the termination of the agreement, with all parties rights being restored to status quo as if the Proposed CNA Settlement Agreement never existed.

Section 5.2 of the Proposed CNA Settlement Agreement specifically provides either CNA or the Diocese the right to terminate the agreement if, among other things, "a plan that is inconsistent with the terms of this Settlement Agreement is confirmed." Proposed CNA Settlement Agreement, § 5.2. Section 5.3 of the Proposed CNA Settlement Agreement specifies that unless the parties otherwise agree, "all Parties shall retain all of their Interests, rights, and obligations relating to the Diocese Policies **as if this Agreement never existed**." Proposed CNA Settlement Agreement, § 5.3 (emphasis added). These two sections, when read together, indicate that the DOR Entities and CNA anticipated the possibility that a non-conforming plan might be proposed, filed, and confirmed. Proposed CNA Settlement Agreement, §§ 5.2 - 5.3. The parties specifically negotiated a remedy for such an event, which is the termination of the Proposed CNA Settlement Agreement pursuant to section 5.2, and the retention of all parties' rights related to the various insurance policies, as though the Proposed CNA Settlement Agreement never existed. In plain

terms, the Diocese's entry into the RSA and filing of the Joint Plan, even if it is a non-conforming plan, is not prohibited by the Proposed CNA Settlement Agreement, and the Proposed CNA Settlement Agreement provides CNA with an appropriate remedy if such a plan is confirmed. The confirmation of a non-conforming plan provides CNA or the Diocese with a right of termination, which, when exercised, restores both the Diocese and CNA to their legal position prior to the negotiation of the Proposed CNA Settlement Agreement.

The Diocese has complied with the Proposed CNA Settlement Agreement to the extent it could, pre-Court approval. For example, the Diocese filed the Settlement Approval Motion, seeking approval of the Proposed CNA Settlement Agreement pursuant to Bankruptcy Rule 9019. That approval has not yet occurred, but could in theory occur in the future, when and if the Court determines that the Proposed CNA Settlement Agreement is in the best interest of the Diocese and its estate. The Diocese respectfully submits that even if the Proposed CNA Settlement Agreement is binding, in the absence of Court approval, no duties exist under the Proposed CNA Settlement Agreement where performance is currently due by the Diocese. Consequently, CNA has suffered no damages because the Diocese has not failed to perform under the Proposed CNA Settlement Agreement, and therefore no breach has occurred.

CNA has alleged that it has "and will continue to suffer damages for sums it is forced to pay above and beyond the Settlement Amount." Complaint, ¶ 59. To the extent that CNA seeks damages under this theory, the damages are reliant upon the speculative assumption that the Proposed CNA Settlement Agreement will be approved over the objections of numerous parties and that the plan contemplated thereby will be confirmed. CNA does not plead, and cannot prove, that the Proposed CNA Settlement Agreement, has been or will be approved by the Court. These damages are speculative to a degree beyond computation and are sought based upon the false

20

premise that the Diocese has breached an alleged settlement that has not even been approved by this Court. Such damages are too speculative to be attributed to the Diocese, and without the presence of provable damages, CNA's claims for breach of contract and anticipatory breach of contract fail as a matter of law.

## II. The Court Should Sustain the Diocese's Administrative Claim Objection.

Through its Administrative Expense Application, CNA assumes, without providing evidence or legal analysis, that the Proposed CNA Settlement Agreement is an enforceable, legally binding contract, and that the Diocese breached that contract. As discussed above at length, New York law is clear that the Proposed CNA Settlement Agreement is not a contract. Without an enforceable contract, CNA cannot claim damages for breach of contract or anticipatory breach of contract to support its request. Further, even if the Proposed CNA Settlement Agreement is an enforceable contract, CNA has not satisfied its legal or evidentiary burden to establish that it is entitled to an administrative claim in the Chapter 11 Case.

### a. Applicable legal standard for allowance of an administrative claim.

Section 507(a) of the Bankruptcy Code sets forth a priority scheme for expenses and claims against a debtor's estate and provides: "(a) [t]he following expenses and claims have priority in the following order: (2) Second, administrative expenses allowed under 503(b) of this title . . . and any fees and charges assessed against the estate under chapter 123 of title 28." 11 U.S.C. § 507(a). Section 503 provides that "[a]n entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause." 11 U.S.C. § 503(a). Further, it provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including (1)(A) the actual, necessary costs of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A).

