**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE DIOCESE OF ROCHESTER,[1]<br><br>                      Debtor. | Chapter 11<br><br>Case No. 19-20905 |
| THE CONTINENTAL INSURANCE COMPANY, successor by merger to Commercial Insurance Company of Newark, New Jersey, and Firemen's Insurance Company of Newark, New Jersey,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE DIOCESE OF ROCHESTER,<br><br>                    Defendant. | Adv. Proc. No. 23-ap-2014 |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
CONSOLIDATED MOTION TO DISMISS THE COMPLAINT IN
ADVERSARY PROCEEDING NUMBER 23-AP-2014 AND
TO DENY CONTINENTAL INSURANCE COMPANY'S
APPLICATION FOR ALLOWANCE AND PAYMENT OF
ADMINISTRATIVE EXPENSE PRIORITY CLAIMS FOR
DEBTOR'S BREACH OF CONTINENTAL SETTLEMENT AGREEMENT**

---

[1]     The last four digits of Debtor Diocese of Rochester's tax identification number are 5765.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................... 5

ARGUMENT ........................................................................................................ 9

I.   The Damages That CNA Seeks Are Not Actual Or  Necessary Costs And Expenses Of Preserving The Estate ........................................................................... 11

     A.   CNA's Costs And Expenses In Sexual Abuse Claim  Litigation Are Not "Actual" And Cannot Be Estimated.................................................................... 11

     B.   CNA's Costs of Sexual Abuse Claim Litigation Cannot Be Estimated ............................ 13

II.  CNA Has No Claim For Breach Or Damages From Breach Because The Diocese Can Terminate The CNA Settlement Agreement  On Confirmation Of An Inconsistent Plan .... 13

III. The Second Settlement Motion should Not Be Granted Based On The Diocese's .............. Inherent "Fiduciary Out" ................................................................................... 16

JOINDER AND RESERVATION OF RIGHTS ..................................................... 19

CONCLUSION..................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Achtman v. Kirby, McInerney & Squire, LLP*
464 F.3d 328, 337 (2d Cir. 2006)..................................................................... 9

*Ashcroft v. Iqbal*
556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)......................... 8

*Bell Atl. Corp. v. Twombly*
550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)......................... 9

*Burrell v. Sowers*
No. 22-2687, 2023 U.S. App. LEXIS 29629, at *2 (2d Cir. Nov. 7, 2023) ......... 14

*In re Adelphia Communications Corp.*
336 B.R. 610, 669–71 (Bankr. S.D.N.Y. 2006)............................................... 17

*In re Amfesco Indus., Inc.*
81 B.R. 777, 785 (Bankr. E.D.N.Y. 1988)...................................................... 10

*In re Atcall, Inc.*
284 B.R. 791 (Bankr. E.D. Va. 2002)............................................................. 13

*In re Club Dev. & Mgmt. Corp.*
27 B.R. 610, 612 (Bankr. App. 9th Cir. 1982)) .............................................. 11

*In re Diocese of Camden, New Jersey*
653 B.R. 309, 347 (Bankr. D.N.J. 2023) ........................................................ 16

*In re Ditech Holding Corp.*
19-10412 (JLG), 2023 Bankr. LEXIS 2418 (Bankr. S.D.N.Y. Sept. 29, 2023) ........ 9, 10

*In re Drexel Burnham Lambert Grp.*
134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991)..................................................... 10

*In re Innkeepers USA Tr.*
442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010)................................................ 16, 17

*In re Patch Graphics*
58 B.R. 743, 745 (Bankr. W.D. Wis. 1986)................................................ 10, 11

*In re United Trucking Serv.*
851 F.2d 159, 161 (6th Cir. 1988) ................................................................. 10

*JA Apparel Corp. v. Abboud*
568 F.3d 390, 396 (2d Cir. 2009).................................................................. 14

*Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*
595 F.3d 458, 467 (2d Cir. 2010)................................................................... 14

*Liberty Towers Realty, LLC v. Richmond Liberty, LLC*
569 B.R. 534, 539 n.3 (E.D.N.Y. 2017) ......................................................... 18

*Lion Bee Equities LLC v. Citibank N.A.,*
No. 652033/2016, 2018 N.Y. Misc. LEXIS 3176, (Sup. Ct. N.Y. County Mar. 26, 2018)...... 16

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*
830 F.3d 152, 157 (2d Cir. 2016)................................................................... 14

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*
627 B.R. 546, 554 (Bankr. S.D.N.Y. 2021).................................................... 9

*Route 21 Assocs. of Belleville v. MHC, Inc.*
486 B.R. 75, 93 (S.D.N.Y. 2012).................................................................. 12