Courts have determined that in order "[f]or a claim in its entirety to be entitled to first priority under [§ 503(b)(1)(A)], the debt must arise from a transaction with the debtor-in-possession . . . . [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business." *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532-33 (3d Cir. 1999) (quoting *Cramer v. Mammoth Mart, Inc., (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976)). "Only expenditures which clearly benefit the estate will be afforded administrative expense status." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 482, 487 (Bankr. S.D.N.Y. 1991) (quoting *Trs. Amalgamated Ins. Fund v. McFarlin's*, 789 F.2d 98, 101 (2d Cir.1986)). A debtor's bankruptcy estate must actually receive a benefit, rather than a potential benefit. *In re Carmichael*, 109 B.R. 849, 851 (Bankr. N.D. Ill. 1990). "Strictly construing the terms 'actual' and 'necessary' minimizes administrative expense claims thereby preserving the estate to benefit all creditors. *In re Enron Corp.*, 279 B.R. 79, 85 (Bankr. S.D.N.Y. 2002) (quoting *Drexel Burnham*, 134 B.R. at 488). Accordingly, "statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed." *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 54 (Bankr. S.D.N.Y. 2004); *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998) ("Because the priority elevates the payment of the administrative claim to the detriment of the unsecured creditors, the language of section 503(b)(1)(A) must be narrowly construed to promote the bankruptcy goal of equality of distribution.") (citations omitted).

When seeking allowance of an administrative claim, "the party claiming entitlement to administrative expense priority has the burden of proof." *In re Mid Region Petroleum, Inc.*, 1 F.3d 1130, 1132 (10th Cir. 1993). The burden of proof for "an administrative expense is on the claimant and the standard of proof is a preponderance of the evidence." *In re Englewood Cmty. Hosp. Corp.*,

22

16879230.11
Case 2-23-02014-PRW, Doc 9, Filed 12/22/23, Entered 12/22/23 14:35:05,
Description: Main Document , Page 28 of 32

117 B.R. 352, 358 (Bankr. N.D. Ill. 1990) (citing *In re Sinclair*, 92 B.R. 787, 788, 20 C.B.C.2d 54

(Bankr. S.D. Ill. 1988)).  In order to satisfy this burden, a movant needs to provide that the fact is

more likely true than not true.  *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).

> **b.** <u>CNA is not entitled to an administrative expense because it has not conferred a benefit on the Diocese's estate.</u>

Through the Administrative Expense Application, CNA has improperly sought to recover

costs of litigation in this Chapter 11 Case, as well as any amounts it is later ordered to pay above

$63.5 million as a result of liability under its insurance policies as an administrative expense of

the Diocese's estate.  CNA alleges that it has made a substantial contribution to this Chapter 11

Case but the fact is that CNA has not paid any settlement proceeds or done anything else to confer

a benefit on the estate.

In order to be entitled to administrative treatment, CNA must show, by a preponderance of

the evidence, that it has a claim that not only arose from a transaction with the Diocese, but also

that CNA's claim for payment has actually (not speculatively) benefited the Diocese's bankruptcy

estate.  *See Englewood Cmty. Hosp.*, 117 B.R. at 358; *see Drexel Burnham*, 134 B.R. at 487.  CNA

attempts to do so through the Diocese's own words in the Settlement Approval Motion.  *See*

Administrative Expense Application; ¶ 43 ("The transaction not only arose as part of the Debtors'

postpetition operations, but was also designed to benefit the estate by – in the Debtor's own words

– 'provid[ing] a concrete financial benefit to the estate,' 'eliman[ing] (sic) the underlying

uncertainty of litigation,' and 'avoiding the expenditure of estate resources on expensive and time-

consuming coverage litigation' . . . .").  Only three (3) days after the filing of the Settlement

Approval Motion, the Court cast the possibility of any future approval into significant doubt by

issuing the May 23 Decision.  The Court's conclusion that the Diocese was not likely to complete

a successful reorganization signaled a change in circumstances and required consideration of an

alternative chapter 11 exit strategy for the Diocese. Both the May 23 Decision and the Committee's steadfast opposition of the Proposed CNA Settlement Agreement, together, meant that the Diocese needed to pursue alternative strategies for moving this Chapter 11 Case forward, including, pursuit of a deal with the Committee.