*S. Cherry St., LLC v. Hennessee Grp. LLC*
  573 F.3d 98, 104 (2d Cir. 2009)....................................................................... 8
*Smith v. Local 819 I.B.T. Pension Plan*
  291 F.3d 236, 240 (2d Cir. 2002)...................................................................... 9
*TAG 380, LLC v. ComMet 380, Inc.*
  10 N.Y.3d 507, 512–13, 860 N.Y.S.2d 433, 436, 890 N.E.2d 195, 198 (2008)...................... 14
*U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*
  38 N.Y.3d 169, 178, 171 N.Y.S.3d 403, 408, 191 N.E.3d 355, 360 (2022).......................... 14
*United States v. Sterling Consulting Corp. (In re Indian Motocycle Co.)*
  261 B.R. 800, 809–10 (B.A.P. 1st Cir. 2001) .......................................................... 13
*Vermont Teddy Bear Co. v 538 Madison Realty Co.*
  1 N.Y.3d 470, 475, 807 N.E.2d 876, 775 (2004)) ................................................... 14
*W.W.W. Assocs. v. Giancontieri*
  77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990)........................... 14
*Zurich Am. Ins. Co. v. Lexington Coal Co. (In re HNRC Dissolution Co.)*, 371 B.R. 210, 224
  (E.D. Ky. 2007), *aff'd*, 2008 U.S. App. LEXIS 17162 (6th Cir. 2008)................. 10, 11, 12, 13

**Statutes**
11 U.S.C. § 502(c) ......................................................................................... 13
11 U.S.C. § 502(e)(1)(B) ................................................................................. 12
11 U.S.C. § 503(b)(1)(A) .............................................................................. 9, 10
Fed. R. Bank. P. 7012.................................................................................... 8
Fed. R. Civ. P. 12(b)(6).................................................................................. 8

**Other Authorities**
2 Moore's Federal Practice, § 12.34 (Matthew Bender 3d ed.)..................................... 9

The Official Committee of Unsecured Creditors (the "**Committee**") of The Diocese of Rochester (the "**Debtor**" or "**Diocese**"), by and through its undersigned counsel, pursuant to the *Stipulation and Order Regarding Scheduling of Various Matters* [the "**Scheduling Order**," Docket No. 2280] hereby submits its consolidated motions (the "**Administrative Treatment Objection**"):[2] (i) to dismiss the Complaint in Adversary Proceeding number 23-ap-2014 (the "**Administrative Treatment Complaint**") and (ii) to disallow Continental Insurance Company's *Application for Allowance and Payment of Administrative Expense Priority Claims for Debtor's Breach of Continental Settlement Agreement* [Docket No. 2314] (the "**Administrative Treatment Application**").[3] In support of its Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. On May 27, 2021, the Court denied the Diocese's attempt to enter into a low-value settlement with two of its insurers.[4] Rather than try to negotiate an appropriate and fair settlement with survivors, the Diocese tried again to force an unfair, unacceptable resolution of its chapter 11 case, entering into new purported settlement agreements with four insurers, including the Continental Insurance Company (**"Continental"** or **"CNA"**). These settlements sought to settle their liability for the claims of survivors who filed a sexual abuse claim against the Diocese ("**Survivors**") by selling their policies of insurance back to the Diocese for fixed

---

[2]      The Scheduling Order provides for the making of motions for dismissal/denial "as a matter of law." The Committee reserves all objections or responses to the Administrative Complaint or the Administrative Treatment Application with respect to any matters of fact, mixed questions of fact or law, or matters arising from any change of circumstances before trial of the Administrative Complaint or hearing of the Administrative Treatment Application.

[3]      Capitalized terms used in this Motion, not otherwise defined, are as defined in the Administrative Treatment Complaint or Administrative Treatment Application.

[4]      *Order Denying Motion to Compromise, Without Prejudice and Directing Parties to Resume Mediation* [Docket No. 1213] (the "**Denial Decision**"). Notably, the Joint Plan (as defined below) incorporates a settlement that is more than double the settlement amount proposed in the motion at issue in the Denial Decision.

sums significantly below their anticipatable liability on account of the claims of the Survivors.[5] The Survivors, whom the Diocese and the insurers, including CNA, deemed irrelevant to the settlements, not surprisingly fought back against the settlements because of their complete inadequacy in addressing the value of the Survivors' abuse claims.

2. CNA is the insurer with the greatest exposure to Survivors' claims. CNA has fought to evade its liability and delay its day of reckoning by every means possible by, among other things, wholesale denying approximately 270 claims alleging abuse during its policy period, negotiating an inadequate settlement with the Diocese in the hope that a court will enforce it over the objection of creditors, filing a chapter 11 plan to try to foist its settlement terms on Survivors, and engendering costly and expensive motion practice and adversary proceedings in this matter. The amount set out in the (proposed, unsigned, and unacceptable) settlement agreement [Docket No. 2313] (the "**CNA Settlement Agreement**") — again, without consultation or input from the Survivors — was $63.5 million.[6]

3. The Diocese and the other settling insurers recognized the reality of the inadequacy of their settlements and entered into new settlement agreements, significantly increasing the amounts to be paid by those insurers. CNA did not. As a result, the Diocese — now jointly with the Committee — has filed a plan of reorganization that includes the new insurer settlement amounts but provides a litigation option against CNA for certain Survivors.