Ultimately, the Proposed CNA Settlement Agreement has not benefitted the Diocese, or its estate, because it is opposed by the Committee, has not been approved by the Court, and has not resulted in any settlement payments from CNA. In the alternative, the Diocese pursued a deal with the Committee which is embodied in the Joint Plan and has the approval of all constituents other than CNA. As was stated in the *Carmichael* case, a debtor's bankruptcy estate "must accrue a real benefit from the transaction, as opposed to mere potential benefit." *Carmichael*, 109 B.R. at 851 (Bankr. N.D. Ill. 1990). Speculative future benefits are also insufficient for a party to be entitled to an administrative expense. *See Enron*, 279 B.R. at 86 ("[A] speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority.") (citations omitted).

The Diocese respectfully submits that CNA has not satisfied its burden to show the Court that it is more likely than not that CNA has provided a real and actual benefit to the Diocese's estate, such that it is entitled to an administrative claim. The Diocese respectfully submits that CNA has not sustained its burden to show it has made a substantial contribution to the Diocese's Chapter 11 Case and is therefore not entitled to an administrative expense. The Court should deny the Administrative Expense Application.

16879230.11

c. <u>CNA is not entitled to an administrative expense because the Diocese's conduct has not harmed CNA.</u>

CNA also asserts that it is entitled to an administrative expense pursuant to the holding of the Supreme Court in *Reading*, a Bankruptcy Act case, which held that certain tort claims arising during an arrangement with a debtor would be treated as actual and necessary expenses of a debtor estate, entitled to priority treatment. *See Reading v. Brown*, 391 U.S. 471, 483 (1968).

CNA further relies upon the *Theatre Row* case to support the proposition that it is entitled to an administrative expense claim, even if it failed to make a contribution to the Diocese's estate, if a postpetition tort or contractual claim against the debtor existed. *See* Administrative Expense Application, ¶¶ 45-46. But the logic of *Reading* and *Theatre Row* only applies if CNA can establish that it had a binding postpetition contract with the Diocese, which, as shown above, it cannot.

Moreover, the facts of *Theatre Row* are particularly instructive here. As CNA correctly points out, in the *Theatre Row* case, the court ultimately denied the motion for an administrative expense claim on the grounds that no contract existed between the parties under New York law. *See In re Theatre Row Phase II Assocs.*, 385 B.R. 511, 524-25 (Bankr. S.D.N.Y. 2008); *see* Administrative Expense Application, ¶ 46. The *Theatre Row* case held that "a chapter 11 debtor cannot enter into a binding contract to sell its sole asset without approval from the bankruptcy court." *Theatre Row*, 385 B.R. 522. In so holding, the court recognized that even under *Reading*, an "allowable claim for an expense of administration must have a satisfactory basis in law other than Code § 503(a)(1), such as contract or tort, as well as factual validity." *See id.* at 521. Similar to the facts in *Theatre Row*, here, as set forth above, the settlement proposal between the Diocese and CNA never became a binding contract. Therefore, CNA's reliance on the *Theatre Row* case is wholly unhelpful to its claim that it is entitled to an administrative expense claim. In light of

16879230.11
Case 2-23-02014-PRW, Doc 9, Filed 12/22/23, Entered 12/22/23 14:35:05, Description: Main Document , Page 31 of 32

the foregoing, the Diocese respectfully submits that CNA did not meet its burden that it is entitled to an administrative expense claim. As a result, the Court should deny CNA's Administrative Expense Application.

## **CONCLUSION**

CNA's Complaint fails to state a cause of action upon which relief can be granted because, in part, no contract was ever formed between the DOR Entities and CNA. In addition, through the Administrative Expense Application, CNA fails to meet its evidentiary burden that it is entitled to an administrative priority claim. Accordingly, the Diocese respectfully submits that the Court should grant the Diocese's Motion to Dismiss, and further deny CNA's Administrative Expense Application.

Dated:  December 22, 2023

BOND, SCHOENECK & KING, PLLC

By: */s/ Stephen A. Donato*
Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
Grayson T. Walter, Esq.
Jeffrey D. Eaton, Esq.
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Email:  sdonato@bsk.com
          csullivan@bsk.com
          gwalter@bsk.com
          jeaton@bsk.com

*Attorneys for The Diocese of Rochester*

26