4. CNA claims that the supersession of the CNA Settlement Agreement constitutes a breach of that agreement and filed the Administrative Treatment Proceeding and the

---

[5]   *See Motion to Approve Proposed Insurance Settlements to Fund Survivor Compensation Trust* [Adversary No. 19-ap-2021, Docket No. 190 (filed on May 20, 2022); Main Case Docket No. 1538 (filed on June 23, 2022)] (the "**Second Settlement Motion**").

[6]   The other insurers contributions were to be: LMI, $16.7 million, Underwriters $1.1 million, Interstate, $26 million, for a total of $43.8 million. Docket No. 1538 at 4.

Case 2-23-02014-PRW,   Doc 10,   Filed 12/22/23,   Entered 12/22/23 19:25:24,
Description: Main Document  , Page 6 of 24

Administrative Treatment Application, and it is now attempting to assert an administrative expense claim (the "**Proposed Administrative Expense Claim**") against the Diocese for alleged damages from this purported breach of the CNA Settlement Agreement. But the Proposed Administrative Expense Claim fails as a matter of law.

5. First, the bulk of the damages that CNA seeks by way of the Proposed Administrative Claim are not cognizable, and cannot be granted or even estimated, as a matter of law.

    a. In the first instance, costs incurred after confirmation are not cognizable as administrative expenses; administrative expense claims are for expenses for the benefit of the estate, and, after confirmation, there is no estate.

    b. Next, even if post-confirmation expenses could be considered in an administrative claim, there is no statutory basis to estimate contingent administrative claims. Moreover, CNA's costs of litigation and payment of judgments or settlements of claims for which it may be responsible are not capable of estimation because there is no way to know how many claims would be litigated and how much it would cost to litigate them if the Joint Plan is confirmed, much less the amounts of any potential settlements or judgments.

    c. Finally, any assertion by CNA that it would owe anything with respect to its coverage of the Sexual Abuse Claims incurred post-confirmation of the Joint Plan contradicts CNA's assertion that it has no, or very limited, liability to cover the Sexual Abuse Claims based on CNA's supposed strong coverage and liability defenses — indeed, it does not even accept that it issued policies to the Diocese. *See CNA Disclosure Reply*, Docket No. 2375, at 24 (explaining why CNA

Case 2-23-02014-PRW, Doc 10, Filed 12/22/23, Entered 12/22/23 19:25:24, Description: Main Document , Page 7 of 24

believes it has no liability). CNA cannot say to this or other courts that there is no coverage and it has no liability, and yet within the confines of the Administrative Claim Proceeding say that it faces post-confirmation contingent liability in excess of $63.5 million. Indeed, if it does, then CNA itself is making the Committee's point that the CNA Settlement Agreement amount is an improper compromise of CNA's liability.

6. Second, the Diocese has given notice of termination of the CNA Settlement Agreement based on the passage of time since it filed the motion to approve the proposed insurance settlements. *See* Diocese Letter dated December 18, 2023 [Docket No. 2390] (giving notice of termination based on the passage of more than eighteen months since the filing of the Second Settlement Motion on May 20, 2022. If for some reason that notice is ineffective, then, if the Joint Plan (or another plan inconsistent with the CNA Termination Agreement) is confirmed, the Diocese will have the right to terminate the CNA Settlement Agreement under the provision which allows termination in the event a plan that is inconsistent with the settlement is confirmed. CNA Settlement Agreement § 5.2. Notably absent from the termination provision is any requirement that the Diocese *not* be a proponent of the inconsistent plan. That provision thus recognizes that the path to confirmation of a plan is uncertain and subject to all manner of changes that might, as here, render the CNA Settlement Agreement irrelevant or inappropriate, and in that event the parties are free to go their own ways.

7. Third, even if the CNA Settlement Agreement could not be terminated by the Diocese, the Diocese's inherent right to seek a "fiduciary out" should be recognized by denial of the Second Settlement Motion or in such other context as may be appropriate. A debtor is obligated to act in the best interest of its creditors and cannot accede to a settlement that is not

appropriate or that has been surpassed by a better arrangement. As set out in the Committee's Objection, the Second Settlement Motion should be denied because the settlement agreements that are the collective subject of the Second Settlement Motion, including the CNA Settlement Agreement, were unreasonable, and were not a supportable exercise of the Debtor's business judgment. Additionally, as the Debtor sought approval of the settlements as a package, the proposed collective settlement constituted a *sub rosa* plan that could not be approved through the Second Settlement Motion. In addition, the Second Settlement Motion was made collectively with respect to all four settlement agreements, and the supersession of three of the agreements mandates its denial. Finally, the new settlements with the insurers provide a significant improvement to the proposed settlements, such that the Second Settlement Motion should be denied in favor of the new settlements.

8. For all these reasons, there is no basis for any allowance of an Administrative Claim. The Administrative Treatment Complaint should be dismissed, and the Administrative Treatment Application denied, as a matter of law.

### **BACKGROUND**

9. Over a year ago, the Diocese negotiated settlement agreements with its principal insurers — LMI, Underwriters, Interstate and Continental — and filed the Second Settlement Motion seeking approval of those proposed settlements. The Committee was not a party to the negotiations of the proposed settlements and, based on its analysis of the underlying claims and coverage available, the Committee determined the proposed settlement was wholly inadequate and filed an objection to the Insurance Settlement Motion.[7]

---

[7] Individual survivors joined in the Committee's objection [Docket Nos. 1559, 1561, 1564, and 1569].

10.     Predictably, the Committee (joined by certain individual Survivors) objected when the Diocese and the insurers, including CNA, sought collective approval of the insurance settlement agreements, as a single proposed settlement, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). *See* Second Settlement Motion at 1–2; and Committee objection [Docket No. 1555] ("**Committee Objection**").

11.     The Committee's Objection to the settlement made three main points:

a.  The settlements constituted a *sub rosa* plan.

b.  The settlements were unreasonably small in light of the insurers' high liability and low likelihood of success on their asserted defenses to coverage.

c.  The Debtor had not properly exercised its business judgment, as a fiduciary to creditors including the Survivors, in entering into the inadequate settlements.

12.     The Committee in its Objection made it clear that the Committee on behalf of the Survivors could not support the proposed settlement.  As such, the Committee argued that the settlements should not be approved, and any plan based on the settlements could not be confirmed.

13.     Given the Committee's staunch opposition to the settlements, the Debtor and the insurers went back to the negotiating table.  Three of the insurers, LMI, Certain Underwrites of Lloyds, and Interstate Fire & Casualty, entered into new settlement agreements that increased the amount of their payments by $27.6 million (to a total of  $71.4 million), an amount consistent with the Diocese's fiduciary obligations and that the Committee representing the interests of the Survivors could find acceptable.[8]

---

[8]     A fourth insurer, First State, who was not included in the earlier settlement, also agreed to settle for $750,000.

14.     The Debtor, as a fiduciary to the Estate, properly exercising its business judgment, determined to move forward with the new settlements and propose a plan that would be supported by the Committee and would result in a near-term exit from Chapter 11 with a funded settlement trust that would permit initial payments to be provided to the Survivors. Pursuit of a plan supported by the Committee, and so likely to be accepted by an overwhelming majority of the Survivors, is in the best interests of the Debtor. Choosing a path to a largely consensual resolution and a confirmable plan was in the best interests of the estate when compared to the prospect of a contested and unconfirmable plan — indeed, the wisdom of the Debtor's change in approach is evidenced by the significant increase in the settlements with the insurers other than CNA and the resulting benefit to the Estate.

15.     As a result, the plan of reorganization [Docket No. 2217, as it may be amended] (the "**Joint Plan**") proposed by the Debtor jointly with the Committee incorporates the other insurers' settlement amounts in a proposed trust for the benefit of Survivors. However, the Joint Plan proposes a mechanism for the litigation of claims subject to coverage under policies issued by CNA. This litigation option will allow Survivors to reduce their claims to judgments enforceable against CNA or, alternatively, for a trust established for the benefit of survivors to negotiate a global settlement with CNA. Under the Joint Plan, CNA may prevail on coverage disputes and underlying claims asserted by Survivors.

16.     On October 3, 2023, CNA proposed its own plan of reorganization (the "**CNA Plan**"), increasing its proposed payment from $63.5 million to $75 million. [Docket No. 2254]. That is roughly a 20% increase, while the total agreed contribution of the other insurers increased by about 63%. In its Plan, CNA also states that it will not enforce its Proposed Administrative Claim if its plan is confirmed.

17.     On November 7, 2023, in accordance with the Agreed Scheduling Order, CNA filed the Administrative Treatment Application and the Administrative Treatment Complaint. CNA, by the Proposed Administrative Claim, seeks its costs of pursuing the administrative claim, its costs in defending "itself against Debtor's liability," and any recovery by Survivors beyond the $63.5 million amount set out in the CNA Settlement Agreement.  Admin. Treatment Compl. at 15.

18.     CNA's disclosure statement threatens creditors — first and foremost the Survivors — with a drastic outcome if they do not vote for the CNA Plan:

> Under the Diocese Plan, by contrast, such [CNA's Administrative] claims must be addressed and, possibly, paid.  Indeed, depending on the ultimate allowed amount of the CNA Administrative Claim, the Diocese may not have the financial ability to pay the CNA Administrative Claim in full, potentially precluding confirmation of the Diocese Plan.

CNA Disclosure Statement at 9 [Docket No. 2247].

19.     The Committee objected to the CNA Disclosure Statement.  Docket No. 2349. CNA has advanced the Administrative Claim as a petulant poison pill, telling the Survivors to vote for CNA's Plan or get nothing.  But, as set out below, CNA faces insurmountable hurdles to allowance of an administrative claim.

## STANDARD OF REVIEW

20.     The Complaint fails to state a claim upon which relief can be granted and must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) (made applicable herein by Fed. R. Bank. P. 7012).  In deciding a motion to dismiss for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6), the Court "assume[es] all 'well-pleaded factual allegations' to be true."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 104 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

"Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). Rather, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

21.     On a motion to dismiss, the issue is not whether the plaintiff will prevail, but whether the plaintiff may present evidence to support the claims. The Court must construe the factual allegations in the complaint liberally in favor of the plaintiff. The complaint must set forth sufficient information for the court to determine whether some recognized legal theory exists to permit relief to the plaintiff. *See Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 554 (Bankr. S.D.N.Y. 2021) (citing 2 Moore's Federal Practice, § 12.34 (Matthew Bender 3d ed.)).

22.     Courts have applied the same standard of review to objections to claims presented as objections as a matter of law rather than on the basis of evidentiary objections. *See In re Ditech Holding Corp.*, 19-10412 (JLG), 2023 Bankr. LEXIS 2418, at *12–13 (Bankr. S.D.N.Y. Sept. 29, 2023).

## ARGUMENT

23.     Section 503(b)(1)(A) of the Bankruptcy Code provides for the allowance of an administrative expense, after notice and a hearing, for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). The claimant bears the burden of showing that a proposed claim is entitled to administrative priority. *See In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2023 Bankr. LEXIS 2175, at *41 (Bankr. S.D.N.Y. Aug. 31, 2023). "Generally, courts determine that claims qualify as administrative priority claims if the

underlying right to payment arose from a post-petition transaction with the debtor's estate and

that the conduct giving rise to the transaction benefitted the estate." *Id.* at \*42. "The burden of

establishing entitlement to priority rests with the claimant and 'should only be granted under

extraordinary circumstances, to wit, when the parties seeking priority have sustained their burden

of demonstrating that their services are actual and necessary to preserve the estate.'" *In re*

*Drexel Burnham Lambert Grp.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991) (quoting *In re*

*Amfesco Indus., Inc.*, 81 B.R. 777, 785 (Bankr. E.D.N.Y. 1988)).

24.     As one bankruptcy court has explained:

> The United States Bankruptcy Code (the "Code") defines administrative expense priority claims as the "*actual, necessary* costs and expenses of *preserving* the estate." 11 U.S.C. § 503(b)(1)(A) (emphasis added). The Code's definition of administrative expenses provides the boundary for the aforementioned distinction between claims of general creditors and administrative expense claims, whereby the latter receive priority over the former. The rationale behind the priority provisions within the Code, at least in the liquidation context, is to facilitate the continued operation (i.e., going concern) of debtors-in-possession "by encouraging third parties to provide those businesses with necessary goods and services" that enable the maximization of value for creditors of the estate upon liquidation. *In re United Trucking Serv.*, 851 F.2d 159, 161 (6th Cir. 1988).

*Zurich Am. Ins. Co. v. Lexington Coal Co. (In re HNRC Dissolution Co.)*, 371 B.R. 210,

224 (E.D. Ky. 2007), *aff'd*, 2008 U.S. App. LEXIS 17162 (6th Cir. 2008). The *Zurich*

*American* court continued: "[B]ecause of the overarching goal to 'keep

administrative expenses at a minimum and thus preserve the estate for the benefit of all

creditors,' it is well-established that 'priority statutes are *strictly construed*.'" *Id.* at 224

(quoting *In re Patch Graphics*, 58 B.R. 743, 745 (Bankr. W.D. Wis. 1986)   (emphasis

added).

# I. THE DAMAGES THAT CNA SEEKS ARE NOT ACTUAL OR NECESSARY COSTS AND EXPENSES OF PRESERVING THE ESTATE

25.     CNA seeks three types of damages as administrative expenses in the ad damnum

clause of the Administrative Treatment Complaint:

> B.  Award damages to Continental, including, but not limited to, reimbursement of Continental's costs and expenses for pursuing this action and defending itself against the Debtor's liability and any action brought by the Trust or other purported beneficiaries of any alleged insurance coverage, and any amounts Continental becomes obligated to pay on account of the Debtor's liability for the Sex Abuse Claims beyond the Continental Settlement Amount.

Admin Treat. Compl. at 12.

## A.      CNA's Costs And Expenses In Sexual Abuse Claim Litigation Are Not "Actual" And Cannot Be Estimated

26.     To qualify for priority treatment as an administrative claim, the costs and

expenses the would-be claimant seeks must be "actual."  That is, they (1) must exist at the time

the claim is made and (2) may not arise after confirmation.  As the *Zurich American* court stated:

> To that effect, the narrow application of § 503(b)(1)(A) is rather unambiguous on its face:  the claimed expense must have been an "actual" cost that is "necessary" to the "preservation" of the estate.  *See In re Patch Graphics*, 58 B.R. at 745 (citing *In re Club Dev. & Mgmt. Corp.*, 27 B.R. 610, 612 (Bankr. App. 9th Cir. 1982)) ("An administrative expense may not be allowed absent a finding that the expense is necessary for preserving the estate.").  It is in this regard that Zurich's claim fails as a simple matter of statutory interpretation on both fronts:  the claimed expenses are not "actual" (i.e., not yet realized) and the payment thereof, when the obligations are realized, cannot act to preserve an estate that no longer exists.  At the moment Zurich's Claim was filed on the bar date for administrative expense claims, the ultimate loss projection for the deductible obligations was entirely speculative by nature and prospective by definition.

*Zurich Am. Ins. Co.*, 371 B.R. at 225.

27.     The bulk of the "costs expenses" — future litigation costs — CNA seeks,

including verdicts and settlements that might be paid by CNA, are not "actual" because they are

"entirely speculative," "prospective," and contingent, and they will only be incurred after a plan is confirmed.

28.     Indeed, the present case is on all fours with *Zurich American*.  In that case, the insurer was seeking administrative expense treatment for deductibles on claims that Zurich might pay post-confirmation.  *Id.* at 220.  "According to Zurich, its claim was filed as a protective measure to ensure payment of administrative expenses incurred by Zurich in the event that the surety bonds and other collateral provided by the Debtors to Zurich to secure the Debtors' payment of insurance deductibles are ultimately dishonored or otherwise fail to cover the prospective deductible obligations."  *Id.*.  CNA's potential future costs of litigation and payment of settlements or judgments (as well as costs of prosecuting the administrative claim itself post-confirmation) are analogous to the speculative and prospective deductibles in *Zurich American*. For the same reason — that they will arise post-confirmation — these expenses cannot be "to preserve" the estate, since there will not be an estate.  *Id.* at 230 n.25.  As such, they cannot be the subject of an administrative expense claim.

29.     Moreover, had CNA brought its claim as a general unsecured claim, it would have been disallowed pursuant to section 502(e)(1)(B) of title 11 of the United States Code (the "**Bankruptcy Code**"), which provides that "the Court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor or has secured the claim of a creditor, to the extent that . . . (B) such claim for reimbursement or contribution is contingent as of the time of allowance of such claim for reimbursement or contribution."  11 U.S.C. § 502(e)(1)(B); *see Route 21 Assocs. of Belleville v. MHC, Inc.*, 486 B.R. 75, 93 (S.D.N.Y. 2012) (affirming the bankruptcy court's disallowance of claim, whether such claim was considered as an administrative expense claim or as a general unsecured claim).  CNA's damages claims based

Case 2-23-02014-PRW,  Doc 10,  Filed 12/22/23,  Entered 12/22/23 19:25:24,
Description: Main Document , Page 16 of 24

on breach of contract amount to claims for indemnification based on its losses beyond the amount it agreed to pay in the settlement agreement. Such damages are classic indemnification claims and must be disallowed as contingent and unliquidated.

**B. CNA's Costs of Sexual Abuse Claim Litigation Cannot Be Estimated**

30. CNA's prospective and speculative future litigation costs and expense claim cannot be saved by estimation, because estimation is not available with respect to administrative claims. While section 502(c) of the Bankruptcy Code allows for estimation of proofs of claim, section 503 of the Bankruptcy Code contains no comparable provision for administrative claims. Estimation is therefore not available for administrative claims. *Zurich Am. Ins. Co.*, 371 B.R. at 234 (citing *In re Atcall, Inc.*, 284 B.R. 791 (Bankr. E.D. Va. 2002) and *United States v. Sterling Consulting Corp. (In re Indian Motocycle Co.)*, 261 B.R. 800, 809–10 (B.A.P. 1st Cir. 2001).

**II. CNA HAS NO CLAIM FOR BREACH OR DAMAGES FROM BREACH BECAUSE THE DIOCESE CAN TERMINATE THE CNA SETTLEMENT AGREEMENT ON CONFIRMATION OF AN INCONSISTENT PLAN**

31. CNA has no basis for a claim for administrative expenses because the CNA Settlement Agreement (which was never signed by the Diocese or related entities) is, if it is nevertheless deemed to have been executed or be enforceable, the subject of a notice of termination by the Diocese based on lapse of time, and will in addition be terminable if a plan that is not consistent with the CNA Settlement Agreement is confirmed. Indeed, on December 18, 2023, the Diocese filed a letter with the Court giving 30 days' notice of termination of the CNA Settlement Agreement. [Docket No. 2390].

32. The Committee notes that the CNA Settlement Agreement was never signed by the Diocese or related entities and thus was never executed, and that therefore it should not be enforceable. Nonetheless, if and to the extent the CNA Settlement Agreement is deemed to have

been "executed," it is in process of, or will be subject to, termination by the Diocese according to its terms.

33.     Under New York law, settlement agreements are subject to the same rules of contract interpretation as other contracts. *Burrell v. Sowers*, No. 22-2687, 2023 U.S. App. LEXIS 29629, at *2 (2d Cir. Nov. 7, 2023). "[I]t is a basic contract principle that 'when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'" *TAG 380, LLC v. ComMet 380, Inc.*, 10 N.Y.3d 507, 512–13, 860 N.Y.S.2d 433, 436, 890 N.E.2d 195, 198 (2008) (quoting *Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 775 (2004)).

34.     Thus, unambiguous contracts are to be interpreted according to their terms, and extrinsic evidence may not be admitted "to add to or vary the writing." *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990); *see also U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, 38 N.Y.3d 169, 178, 171 N.Y.S.3d 403, 408, 191 N.E.3d 355, 360 (2022) (citing *Giancontieri* and other cases in interpreting the plain language of contract). As the Second Circuit has very recently noted:

> Under New York law, a contract is unambiguous "if the contract language has a definite and precise meaning . . . and concerning which there is no reasonable basis for a difference of opinion." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) (quotation marks omitted). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quotation marks omitted); see *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).

*Burrell*, 2023 U.S. App. LEXIS 29629, at *3.

35.     Section 5.2 of the CNA Settlement Agreement provides, in relevant part:

> Each of the Diocese or Continental may terminate this Settlement Agreement upon thirty (30) days written notice to the other Party in

the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) the Approval Order and the Plan Confirmation Order are not entered within eighteen (18) months from the date on which the Settlement Agreement is executed by all the Parties (ii) the Bankruptcy Court enters an order that becomes a Final Order inconsistent with the Approval Order or the Plan Confirmation Order; (iii) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed . . . .

Additionally, (x) Continental may terminate this Settlement Agreement upon thirty (30) days written notice to the Diocese if the Diocese files a plan inconsistent with this Settlement Agreement . . . .

36.     Section 5.2 is clear and unambiguous. By its plain terms, should (i) the Second Settlement Motion not be granted and a confirmation order not be entered within 18 months of the date the Second Settlement Motion was filed (May 20, 2022) or (ii) an inconsistent plan be confirmed, the Diocese will have the right to terminate the CNA Settlement Agreement on thirty days' notice.

37.     By letter dated December 18, 2023 [Docket No. 2390], the Diocese gave 30 days' notice of termination of the CNA Settlement Agreement pursuant to Section 5.2(i), as more than eighteen months have elapsed since the Second Settlement Motion was filed.

38.     If for some reason the Diocese's termination of the CNA Settlement Agreement is not, or does not become, effective, the Diocese may, after termination of an inconsistent plan, terminate the CNA Settlement Agreement pursuant to Section 5.2(ii) or (iii). Those provisions contain no exception in the case where the Diocese files such a plan. A no-fault termination provision is consistent with the Diocese's obligation to seek a confirmable plan, as well as its fiduciary duties in respect of obtaining the best possible outcome for the creditors, as well as the vagaries and uncertainties of the confirmation process.

39.     The termination provision is in the passive voice, so that it makes no implication or inference on who the proponent of the inconsistent plan might be, any concept of fault for the

confirmation of an inconsistent plan, or requirement for the process of confirmation. Notably,

the last sentence of the provision contemplates that Continental would have the right to terminate

the CNA Settlement Agreement upon the Diocese filing a plan, like the Joint Plan, that is

inconsistent with this Settlement Agreement. With that provision, the parties self-evidently

recognized the possibility that the Diocese might file an inconsistent plan and could have

excluded the Diocese being the proponent of such a plan from the termination right. So, Section

5.2 gives CNA a *pre-confirmation* termination right, while allowing the Diocese to terminate

*after* confirmation of an inconsistent plan.

40.     Termination of a contract according to its terms is not a breach. *Lion Bee Equities*

*LLC v. Citibank N.A.*, No. 652033/2016, 2018 N.Y. Misc. LEXIS 3176, at \*10 (Sup. Ct. N.Y.

County Mar. 26, 2018). Because it can be expected that the Diocese will terminate the CNA

Settlement Agreement if an inconsistent plan is confirmed, CNA would not be able to claim that

the Diocese breached the CNA Settlement Agreement or claim any damages.

## III.     THE SECOND SETTLEMENT MOTION SHOULD NOT BE GRANTED BASED ON THE DIOCESE'S INHERENT "FIDUCIARY OUT"

41.     Finally, the Proposed Administrative Claim must be denied because the Diocese's

inherent "fiduciary out" provides it a basis to walk away from the CNA Settlement Agreement

should it be deemed to have been executed. In a recent decision in the Diocese of Camden's

chapter 11 case, the court recognized that lack of an express fiduciary out does not render the

debtor's fiduciary obligations a nullity. *See In re Diocese of Camden, New Jersey*, 653 B.R. 309,

347 (Bankr. D.N.J. 2023) (rejecting an argument that a chapter 11 plan was not feasible where

non-settling insurers asserted an administrative claim based on a purported breach of an

insurance settlement agreement that did not include a fiduciary out) (citing *In re Innkeepers USA*

*Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010)). The *Innkeepers* court, considering language

that limited the debtor's ability to "annul, modify, amend or otherwise alter" a plan support agreement, held that such language could not prohibit a debtor from exercising its fiduciary duties. The court noted that:

> In a bankruptcy case, it is "Bankruptcy 101" that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the estates in a multi-debtor case. As Judge Gerber held in *Adelphia*, in a case with multiple debtors, the debtors, as fiduciaries, have duties to refrain from favoring or appearing to favor one or another of their estates and its creditors over another. *See In re Adelphia Communications Corp.*, 336 B.R. 610, 669–71 (Bankr. S.D.N.Y. 2006). The Debtors have not done so here.

*In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010).

42. In this case, the CNA Settlement Agreement favors CNA to the detriment, and over the opposition of, Survivors. The lack of an express fiduciary out cannot be relied upon by CNA to assert that the Diocese must adhere to the settlement agreement even in violation of its fiduciary duty. The Diocese's ultimate objective in this case is to obtain a resolution of all claims against it, which are almost entirely comprised of Abuse Claims. That objective could not be met through the settlement agreements presented in the Second Settlement Motion. Thus, the Diocese must be released from the underlying agreement because the Diocese's fiduciary duties to its estate and creditors require it to enter into a confirmable, acceptable plan of reorganization. It cannot be shackled to a dead on arrival settlement on the mere basis that it lacks an express "fiduciary-out."

43. Without limiting the ways in which the Diocese's fiduciary out may be recognized in the complex of proceedings as this case moves toward confirmation of a plan, the Committee recognizes that the Diocese can put the issue forward on the Second Settlement Motion. Should the Court reject the CNA Settlement Agreement in deciding the Second

Settlement Motion, it would become a nullity (*see Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 569 B.R. 534, 539 n.3 (E.D.N.Y. 2017)), and CNA would have no basis to assert an administrative claim for its breach.

44. *Liberty Towers* is instructive on the procedure within Bankruptcy Rule 9019 to assert a fiduciary out. As the court explained:

> [W]here a debtor receives a better offer after settlement but before approval, such a debtor may question whether its fiduciary obligations to its creditors oblige it to breach its settlement contract . . . . However, Rule 9019 provides a mechanism for debtors to respect all of their obligations. The debtor can abide by its obligations under the settlement agreement, including, if necessary, filing a motion for settlement approval. Then, to protect the interest of its creditors, the debtor can present the post-settlement offer to the bankruptcy court in connection with the Rule 9019 proceedings. The court will then have the opportunity to evaluate whether this better offer warrants rejecting the settlement agreement. *See* [*Myers v.*] *Martin* [*In re Martin*], 91 F.3d [389,] 394 [(3d Cir.1996)] (stating that, where a trustee "was faced with a conflict between her fiduciary duty to the creditor body as a whole" and her duty to abide by a settlement agreement, "the trustee should inform the court and the parties of any changed circumstances since the entry into the stipulation of settlement" so that the court can "determine what course of action will be in the best interest of the estate"); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 Bankr. LEXIS 2000 (Bankr. D. Del. Apr. 29, 2014) (applying *Martin* and reviewing settlement in light of changed circumstances).

*Id.* at 542–43.

45. The insurance settlements as initially proposed were manifestly inadequate, such that the Court should have rejected them. *See* Committee 9019 Objection (explaining why the proposed settlements should be rejected). To their credit, the Diocese and three of the insurers negotiated a substantially better deal and consensually abandoned their proposed settlements. CNA did not. While it is regrettable that CNA has chosen to stand alone with its proposed settlement, it is the Diocese's judgment — with which the Committee firmly concurs — that the

CNA Settlement Agreement remains inadequate, and indeed that its inadequacy is underscored by the improved terms to which the other insurers agreed. Thus, whether the Second Settlement Motion is viewed as seeking comprehensive approval of four settlement agreements (three of which the parties have abandoned), or whether the CNA Settlement Agreement could be considered separately and as subject to separate approval, the Court should, in the exercise of its independent judgment, deny the Second Settlement Motion. Denial of the Second Settlement Motion would vitiate the CNA Settlement Agreement and eliminate the Proposed Administrative Claim.

## **JOINDER AND RESERVATION OF RIGHTS**

46. The Committee respectfully joins in the objection and motion to dismiss CNA's Administrative Treatment Complaint and Administrative Treatment Application filed by the Diocese and incorporates them herein by reference for all purposes.

47. To the extent the Court does not dismiss the Administrative Treatment Complaint or deny the Administrative Treatment Application as a matter of law, the Committee reserves all rights regarding the objection and any related matter, including any motion by CNA to estimate the value of a purported administrative claim.

## **CONCLUSION**

48. For the reasons set forth herein, the Administrative Treatment Complaint should be dismissed and the Administrative Treatment Application denied, and the Court should grant such other, further, and different relief as to it seems just and proper.

LA:4872-9576-0792.5 18489.002

Dated: December 22, 2023

PACHULSKI STANG ZIEHL & JONES LLP

*/s/Ilan D. Scharf*

James I. Stang
Ilan D. Scharf
Brittany M. Michael
Jeffrey M. Dine
780 Third Avenue, 34th Floor
New York, New York 10017-2024
Telephone: 212-561-7700
Facsimile: 212-561-7777

*Counsel to Official Committee of Unsecured Creditors*