**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

In re:

The Diocese of Rochester,

              Debtor.

Case No. 19-20905

Chapter 11

---

THE CONTINENTAL INSURANCE
COMPANY, successor by merger to
Commercial Insurance Company of Newark,
New Jersey, and Fireman's Insurance
Company of Newark, New Jersey,

              Plaintiff,

v.

The Diocese of Rochester,

              Defendant.

Adversary Proceeding
No.: 2-23-02014

---

### CORRECTED POST-TRIAL BRIEF
### OF
### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................. iii

**PRELIMINARY STATEMENT** ....................................................................................... 1

**PROCEDURAL HISTORY** ............................................................................................ 5

    A.    The Diocese Of Rochester Bankruptcy .............................................................. 5

    B.    The Diocese Files The Insurance Adversary ..................................................... 6

    C.    The 9019 Motion .............................................................................................. 6

    D.    Everyone Other Than CNA Improved Their Settlements ................................... 7

    E.    CNA Brings The Administrative Claim ............................................................. 8

**THE FACTS AT TRIAL** ................................................................................................. 9

    A.    The Diocese Could Not/Did Not Enter Into The Proposed CNA
        Agreement ......................................................................................................... 9

    B.    CNA's Testimony To Support the Reasonability Of Their Proposed
        Settlement Of $63,500,000 Was Substantively Irrelevant ................................. 11

        1.    James Murray ....................................................................................... 11

        2.    Julia Hilliker ........................................................................................ 12

        3.    Timothy Delahunt ................................................................................ 12

        4.    Dr. Denise Martin ................................................................................ 13

        5.    Professor Tom Baker ........................................................................... 14

        6.    Katheryn McNally ............................................................................... 14

    C.    CNA Failed To Prove Its Damages .................................................................. 15

        1.    The Damages That CNA Seeks Cannot Be Calculated ......................... 16

        2.    CNA Has Asserted Defenses To Coverage For The CNA Claims .. 17

        3.    CNA Disagrees With The Committee's Beliefs About CNA's Liability .. 17

        4.    Tesmer Testimony On Reliance Damages ........................................... 18

        5.    CNA Presented No Expert Testimony On Damages ............................. 19

**LEGAL ANALYSIS** ....................................................................................................... 19

    I.    **THERE IS NO CLAIM FOR BREACH OR ANTICIPATED BREACH OF
        CONTRACT OVER AN UNAPPROVED SETTLEMENT
        AGREEMENT** ............................................................................................. 19

    II.    **EVEN AS ASSERTED, CNA'S BREACH AND ANTICIPATORY BREACH
        OF CONTRACT CLAIMS FAIL** ............................................................... 21

    III.    **THE DIOCESE NEVER ENTERED INTO THE PROPOSED CNA
        AGREEMENT AND THE CONDITIONS PRECEDENT TO THE
        DIOCESE BEING BOUND DID NOT OCCUR** ......................................... 22

IV.    **THE 9019 MOTION WOULD HAVE BEEN DENIED** ....................26

V.    **CNA IS NOT ENTITLED TO AN ADMINISTRATIVE CLAIM OR DAMAGES** ..........................................................................................27

VI.   **THE COURT CANNOT ESTIMATE THE ADMINISTRATIVE CLAIM**...............................................................................................30

**CONCLUSION** ................................................................................................................30

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

<u>**CASES**</u>

*34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44 (2022) ........................................21

*Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47 (1st Dep't 2010)................................................................................................................22

*Aspen Limousine Servs., Inc. v. Aspen Limousine Serv., Inc.*, 193 B.R. 325 (D. Colo. 1996).................................................................................................................30

*Bedoya v. Rodriguez*, 131 N.Y.S.3d 45 (2d Dep't 2020)........................................24

*Berman v. Sugo LLC*, 580 F. Supp.2d 191 (S.D.N.Y. 2008)....................................23

*Bersin Props., LLC v. Nomura Credit & Cap., Inc.*, 74 Misc. 3d 1209(A), 2022 NY Slip Op. 50084(U) (Sup. Ct. N.Y. County Feb. 7, 2022) ...........................................29

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) ........................3

*Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363 (2005) ..................................23

*Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379 (1974)....................................29

*Galarneau v. D'Andrea*, 126 N.Y.S.3d 766 (3d Dep't 2020) .........................................22

*Grgurev v. Licul* No. 1:15-cv-9805-GHW, 2016 U.S. Dist. LEXIS 156162 (S.D.N.Y. Nov. 9, 2016)....................................................................................................22

*Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024)....................................3, 25

*In re Appalachian Fuels, LLC*, 521 B.R. 779 (Bankr. E.D. Ky. 2014).................................28, 29

*In re MacDonald,* 128 B.R. 161 (Bankr. W.D. Tex. 1991)........................................30

*In re Motors Liquidation Co.*, 580 B.R. 319 (Bankr. S.D.N.Y. 2018) ...................... 20, 21, 22, 23

*Kaczmarcysk v. Dutton*, 414 F. App'x 354 (2d Cir. 2011)....................................22, 23

*Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, 98 A.D.3d 403 (1st Dep't 2012), *aff'd*, 20 N.Y.3d 1082 (2013).................................................................21

*Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 734 F. App'x 68 (2d Cir. 2018) ...........20

*Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 569 B.R. 534 (E.D.N.Y. 2017), *aff'd*, 734 F. App'x 68 (2d Cir. 2018) ...........................................................2, 8, 20

*Lion Bee Equities LLC v. Citibank N.A.*, No. 652033/2016, 2018 N.Y. Misc. LEXIS 3176 (Sup. Ct. N.Y. County Mar. 26, 2018) ...............................................................25

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379 (2d Cir. 1997) ...................1

*Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007) ...............................................................19, 26

*Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437 (2d Cir. 2005) ...............................................21

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685 (1995) .......................24

*Salim v. Nisselson (In re Big Apple Volkswagen, LLC)*, 571 B.R. 43 (S.D.N.Y. 2017).........19, 20

*Schoninger v. Green*, 763 F. App'x 1 (2d Cir. 2019) ...........................................................21, 22

*StarVest Partners II, L.P. v. Emportal, Inc.*, 957 N.Y.S.2d 93 (1st Dep't 2012)...........................22

*Vacold LLC v. Cerami*, 545 F.3d 114 (2d Cir. 2008) ...............................................................22

*West Hills Auto Repair v. State*, 32 A.D.3d 849 (2d Dep't 2006) ...............................................24

*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78 (2d Cir. 1985)...............................................22, 23

*Zurich Am. Ins. Co. v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.)*, 371 B.R.210 (E.D. Ky. 2007), *aff'd*, 2008 U.S. App. LEXIS 17162 (6th Cir. Aug. 13, 2008 ...............................................................27, 28, 29

## **STATUTES**

11 U.S.C. § 363...............................................................................................................1

11 U.S.C. § 365...............................................................................................................1

11 U.S.C. § 503(b)(1)(A) ...............................................................................................31

11 U.S.C. § 503(c)(3)...............................................................................................1, 31

## **RULES**

Fed. R. Bankr. P. 9019 ...............................................................................................passim

## **OTHER AUTHORITIES**

Restatement (Second) of Contracts §349 ...........................................................................33

Intervenor-Defendant the Official Committee of Unsecured Creditors of the Diocese of Rochester (the "**Committee**") submits its Post-Trial Brief concerning the trial of this adversary proceeding (the "**Adversary Proceeding**") brought by Plaintiff Continental Insurance Company ("**CNA**") seeking allowance of an administrative claim (the "**Administrative Claim**").

## PRELIMINARY STATEMENT

1.       A debtor-in-possession cannot enter into transactions outside of the ordinary course of business without court approval, because such approval is necessary to protect the estate and creditors from transactions that are not in the best interests of the estate.  Court approval also prevents a debtor from incurring obligations, such as administrative expenses, that reduce amounts available to satisfy prepetition creditors.[1]  The Proposed CNA Agreement was doomed as a matter of bankruptcy law and contract law because (a) it was not reasonable to begin with; (b) it was not binding on the Diocese by its terms; and (c) it was subject to conditions precedent that were clearly impossible when the Diocese filed the 9019 Motion and which remain so today.  The Court should not allow CNA an Administrative Claim on the nonexistent foundation of a futile, unexecuted and unenforceable agreement and conjectural damages.

2.       The Proposed CNA Agreement[2] is a transaction outside of the "ordinary course of business" and, thus, could not be binding on the Diocese until approved by the Court.  But approval was an impossibility at the time the agreement was negotiated.  Fundamentally, the Proposed CNA Agreement was doomed because the condition precedent of confirmation of a Chapter 11 plan

---

[1] *See* 11 U.S.C. §§ 363 and 365; Federal Rule of Bankruptcy Procedure 9019 ("**Rule 9019**"); *see also Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (holding that "design[]" behind section 363 is to protect "secured creditors and others from dissipation of the estate's assets.").  Additionally, section 503 of the Bankruptcy Code makes clear that one is not entitled to an administrative expense claim for "transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3).

[2] The "**Proposed CNA Agreement**" is attached to CNA's Adversary Complaint as Exhibit A and is at Trial Ex. 1, Doc. #190-4.

incorporating the terms of the settlement could not occur over the clear overwhelming rejection by Survivors. The futility of approving a Plan incorporating the Proposed CNA Agreement was clearly demonstrated when approximately 85% of voting Survivors rejected the CNA Plan – which provided for a CNA settlement more than 18% higher than the $63.5 million provided in the Proposed CNA Agreement.[3]

3. CNA asserts that it is entitled to the benefit of its bargain as if the Court had approved the settlement and all conditions precedent to the settlement had been met. CNA relies on *Liberty Towers* for the proposition that the Diocese is bound and cannot repudiate a properly executed agreement once a Rule 9019 motion is filed. However, *Liberty Towers* does not hold that the counterparty is entitled to damages or administrative claim even if the Rule 9019 motion is never granted. What *Liberty Towers* holds is that, while a debtor cannot "repudiate" the executed agreement, the debtor ***can oppose*** approval of the Rule 9019 motion if that is consistent with its fiduciary duties.[4]

4. The evidence at trial was clear. The Proposed CNA Agreement is not enforceable because: (i) it was not executed by the Diocese and the Other Diocesan Entities in writing, as required by the terms of the agreement; (ii) it was not approved by the Court; (iii) the Diocese terminated the agreement by its own terms; (iv) the agreement was not reasonable and was opposed

---

[3] CNA does not disguise that the purpose of the Adversary Proceeding is to leverage its supposed Administrative Claim to defeat the Joint Plan and force the Survivors to accept its proposed settlement: "if the [CNA] Administrative Expense Claim is allowed in a substantial amount, the Debtor will be unable to meet the requirement for confirmation that it pay the [CNA] Administrative Expense Claim in full, in cash, on the effective date of the Debtor's Plan." *CNA's Motion for Estimation of Continental Administrative Expense Claim for Purposes of Considering Confirmation of the Debtor's Plan Only* (Adv. Doc. # 18) at 4.

[4] *Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 569 B.R. 534, 542-43 (E.D.N.Y. 2017), *aff'd*, 734 F. App'x 68 (2d Cir. 2018) ("However, Rule 9019 provides a mechanism for debtors to respect all of their obligations. The debtor can abide by its obligations under the settlement agreement, including, if necessary, filing a motion for settlement approval. Then, to protect the interest of its creditors, the debtor can present the post-settlement offer to the bankruptcy court in connection with the Rule 9019 proceedings. The court will then have the opportunity to evaluate whether this better offer warrants rejecting the settlement agreement.").

by the Committee and a majority of Survivors; and (v) conditions precedent to the formation of the agreement, including confirmation of a plan incorporating its terms would and could not occur without acceptance by Survivors.[5]

5.      Even if the Court found that the proposed agreement was enforceable, CNA is not entitled to an administrative claim because it did not prove its damages.

6.      At trial, the testimony and documents in evidence showed:

a.   CNA's witness acknowledged that CNA intended that the proposed settlement be memorialized in a written document; Trial Tr. 7/29 at 72:1-4.

b.   CNA's witness acknowledged that the Proposed CNA Agreement was clear by its terms that the Diocese was not authorized to enter into the Settlement without Court approval (Trial Tr. 7/29 at 64:12-20).

c.   CNA's witness admitted that the purpose of the 9019 Motion was the Diocese seeking authority to enter into the Proposed CNA Agreement. (*Id*. at 67:25-68:9; 70: 21-24).

d.   CNA's witness admitted "I can't estimate what [CNA's exposure for the CVA claims] would actually be." (*Id*. at 107: 21-25).

e.   The Diocese terminated[6] the Proposed CNA Agreement according to its terms.

f.   The Proposed CNA Agreement would never have been approved under Rule 9019, and the plan on which, by its own terms, its future effectiveness would be predicated would never have been confirmed.

g.   CNA presented no documentary or expert evidence concerning damages for liability or defense costs it might incur in the future.

      i.   CNA presented no evidence quantifying the value of the claims at issue nor was there any evidence assessing the probability of success on the merits with respect to any asserted legal position in future litigation.

      ii.   CNA provided no credible evidence of any actual or estimatable damages.

---

[5] Any Plan incorporating the Proposed CNA Agreement was futile because it would have been rejected by Survivors under the standards of *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2088 (2024) (providing that non-debtor releases cannot be approved without consent of the affected creditors) and prior Second Circuit precedent such as *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005).

[6] Even though not a binding agreement, the Proposed CNA Agreement provided for termination of the Proposed CNA Agreement so that its approval would not need to be pursued if certain of the conditions to effectiveness could not be met. *See* Proposed CNA Agreement § 5.2.

iii.    CNA apparently seeks to rely on statements made by the Committee in pleadings[7] about potential Survivor recovery for an estimation (not allowance) of its alleged damages.

iv.    CNA has denied that it has such liability or that such liability will be anywhere near $63.5 million. CNA told the Survivors in the CNA Disclosure Statement that it "vigorously" disputes that the potential claims against CNA have substantial value. CNA Disclosure Statement at 8 (Doc. # 2591).

v.    None of CNA's three testifying expert witnesses performed any work towards valuation of the Survivor claims for which CNA may be responsible, the likelihood of success of CNA's coverage defenses, or consequently any valuation of CNA's alleged potential damages. In fact, the three experts admitted that they had not reviewed any of the proofs of claim or complaints against DOR filed against the Diocese in this case.

7.    CNA asked this Court to allow it damages based on unquantified purported future liability and expenses it says it may face years after confirmation of the Joint Diocese-Committee Restructuring Plan (Doc. # 2593, as it may be amended, the "**_Joint Plan_**"). *See* DX-D at 9.

8.    Through its experts, CNA only attempted to show that the aggregate amount of the proposed settlement was "reasonable" in comparison to settlements approved in other Catholic diocesan chapter 11 cases. However, CNA only presented the unremarkable proposition that both sides have risk in litigation and may choose to settle to avoid those risks. The evidence presented by the Debtor and the Committee demonstrated that, notwithstanding risk in litigation, the Survivors would not choose to accept the Proposed CNA Agreement even though CNA thought they should.

9.    Not only did CNA fail to demonstrate the existence of a contract that binds the Debtor, CNA has not provided any basis for determination of its actual, nonspeculative damages in this adversary proceeding. CNA itself admitted that "**_[T]here is no way_**" to determine what

---

[7] Trial Tr. 7/29 at 11:1-5 (CNA opening statement).

would be considered a Litigation Claim *or an estimate* for [CNA]'s liability."[8]  CNA cannot now ask the Court to miraculously do what CNA says is impossible and make some legally invalid, foundationless and speculative guesstimate of the amount of the alleged Administrative Claim that should be allowed.

10.     In sum, the recovery that CNA seeks is based on an unexecuted agreement allegedly entered into without bankruptcy court approval and that is not justified by the facts and circumstances of the case.  Moreover, CNA's alleged administrative claim seeks speculative, contingent and unrealized damages, and is thus not even cognizable as an administrative expense under section 503.  The Court should enter judgment against CNA.

## PROCEDURAL HISTORY

### A.     The Diocese Of Rochester Bankruptcy

11.     On September 12, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned bankruptcy case (the "**Bankruptcy Case**") in the Bankruptcy Court for the Western District of New York (the "**Court**").[9]

12.     Over 300 Sexual Abuse Claims identified abuse that occurred during the time period that CNA (by a predecessor) had issued policies of insurance to the Diocese (the "**CNA CVA Claims**").[10]

---

[8] DX-D at 11 (emphasis added).
[9] The Diocese sought bankruptcy protection to address its liability for claims by individuals ("**Survivors**") asserting claims against the Diocese and related entities on account of sexual abuse by individuals for whom the Diocese and/or related entities are responsible.  Survivors filed approximately 554 proofs of claim against the Diocese (Trial Ex. 47 at 25) (such claims, "**Sexual Abuse Claims**") against the Diocese by the Bar Date (as defined in the Joint Plan).
[10] Trial Tr. 7/29 at 30:18-22; DX-D at 8.

### B. The Diocese Files The Insurance Adversary

13. CNA has denied coverage or reserved rights to deny coverage, with respect to all of the CNA CVA Claims. *See* DX-F at DORUCC-001889 to 1901; DX-G (summarizing defenses by claim) Consequently, on November 14, 2019, the Diocese filed an adversary proceeding (the "**Insurance Adversary**," No. 19-02021) against CNA and other insurers, in general seeking a declaration of the Diocese's rights under insurance policies issued or allegedly issued by the insurers that may cover the CVA Claims.

14. On May 27, 2021, the Diocese filed a motion to approve proposed settlements with LMI and Interstate [Doc. # 1101; Adv. Proc. 19-02021 Doc. # 99] (the "**First Settlement Motion**"). On July 12, 2021, the Court entered an order that denied the First Settlement Motion and directed all parties to return to mediation. Doc.# 1213; Adv. Proc. 19-02021 Doc. # 153.

### C. The 9019 Motion

15. During May 2022, the Diocese negotiated proposed settlements with certain of the Diocese's insurers, including CNA, which, if approved by the Court and ultimately consummated, would have provided aggregate settlement proceeds of $107,250,000 to fund a post-confirmation trust for survivors. CNA's proposed settlement contribution totaled $63,500,000 (the "**CNA Settlement Amount**"), in exchange for which CNA would buy back all known and unknown liability insurance policies issued by CNA to the Diocese and Diocese Participating Parties from 1943 through June 1, 1977 (the "**CNA Policies**") and would receive further protection in the form of certain releases and injunctions.

16.     On May 20, 2022, the Diocese filed a motion pursuant to Rule 9019 (the "**9019 Motion**," Adv. Proc. 19-02021 Doc. # 190 (Trial Ex. 1) seeking approval of proposed settlements between the Diocese, certain related entities and its insurers, including CNA.[11]

17.     On May 23, 2022, the first business day after the Diocese filed the Second Settlement Motion, this Court issued a Decision and Order (the  "**May 23 Decision and Order,**" Adv. Proc. 22-02075 Doc. # 48 (Trial Ex. 11))[12], denying the Diocese's request to enjoin litigation against the non-debtor Diocese Participating Parties.   The Court held that "[g]iven the Diocese's suggestion that it may seek to confirm a Chapter 11 plan without the consent of the Abuse Survivors, the Court cannot conclude that a successful reorganization is likely." *Id.* at 12.

18.     On June 30, 2022, the Committee, which had ***not*** been involved in the negotiations leading up to the proposed settlements, objected to the 9019 Motion as, among other things, the settlement amounts, including the Proposed CNA Payment, were inadequate.  (Doc. # 1555, Trial Ex. 18).

**D.      Everyone Other Than CNA Improved Their Settlements**

19.     After the Committee filed its opposition to the 9019 Motion, the Committee and the Diocese negotiated a settlement that included an increased contribution from the Diocesan entities.  The Committee and the Diocese then negotiated settlements with all insurers other than CNA that included substantially greater contributions from those insurers.  Trial Ex. 47 at 28. CNA did not reach agreement with the Diocese and the Committee.

---

[11] At the Committee's request, the Diocese subsequently refiled the 9019 Motion, in its entirety and without revision, in the main proceeding so that the Committee would have standing to object to it.  Trial Ex. 13; Trial Tr. at 142:15-20.

[12] In March 2022, the Committee advised the Diocese that it would not consent to any further extensions to the stipulated stay of litigation against the non-debtor Diocese Participating Parties.  The Diocese subsequently commenced an adversary proceeding seeking a preliminary injunction enjoining litigation against non-debtor affiliates in aid of a mediated global resolution.  Adv. Proc. No. 22-02075.

20.     In connection with the new settlements, the Diocese and the Committee proposed the Joint Plan (as it may be amended or modified).  In summary, the Joint Plan establishes a settlement trust (the "**Trust**") that will be funded with at least $126 million on the Effective Date to make payments to Survivors.  Survivors with claims that are allowed through the process provided for in the Trust should be able to begin receiving payments from the Trust not long after the Effective Date.  The Plan and Trust also provide that Survivors whose claims are among the CNA CVA Claims may bring litigation against the Diocese and related entities (in accordance with the terms of the Plan and the Trust) with any recovery on those CNA CVA Claims to be paid solely by CNA.  *See generally* Trial Ex. 47 at 45-48 (Joint Plan Disclosure Statement).  Over 95% of Survivors voting on the [Joint] Plan *accepted* the Joint Plan.  Doc. # 2707, DX-X.

21.     In an effort to try and "settle" around the Committee and the Diocese and to attempt to garner leverage, CNA pursued approval of its own plan, which proposed to accept the settlements and other contributions forming the basis of the Joint Plan with an additional $75 million contribution from CNA (and a waiver of its alleged Administrative Claim) to settle CNA's liability for CNA CVA Claims.  The CNA Plan was *rejected* by approximately 85% of Survivors voting on the CNA Plan.  *Id*.

### E.     CNA Brings The Administrative Claim

22.     Rather than pursue approval of the 9019 Motion on its own, CNA filed the "**Adversary Complaint**" (Adv. Doc. # 1, Trial Ex. 38) and its Application for Allowance and Payment of Administrative Expense Priority Claims (the "**CNA Application**," Doc. # 2314) asserting that the Diocese breached or repudiated the Proposed CNA Agreement, and that, as a result, CNA is entitled to an administrative expense claim. [13]

---

[13] CNA has never asked the Court to rule on the 9019 Motion, as the aggrieved settlor in *Liberty Towers* did.

23.     The Adversary Complaint thus claims that CNA is entitled to:

> [CNA]'s costs and expenses for pursuing this action and defending itself against the Debtor's liability and any action brought by the Trust or other purported beneficiaries of any alleged insurance coverage, and any amounts [CNA] becomes obligated to pay on account of the Debtor's liability for the Sex Abuse Claims beyond the [CNA] Settlement Amount.

Trial Ex. 38 at 12, 15.

24.     On December 18, 2023, the Diocese delivered a notice of termination of the Proposed CNA Agreement to CNA based on the pendency of the 9019 Motion for more than 18 months.  Trial Ex. 39.

25.     The parties engaged in extensive discovery on the Administrative Claim.  The Court conducted the trial with respect Adversary Complaint on July 29 and 30, 2024.

## THE FACTS AT TRIAL

### A.     The Diocese Could Not/Did Not Enter Into The Proposed CNA Agreement

26.     The Diocese and the Diocese Parties did not sign the Proposed CNA Agreement. Trial Ex. 1, Doc. # 190-4 at 23-130.  CNA and the Diocese understood that the Diocese and Diocese Parties could not and would not enter into the Proposed CNA Agreement until the Court approved it.[14]  The Diocese did file the 9019 Motion and proposed "Approval Order" seeking authority to enter into the Proposed CNA Agreement in the form attached to the Proposed CNA Agreement.  The form of the Approval Order, requests that the Court order that:  "3. The Debtor is *authorized to enter into* and perform the terms of the [CNA] Settlement Agreement and undertake any transactions contemplated by the [CNA] Settlement Agreement."  *Id.* at 138 (emphasis added).

---

[14] The Proposed CNA Agreement provides that the "'Settlement Agreement Effective Date' means the day following the date on which all of the following have occurred: (i) all Parties have executed this Settlement Agreement; (ii) the Approval Order shall have become a Final Order…."  Tr. Ex. 1, Doc.# 190-4 § 1.1.41.

27.     The terms of the 9019 Motion were consistent with the form of Approval Order. The 9019 Motion throughout refers to the settlements with all of the insurers as "proposed." *E.g., id.* at Doc. # 190 at 4-5, 13-14, 17-18, 19-22, 23-29, 31-33).  Consistent with the Proposed CNA Agreement, the Diocese in the 9019 Motion requested that the Court enter an order "(iii) authorizing the Diocese ***to enter into*** the proposed settlement agreements."  Trial Ex. 1 at 37 (emphasis added).  CNA submitted an extensive joinder to the 9019 Motion (Trial Ex. 17, Doc. # 1542); CNA's joinder echoes the Diocese's characterization of the settlements as "proposed" (*id.* at 1) and requests that the Court simply "grant the Diocese's Motion," thus requesting that the Bankruptcy Court authorize the Diocese to enter into the Proposed CNA Agreement (*id.* at 17).  CNA repeated its request that the 9019 Motion be granted in its reply brief.  Trial Ex. 25, Doc. # 1646 at 9.

28.     Ms. Tesmer on cross-examination agreed that the form of Approval Order asked the Court to authorize the Diocese to enter into the Proposed CNA Agreement, and that the Court had not done so.  Trial Tr. 7/29 at 67:25-68:12.  The Diocese's witnesses' testimony was that the Diocese's decision not to sign the Proposed CNA Agreement was intentional, and that the Diocese understood the Proposed CNA Agreement to be only a proposal.  Trial Tr. 7/29 at 151:1-7 (Bishop Matano understood agreement to be a proposal requiring Court approval), 173:17-174:7 (Ms. Passero stating agreement not signed because it was a proposal requiring Court approval), 179:16-21 (conscious decision not to sign), 213:2-4 (Fr. Condon testifying that no one from the Diocese signed).  CNA thus knew and understood that the Diocese had not entered into the Proposed CNA Agreement and that the Diocese *required* Court approval to do so.

29.     The Proposed CNA Agreement itself was clear of the conditions to the agreement becoming effective and binding on the parties.  Section 1.1.41 of the Proposed CNA Agreement

lays out the contractual conditions precedent to the formation of the agreement, including, among other things, (i) execution of the agreement by *all* parties, (ii) a final Approval Order, (iii) a final Plan Confirmation Order, and (iv) creation of the Trust. Trial Ex. 1, Doc. # 190-4 § 1.1.41.

30.     Ms. Tesmer agreed that the conditions for the Settlement Effective Date had to be met for the Diocese to be bound. (Trial Tr. 7/29 at 64:5-20), and that none of these events had occurred (*Id.* at 65:8-71:25).

**B.      CNA's Testimony To Support the Reasonability Of Their Proposed Settlement Of $63,500,000 Was Substantively Irrelevant**

31.     CNA presented one fact witness (James Murray, coverage counsel for the Diocese), and three expert witnesses at trial in an effort to show that the Proposed CNA Agreement was "reasonable" within the larger group of settlements and Diocesan contribution contemplated by the 9019 Motion (the "**9019 Settlements**"): Julia Hilliker, Timothy Delahunt and Dr. Denise Martin. Defendants presented two rebuttal witnesses: Tom Baker and Katheryn McNally

**1.      James Murray**

32.     Mr. Murray was unavailable for trial. His identical declarations in the Insurance Adversary and main case were admitted into evidence. Trial Exs. 2, 14. Mr. Murray testified that the 9019 Settlements were within the range of reasonableness. However, that testimony was limited by his statements in the same declaration and also in his deposition. Mr. Murray testified that his statement in his declaration was subject to the "footnote" on the range of reasonableness being subject to a number of factors, "including what could get approved by the Bankruptcy Court and *what the Creditors Committee would agree to*." Murray Depo. Tr. at 31:18– 25 (emphasis added); *see generally id.* at 30:9–33:12 (emphasis added). As he noted, while he thought the insurers fell in the range of reasonableness, after the Committee filed objections to the 9019 Motion, certain insurers offered more. *See id.* at 30:9–20.

### 2. Julia Hilliker

33. Ms. Hilliker is a New York lawyer. Ms. Hilliker is involved defending some 92 claims brought under the CVA, representing institutional defendants such as school districts and non-Catholic religious institutions and has resolved approximately 67 of those. Trial Tr. 7/30 at 225: 5-11. She has not represented any Catholic diocese, parish or diocesan entity, and she has not reviewed case information for any claim against the Diocese. She has not addressed insurance coverage denials in her cases. *Id.* at 236:1-19. Ms. Hilliker's testimony was, in brief, that CVA litigations may take a long time to resolve, present significant difficulties of discovery, proof for both sides given the long time that has passed between the abuse and the plaintiff filing its lawsuit, and present risks for both plaintiffs and defendants. *Id.* at 240:15-21. However, Ms. Hilliker's testimony was significantly undercut by her admissions that, of (i) some 67 of her cases (more than 72%) resolved by settlement with a payment from the institution (approximately 55 or 82%) or summary dismissal. *Id.* at 238:14-20.[15]

### 3. Timothy Delahunt

34. Mr. Delahunt is likewise a New York lawyer, specializing in insurer-side insurance coverage litigation, although he had never litigated many of the defenses on which he was testifying in the context of sexual abuse claims.[16] Mr. Delahunt reviewed some, but not all, policy information provided in this matter. Trial Tr. 7/30 at 282:2-16. Mr. Delahunt testified broadly concerning CNA's coverage defenses including failure of the insured to prove the existence of a policy or its terms, exceptions to coverage such as the abuse not being committed by a person for whom the Diocese was responsible, late notice and that the abuse was "expected or intended," but

---

[15] In light of the high percentage of settlements, it is not remarkable that only one of her cases went to trial, and that, after apportionment, her client paid a seven-figure judgment to the victim. *Id.* at 239:6-16.

[16] With regard to sexual abuse claims, Mr. Delahunt never litigated the expected or intended defense (Trial Tr. 7/30 280:22-25); notice of occurrence (*id.* at 281:1–4); or late notice (*id.* at 281:5-9).

he had no specific factual basis to opine on the application of defenses to specific claims.  *Id.* at 283:13-286:5.  Mr. Delahunt did not express an opinion as to  likelihood of success on any of these defenses, only that such defenses were "viable."  *Id.* at 286:4-5 ("I was not opining on coverage likely – likely outcomes with respect to particular claims.").

### 4. Dr. Denise Martin

35.     Dr. Martin is an economist with the consulting firm NERA.  Dr. Martin did not review the abuse claims or opine on the value of the abuse claims, including the CNA CVA Claims. Trial Tr. 7/30 at 334:6-17.  Dr. Martin developed and presented a statistical analysis bearing on whether the aggregate  settlements proposed in the 9019 Motion constituted "economically reasonable compensation" to the Survivors.  Dr. Martin compared the proposed settlement against a universe of public information concerning the confirmed plans of 22 Catholic entity bankruptcies, as well as pre-CVA, non-litigation settlements involving only the Diocese.  Dr. Martin opined that the 9019 Settlements, taken as a whole and adjusted for inflation, fell in the 44th percentile of the group of Diocesan settlements, and the overall insurer contribution adjusted for inflation is in the 64th percentile.  Dr. Martin also compared the 2022 proposed DOR insurer settlement to the settlements that had been reached by the Diocese prior to its bankruptcy.  She found the settlements approved between 2019 and 2023 were not statistically different.  Dr. Martin did not, however, express an opinion as to whether the 9019 Settlements, and in particular the proposed CNA Settlement Amount, would have provided reasonable economic value to the Survivors.  Her testimony was limited to "aggregate outcomes." (Trial Tr. 7/30 at 349: 4).  She also did not provide opinion testimony as to the value of the CNA insurance policies CNA was attempting to repurchase.  (*Id.* at 347:20-23).

4878-6583-7534.1

### 5. Professor Tom Baker

36.     Prof. Baker is a lawyer and professor of insurance law at the University of Pennsylvania.  Prof. Baker is the Reporter for the Restatement of Law Liability Insurance and the author of an insurance law case book and more than 70 scholarly articles concerning aspects of insurance.  He recently received the Kalven Prize for "empirical scholarship that has contributed most effectively to the advancement of research in law and society" for his research on insurance.  Prof. Baker testified in full to his qualifications.  Trial Tr. 7/30 at 352:23-360:18.

37.     As to Ms. Hilliker's testimony, Prof. Baker "took issue with [] the implication that [her experiences] are a guide to what happens in very different context where there's hundreds of claims in bankruptcy."  Trial Tr. 7/30 at 362:13-15.  He opined that mass tort cases (which he testified was an appropriate characterization of the CVA claims against the Diocese) would not be litigated individually to judgment and the exhaustion of appeals, but that the parties would, after some experience of litigation, come to settlements of cases in batches that had similar issues.  *Id.* at 363:25–364: 24.

38.     As to Mr. Delahunt's testimony, Prof. Baker testified that coverage cases concerning CVA cases would also not be expected to be litigated individually to finality but would also be expected to settle in batches. (*e.g., id.* at 369:19-25).  Professor Baker testified that Mr. Delahunt's citations and expression of the law in favor of the insurers was more aggressive than he would agree with."  *Id.* at 393:20-24; *see id.* at 372:11-18; 374:16-20.

### 6. Katheryn McNally

39.     Ms. McNally, a Managing Director at Stout Risius Ross, possesses an MBA with concentrations in statistics and economics (among others) from the University of Chicago and has taught statistics and economics at Northwestern University.  Trial Tr. 7/30 at 395:15-397:10.  Her economic damage quantification practice focuses on valuation of mass tort claims including

valuation of mass sexual abuse claims in bankruptcy and insurance policies' exposure to such claims. *Id.* at 397:6-15. She has served as an expert concerning sexual abuse claims in approximately 10 Diocesan bankruptcies and also as an expert in non-Diocesan bankruptcies such as Boy Scouts of America and non-bankruptcies such as University of Michigan and USC, among others. *Id.* at 398:2-399:12.

40. Ms. McNally testified that Dr. Martin's analysis was misplaced in the first instance, as the proper measure for expert analysis of whether a mass tort settlement is reasonable is not simply the outcome of other settlements but rather the value of the claims and coverage at issue. Trial Tr. 7/30 at 400:18-401:11, 407:22-408:11. With respect to the substance of Dr. Martin's analysis, Ms. McNally explained that the analysis improperly excluded the impact of the statute of limitations. *Id.* at 402:18–403:14. Ms. McNally testified that in the Diocese of Stockton bankruptcy, the difference between the value of claims within the statute of limitations and outside of it was the difference between $3.25 million and $20,000 - $25,000. *Id.* at 404:23-405:5. Dr. Martin just used the average of $550,000 to $600,000. *Id*. at 405:6-10.

41. Dr. Martin, according to Ms. McNally, also ignored insurance implications such as the amount of insurance, whether there are aggregate limits on policies, non-settling insurers, insolvent insurers, making Dr. Martin's conclusions unreliable and irrelevant to an analysis of the reasonableness of the Proposed CNA Agreement. *See id.* at 400:7-403:14.

## C. CNA Failed To Prove Its Damages

42. As the Committee discussed in its Objection to CNA's Motion to Estimate (Adv. Doc. # 46, incorporated herein by reference), CNA in discovery admitted that its damages were not susceptible to estimation or calculation. That discovery was affirmed by CNA's witness. Moreover, none of CNA's expert witnesses expressed any opinion as to plaintiffs' likelihood of success in underlying litigation or of CNA succeeding on its coverage defenses.

1.      **The Damages That CNA Seeks Cannot Be Calculated**

43.      CNA in the CNA 2024 Interrogatory Responses (DX-C; DX-D) represented that its damages are the amount of the difference between the amount it may ultimately pay and the amount which it agreed to pay in the Proposed CNA Agreement or, possibly, the larger amount it offered as part of the CNA Plan: "[i]f the Debtor Plan is confirmed, [CNA]'s damages may include those sums, if any, it pays beyond the $75 million offered in the CNA Plan."  DX-C at 64-65, *see* DX-D at 11-12 (Response to Interrogatory No. 3).

44.      CNA was completely candid: it admits forthrightly that the potential liability for which it now asserts damages cannot be determined.  In response to the Committee's interrogatory regarding "the amount of liability You believe You face for Litigation Claims and other obligations" (DX-C at 64; DX-D at 10), CNA stated:

> [CNA] states that the amount of liability [CNA] may face for Litigation Claims arising out of the Debtor's liability for Abuse Claims cannot be determined at this time because, *inter alia*, (i) the Joint Chapter 11 Plan of Reorganization for the Diocese of Rochester ("Diocese Plan") is unclear on how many Litigation Claims the Trust might permit to go forward, (ii) the criteria the Trust would use to determine whether to permit individuals with Litigation Claims to proceed with their Litigation Claims is not disclosed in the Diocese Plan or the disclosure statement relating thereto, (iii) [CNA] does not know which particular Litigation Claims, if any, would be allowed to proceed, and (iv) *[CNA] does not know how any particular Litigation Claim will be resolved, including by judgment or settlement.  **Accordingly, there is no way to determine what would be considered a Litigation Claim or an estimate for [CNA]'s liability**.*

DX-C at 65; DX-D at 11 (emphasis added).

45.      Additionally, when asked what liability CNA would face in excess of $63.5 million for Abuse Claims, considering the numerous defenses raised (DX-C at 65; DX-D at 12), CNA first denied that it would face liability in excess of $63.5 million, stating that the Interrogatory itself was "contrary to fact, in that the Request assumes that CNA 'believe[s it] will face liability in excess of $63.5 million for Abuse Claims.'"  DX-C at 66; DX-D at 13.

46. CNA's interrogatory responses are consistent with its representation to Survivors in the CNA Disclosure Statement regarding the risks to Survivors in pursuing CNA (Trial Ex. 49 at 61), and with Ms. Tesmer's testimony at trial that CNA did not agree with the Committee's view of CNA's liability. Trial Tr. 7/29 at 95:14-96:4. Indeed, Ms. Tesmer concurred that she could not estimate CNA's actual exposure to the CNA CVA Claims. Trial Tr. 7/29 at 107:10-108:3. To the extent that CNA suggests that there is a difference between its ultimate liability and the amounts it may expend as legal expenses, the same reasons that their damage cannot be determined applies to both aspects of the claim. *See* Trial Tr. 7/29 at 96:15-97:3 (there is no way to know how many claimants there might be and to determine consequent costs of litigation).

## 2. CNA Has Asserted Defenses To Coverage For The CNA CVA Claims

47. Throughout the bankruptcy proceeding, including the Insurance Adversary and the Administrative Claim Adversary Proceeding, CNA has consistently maintained that it has or may have defenses to coverage to the over 300 CNA CVA Claims. CNA stated in its interrogatory responses that it has or may assert defenses to all of the CNA CVA Claims. *Id.* (responses to interrogatories 4-16); DX-G.[17] CNA thus accentuates the impossibility of proving actual damages by continuing to maintain coverage defenses without providing any means for the Court evaluate the effect of those defenses.[18]

## 3. CNA Disagrees With The Committee's Beliefs About CNA's Liability

48. Without any evidence of damages of its own to put forward, CNA at trial stated that it was relying on the Committee's belief that CNA would potentially be liable for "hundreds of millions of dollars" in damages. Trial Tr. 7/29 at 97:14-20. Ms. Tesmer acknowledged, however,

---

[17] CNA objected to the admission of DX-G. However, that chart is merely a summary of certain interrogatory responses in DX-F and is admissible pursuant to F.R.E. 1006, and the Committee moves its admission.
[18] Ms. Tesmer reiterated that CNA believed (and believes) it had (and has) defenses to coverage, and that it could ultimately have no liability for the Sexual Abuse Claims. Trial Tr. 7/29 103:22-104:5, 106:19-107:9.

that the purpose of the trial was not to estimate damages but to prove the amount of actual damages. *Id.* at 97:21-24. Ms. Tesmer also testified that CNA "vigorously" disputes the Committee's belief regarding damages. *Id.* at 104:6-12; 104:13-105:8; *see* Trial Ex. 49 at 14. Moreover, the Committee's beliefs as to CNA's liability are, as the Committee stated in the Joint Plan Disclosure Statement, subject to substantial risks and the Trust might recover nothing. Trial Ex. 47 at 99.

### 4. Tesmer Testimony On Reliance Damages

49. In discovery, CNA represented that it would not produce documents such as attorney invoices that contained attorney-client privileged or work-product information. DX-C at 31-32 (Response to Request 20), 41 (Response to Request 30). It is not contested that CNA has produced one set of invoices, for expert services (for less than $250,000 for the period of September 2021 through August 2022), but no attorney invoices. *Id.* Ex. 50; Trial Tr. 7/29 at 90:18-23.

50. In an about-face surprise at trial, and over the Diocese's and Committee's objections, Ms. Tesmer testified that, after her deposition, she reviewed the unproduced attorney invoices in the bankruptcy proceeding and, applying her own subjective judgment and standards, arrived at an amount that she believed would constitute damages for attorney work expended in negotiating the Proposed CNA Agreement and supporting the 9019 Motion. Trial Tr. 7/29 56:3-57:3, 108:4-109:7. Given CNA's refusal to produce the underlying documents, which denied Defendants a fair opportunity to examine Ms. Tesmer at her deposition and at trial, Ms. Tesmer's testimony on the amount of attorneys' fees incurred by CNA should be stricken or disregarded.

51. As to NERA, Ms. Tesmer stated that the payment of the NERA invoices was part of CNA's damages from the Diocese's alleged breach. But they aren't. Ms. Tesmer said that the purpose of hiring NERA was: "if we were to settle with the Diocese, we would need somebody to … do the research as to whether it was reasonable." Trial Tr. 7/29 at 53:13-16. And NERA went

right to work in September 2021, well in advance of any settlement or the filing of the 9019 Motion. *Id.* at 53:17-54:2, 87:18-88:11. Ms. Tesmer's timeline is an admission that CNA was going to incur the expenses for NERA's work, regardless of whether they were able to convince the Diocese to settle with them; the exact opposite of reliance damages.

### 5. CNA Presented No Expert Testimony On Damages

52. None of CNA's experts testified as to any opinion about CNA's potential liability for judgments or settlements, or the amount of fees that CNA might incur to the point of resolution of any claims against it. Dr. Martin did not value the CNA CVA Claims or CNA's potential liability or costs. Trial Tr. 7/30 at 333:14-334:4. Ms. Hilliker's testimony was both that CVA litigation could be arduous, time consuming and unrewarding to the plaintiffs – but also that many matters settled and that either party could succeed at trial. *See* Trial Tr. 7/30 at 239:17-240:21. Mr. Delahunt testified that CNA's defenses to coverage are "viable" but could pin no estimate of CNA's likelihood of success. *Id.* at 252:15- 253:9. In short, CNA's experts provided no basis for determining CNA's damages.

## LEGAL ANALYSIS

### I. THERE IS NO CLAIM FOR BREACH OR ANTICIPATED BREACH OF CONTRACT OVER AN UNAPPROVED SETTLEMENT AGREEMENT

53. Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." The Second Circuit makes clear that "[*b*]*efore pre-plan settlements can take effect, however, they must be approved by the bankruptcy court pursuant to Bankruptcy Rule 9019.*[19] Applying the Second Circuit's rule in *Iridium*, the Southern District of New York in *Salim v. Nisselson (In re Big Apple Volkswagen, LLC)*, 571 B.R.

---

[19] *Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (emphasis added).

43, 59 (S.D.N.Y. 2017) affirmed the bankruptcy court's dismissal of plaintiff's claim for breach of a settlement agreement by the trustee where (as here) the settlement agreement had not been approved by the bankruptcy court.

54.     The district court observed that the "overwhelming majority" of courts take the view that settlement agreements can be enforced only if approved by the bankruptcy court. *Id.* at 53 (collecting cases). The court reasoned:

> By requiring court approval following a hearing before any compromise or settlement may be enforced, Rule 9019(a) … guarantees transparency in the process of compromise or settlement and provides other creditors an opportunity to voice their concerns. While compromise is favored in bankruptcy, Rule 9019(a) operates as an important check on the process, ensuring that any compromise or settlement will be effective only after it is disclosed to other creditors and reviewed by the bankruptcy court. And if the Rule were not mandatory, as Salim argues, it would do little to "prevent the making of concealed agreements," for any compromise or settlement could be enforced without notice to other creditors or to the bankruptcy court.

*Id.* at 57. Because the claimed agreement in the case had not been approved under Rule 9019, the Court held: "*Accordingly, this agreement is not enforceable, and Salim's breach of contract claim fails as a matter of law.*" *Id.* at 57-58 (emphasis added).

55.     The *Liberty Towers* cases are not to the contrary. While *Liberty Towers* provides that a party may not unilaterally repudiate an otherwise binding settlement subject to a 9019 motion (not the case here as discussed in Point II, *infra*), it does not grant to the counterparty a claim for breach of contract for an agreement not approved by the bankruptcy court nor for an unexecuted agreement that the parties did not intend to be binding.[20]  Rather, *Liberty Towers* reconciles a debtor's fiduciary duty if an agreement is no longer in the best interests of the estate by expressly

---

[20] *Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 734 F. App'x 68 (2d Cir. 2018); *see In re Motors Liquid. Co.,* 580 B.R. at 344.

permitting the debtor to oppose approval.[21] *Liberty Towers* does not permit an affected party to sit back and later bring claim for breach of an agreement that might never have been approved.

56.     Here, CNA did not pursue approval of the Proposed CNA Agreement, because it knew that the Court would not cram the settlement through over the objection of the Committee and Survivors.  CNA has no right to seek damages for breach or anticipated breach; its remedy was to have the agreement's approval dealt with in the 9019 Motion.  The Adversary Complaint rests on a claim for breach of contract of a settlement agreement that has not been approved by this Court.  It cannot succeed.

## II.     EVEN AS ASSERTED, CNA'S BREACH AND ANTICIPATORY BREACH OF CONTRACT CLAIMS FAIL

57.     Even if CNA could get past the Rule 9019 prohibition on enforcing unapproved settlement agreements, its breach and anticipatory breach of contract claims would fail.  Under New York law, to establish a cause of action for breach of contract, a plaintiff must prove that (i) a contract was formed, (ii) the plaintiff performed in accordance with the contract, (iii) the defendant breached its contractual obligations, and (iv) the defendant's breach resulted in actual damages.[22]

58.     "An agreement to settle litigation is a 'contract that is interpreted according to general principles of contract law[.]'"[23]  A binding and enforceable contract exists under New York law only if the plaintiff establishes "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."[24]  "The party seeking to enforce a purported settlement agreement bears

---

[21] *Liberty Towers*, 569 B.R. at 542-43.
[22] *Schoninger v. Green*, 763 F. App'x 1, 4 (2d Cir. 2019); *34-06 73 LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).
[23] *In re Motors Liquidation Co.*, 580 B.R. 319, 343 (Bankr. S.D.N.Y. 2018) (quoting *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005)).
[24] *Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, 98 A.D.3d 403, 404 (1st Dep't 2012), *aff'd*, 20 N.Y.3d 1082 (2013).

the burden of proving that such a binding and enforceable agreement exists."[25] "[W]hether a binding agreement exists is a legal issue, not a factual one." [26] The existence of a binding contract "is not dependent on the subjective intent of either [party]," but "depends upon the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." [27]

## III.  THE DIOCESE NEVER ENTERED INTO THE PROPOSED CNA AGREEMENT AND THE CONDITIONS PRECEDENT TO THE DIOCESE BEING BOUND DID NOT OCCUR

59.    Absent *objective* evidence of an intent to be bound, an unsigned proposed agreement lacks the requisite mutual assent necessary to give rise to a binding and enforceable contract.[28]

60.    In addressing a similar attempt to enforce an unsigned settlement agreement, the court in *Motors Liquidation* held that an express reservation not to be bound until all parties had signed the written agreement made it unenforceable, even where it was undisputed that "all of the parties to the Settlement Agreement had agreed to all of the material terms of their settlement, and the parties all 'signed off' on the written draft of the Settlement Agreement."  580 B.R. at 327.  *Id*. at 327-28.    The *Motors Liquidation* court stressed the importance courts accord to a party's inclusion of an express reservation not to be bound by a document until it is fully executed by all parties.[29]

---

[25] *Grgurev v. Licul*, No. 1:15-cv-9805-GHW, 2016 U.S. Dist. LEXIS 156162, at *10 (S.D.N.Y. Nov. 9, 2016); *Galarneau v. D'Andrea*, 1 2 6 N . Y . S . 3 d 7 6 6 , 7 6 7 - 6 8 (3d Dep't 2020).
[26] *Schoninger*, 763 F. App'x at 4 (quoting *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008)).
[27] *Schoninger*, 763 F. App'x at 4-5. (internal citations omitted).
[28] *See StarVest Partners II, L.P. v. Emportal, Inc.*, 957 N.Y.S.2d 93, 95 (1st Dep't 2012) (dismissing contract claim "where, as here, the parties have agreed that there would be no binding agreement until their execution of a written contract, but no such contract was ever executed."); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 50 (1st Dep't 2010) ("Generally, where the parties anticipate that a signed writing is required, there is no contract until one is delivered.").
[29] *Motors Liquidation*, 580 B.R. at 344 (citing *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) and quoting *Kaczmarcysk v. Dutton*, 414 F. App'x 354, 355 (2d Cir. 2011)).

61.     The *Motors Liquidation* court went on to emphasize the importance courts accord to a party's inclusion of an express reservation not to be bound by a document until it is fully executed by all parties:

> [I]f either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.  Moreover, if there is a writing between the parties "show[ing] that [the defendant] did not intend to be bound," a court may "look no further than this factor."[30]

62.     Here, the plain meaning of "Settlement Agreement Effective Date" (as defined in Section 1.1.41 and used throughout the Proposed CNA Agreement) includes a reservation that the proposed settlement with CNA would not be binding on the DOR Entities without formal execution by all parties.[31]  Trial Ex. 1, Doc. # 190-4 § 1.1.41.  If that language left any doubt, the form of Approval Order signed off on by CNA, which required Court authorization for the Diocese to "enter into" the Proposed CNA Agreement, makes it clear that the parties knew and understood that the Diocese would and could not enter into the agreement until the Court gave its imprimatur.[32]

63.     The evidence is unambiguous:  the parties did not intend for the Diocese to enter into the Proposed CNA Agreement unless and until the Court approved it.[33]

---

[30] *Motors Liquidation*, 580 B.R. at 344 (citing *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) and quoting *Kaczmarcysk v. Dutton*, 414 F. App'x 354, 355 (2d Cir. 2011)).

[31]  The fact other Diocese Parties other than the Diocese did not sign the agreement makes it clear that it was never executed or effective. Assuming the court accepts that filing the 9019 signals acceptance by the Diocese, the same cannot be said regarding these parties.

[32] *See Berman v. Sugo LLC*, 580 F. Supp.2d 191, 203 (S.D.N.Y. 2008) (parties did not intend to be bound due to contract language stating "[t]his Agreement shall be effective when it is signed by all of the Members"); *see also* CPLR 2104 (providing in relevant part, "[a]n agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing *subscribed by him or his attorney* or reduced to the form of an order and entered." (emphasis added)).

[33] *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363 (2005), cited by CNA in its opening statement, is not to the contrary; it is simply the flip side of the "objective intent" coin.  *Flores* requires an objective manifestation of intent for a party to be bound absent its signature.  *Id.* at 369.  But as set out here, the parties' objective manifestation of intent, as described above, is clear — the agreement would not be binding until the Court approved the 9019 Motion and authorized the Diocese to enter into the agreement.

Case 2-23-02014-PRW,    Doc 82,    Filed 08/30/24,    Entered 08/30/24 15:22:52,    Description: Main Document  , Page 28 of 36

64.     The provisions of the Proposed CNA Agreement also unambiguously establish several conditions precedent to formation of the contract.

65.     Under New York law, "[a] condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises."[34] A condition precedent can be a condition to the formation or existence of a contract.[35] Where a written agreement is based upon the satisfaction of a condition precedent, "no contract arises unless and until the condition occurs."[36] Where the clear written intent of the parties indicates that any agreement is subject to the occurrence of certain conditions precedent, and such conditions do not occur, the parties are not bound. *See West Hills Auto Repair v. State*, 32 A.D.3d 849, 850 (2d Dep't 2006).

66.     The evidence at trial confirmed the plain and unambiguous terms of the Proposed CNA Agreement: the Diocese did not intend to be bound to the Proposed CNA Agreement until and unless (among other things) it was approved by the Court, signed by all requisite parties, and implemented through a confirmed chapter 11 plan.[37] The Proposed CNA Agreement establishes that the Diocese reserved the right not to be bound except upon the occurrence of multiple conditions precedent. Trial Ex. 1, Doc. # 190-4 § 1.1.41.

67.     Additionally, the above-referenced "Plan Confirmation Order," entry of which is a condition precedent to contract formation, required this Court to confirm a chapter 11 plan containing third-party release and injunction provisions in favor of CNA and the Diocese Participating Parties. In light of the opposition by the Committee and Survivors to the proposed

---

[34] *Bedoya v. Rodriguez*, 131 N.Y.S.3d 45, 47 (2d Dep't 2020) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995) (quoting Calamari & Perillo, Contracts § 11-2 at 438 (3d ed.))).
[35] *See Oppenheimer*, 86 N.Y.2d at 690.
[36] *Id.* (internal quotations omitted).
[37] These are all conditions to the formation and effectiveness of the proposed agreement. *See* Trial Ex. 1, Doc. # 190-4 §§ 1.4.41 (conditions to the Settlement Agreement Effective Date), 8.21 ("This Settlement Agreement shall be effective on the Settlement Agreement Effective Date.").

settlement with CNA, and with the resounding rejection by 85% of voting survivors of the CNA Plan (*see* DX-X, Doc. # 2707-1 at 2) it is clear now that such releases and injunctions could not have been consensual and are therefore precisely the type of impermissible provisions the Supreme Court recently held to be beyond the power of bankruptcy courts to authorize. *See Harrington*, 144 S. Ct. at 2088 (Bankruptcy Code does not authorize non-consensual third-party releases).[38]

68.     Nothing in the record before this Court establishes that any of the conditions precedent to the Proposed CNA Agreement becoming a valid and binding contract have been satisfied   Accordingly, no enforceable contract has been (or could be, given *Purdue*) formed under New York law.

69.     In addition to conditions precedent to effectiveness, the Proposed CNA Agreement provided for the termination of the agreement – meaning that neither party would need to continue to pursue the 9019 Motion or fulfill the conditions to there being a binding agreement, including that CNA could terminate the agreement "if the Diocese files a plan inconsistent with this Settlement Agreement."   Proposed CNA Agreement § 5.2.   Thus, CNA may terminate the agreement, ending its obligation to make the settlement payment.   CNA's remedies should not be expanded beyond the terms of the agreement.[39]

---

[38] CNA's witness testified that CNA was concerned about the potential of a decision in *Purdue* limiting the availability of releases for non-debtor entities.  CNA should not be rewarded for attempting to front-run a decision in *Purdue* by hastily seeking confirmation of a plan not acceptable to Survivors.  Moreover, the Proposed CNA Agreement was rejected by about 85% of Survivors voting on the CNA Plan.  Reinforcing the importance of this issue to CNA, the parties are able to terminate the pursuit of the Proposed Settlement Agreement as the Supreme Court issued "a precedential decision…holding that the federal courts lack the subject matter jurisdiction, the statutory authority, or the Constitutional ability to issue the Channeling Injunction or the Supplemental Injunction."  Proposed CNA Agreement § 5.2(v).

[39] On December 18, 2023 (more than 18 months after the Diocese first presented the Proposed CNA Agreement to the Court by filing the Second Settlement Motion), the Diocese delivered to CNA a notice of termination of the Proposed CNA Agreement pursuant to section 5.2 thereof.   Trial Ex. 39.   If there was an agreement, it has been terminated according to its terms, and the Diocese has no liability.   Termination of a contract according to its terms is not a breach.  *Lion Bee Equities LLC v. Citibank N.A.*, No. 652033/2016, 2018 N.Y. Misc. LEXIS 3176, at *10 (Sup. Ct. N.Y. County Mar. 26, 2018).

## IV.    THE 9019 MOTION WOULD HAVE BEEN DENIED

70.    The Proposed CNA Agreement would not have been approved under Rule 9019 for the reasons set out in the Committee's Objection to the 9019 Motion (Trial Ex. 18).  Time and trial have only emphasized the bases for the Committee's objection; the Proposed CNA Agreement fails to meet the standard for approval of a settlement pursuant to Rule 9019 set out in *Iridium*. *See* 478 F.3d at 262 (setting out 7-factor test); 9019 Objection at 10.  Most importantly, the Proposed CNA Agreement utterly failed the paramount interests of creditors, as demonstrated at the outset by the Committee's objection and confirmed by the Survivors' overwhelming rejection of the CNA Plan.  DX-X.

71.    CNA at trial failed to show that other *Iridium* factors, (1) particularly the balance between the litigations' possibility of success and settlement future benefits, and (2) the likelihood of complex and protracted litigation, weigh in favor of approval.

72.    Dr. Martin's analysis is not relevant to the *Iridium* factors as she did not express an opinion as to whether the proposed CNA Settlement Amount would have provided reasonable economic value to the Survivors.  Her testimony was limited to "aggregate outcomes." Trial Tr. 7/30 at 349:4.  Moreover, as pointed out by Ms. McNally, Dr. Martin's analysis as to "reasonable compensation" was fundamentally flawed failing to take into account significant variables.  Even for the variable accounted for by Dr. Martin, Dr Martin ignored material factors – including whether claims were outside of the statute of limitations – in performing her analysis.

73.    While Mr. Delahunt testified about CNA's potential defenses, he did not express an opinion as to CNA's likelihood of success on any of these defenses, only that such defenses were "viable." Trial Tr. 7/30 at 286:4-5.  Thus, Mr. Delahunt does not provide any basis to assess whether the proposed settlement was "reasonable."  Similarly, Ms. Hilliker offered no specific testimony as to the potential length of time any of the CVA Claims pending against the Diocese

might take to resolve or whether such claims would settle. She testified merely that litigation provides risk for both sides which can encourage settlement. *See id.* at 239:17-240:21.

74.    The evidence showed that 85% of the Survivors rejected an amount from CNA that was $11 million more than the proposed CNA Settlement Amount. The Survivors' rejection of the proposed CNA Settlement Amount shows that the 9019 Motion would not have been approved and no plan integrating the proposed CNA Settlement Amount could have been confirmed.[40]

75.    Because the Proposed CNA Agreement would not have been approved, it would be impossible to perform, and the Diocese could not be held to account for any part of it.[41]

## V.    CNA IS NOT ENTITLED TO AN ADMINISTRATIVE CLAIM OR DAMAGES

76.    Bankruptcy Code § 503(c)(3) disallows administrative expense claims for post-confirmation damages relating to judgments, costs, expenses, settlements and litigation based on unapproved, non-ordinary course agreements. Administrative priority claims must be strictly and narrowly construed. *Zurich Am. Ins. Co. v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.)*, 371 B.R. 210, 224 (E.D. Ky. 2007), *aff'd*, 2008 U.S. App. LEXIS 17162 (6th Cir. Aug. 13, 2008. In the first instance, costs and expenses arising after confirmation cannot be the subject of an administrative claim. To qualify for priority treatment as an administrative claim, the costs and expenses that the would-be claimant seeks must be "actual." § 503(b)(1)(A). That is, they (1) must exist at the time the claim is made and (2) may not arise after confirmation.

77.    As the court in *Zurich American* stated:

---

[40] Nothing in the testimony of CNA's experts evidenced the reasonableness of the proposed CNA Settlement Amount or whether the 9019 Motion would be approved. Moreover, CNA's experts ignore the fact that, since the settlement was subject to confirmation of a plan, Survivors' votes could render the Proposed CNA Agreement moot by voting to reject a plan with the settlement. The vote is actual; the experts' opinions are only hypothetical. The vote is the reality-based arbiter of reasonableness.

[41] Even if the 9019 Motion were approved, such approval would not guarantee that the settlement would be effectuated because the ultimate approval of the settlement was in Survivor's hands when deciding to vote on a plan. Here, Survivors overwhelmingly rejected the CNA Plan.

To that effect, the narrow application of § 503(b)(1)(A) is rather unambiguous on its face: the claimed expense must have been an "actual" cost that is "necessary" to the "preservation" of the estate. It is in this regard that Zurich's claim fails as a simple matter of statutory interpretation on both fronts: the claimed expenses are not "actual" (i.e., not yet realized) and the payment thereof, when the obligations are realized, cannot act to preserve an estate that no longer exists. At the moment Zurich's Claim was filed on the bar date for administrative expense claims, *the ultimate loss projection for the deductible obligations was entirely speculative by nature and prospective by definition.*

371 B.R. at 225 (emphasis added) (internal citations omitted).

78.     This case is on all fours with *Zurich American.*  CNA seeks:

[R]eimbursement of [CNA]'s costs and expenses for pursuing this action and defending itself against the Debtor's liability and any action brought by the Trust or other purported beneficiaries of any alleged insurance coverage, and any amounts [CNA] becomes obligated to pay on account of the Debtor's liability for the Sex Abuse Claims beyond the [CNA] Settlement Amount.

Adversary Complaint at 12, 15.

79.     As in *Zurich American*, CNA's obligations for costs of "defending itself against the Debtor's liability and any action brought by the Trust" (exceeding at least $63.5 or $75 million) can only be triggered well after confirmation and plan effectiveness – once the Trust established under the Joint Plan is created *and* once the Trust approves Litigation Claims to be brought *and* after CNA has expended costs and is obligated to indemnify for judgments or settlements of those Litigation Claims.  The costs and expenses have not and cannot be realized until after confirmation and the effective date; as in *Zurich American* they are "speculative" and "prospective," and at that point, there will no longer be an estate to preserve. These costs cannot be awarded because they do not exist for recovery.[42]

---

[42] *Appalachian Fuels* is inapposite to this case.  *First*, there was no question of the existence of a that under law the applicable environmental laws, the duty to perform under the state issued permits and any liability from failing to perform arose post-petition.  *Second*, because the case involved liability for environmental obligations, the benefit to

80.     Governing New York law sets out the standard for the award of damages for breach of contract: "the amount of damages claimed [must] be measurable with a reasonable degree of certainty and, of course, adequately proven."[43] *Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974) (addressing expectation and reliance damages for plaintiff's failure of proof). *See also Bersin Props., LLC*, 2022 NY Slip Op 50084(U), at *15.

81.     Even if the Court could find some basis for holding the Diocese liable for breach of the Proposed CNA Agreement, CNA has failed to prove its damages. CNA in documentary discovery and witness testimony has affirmatively stated that its liability and other costs and expenses are impossible to determine. *See supra* ¶¶ 44-47. It stands on its purported comprehensive coverage defenses, which are in direct contradiction to the implication that it will face significant liability beyond $63.5 million for the Administrative Claim. *See supra* ¶¶ 47. Its three expert witnesses, including an economics and statistics expert, made no assessment of CNA's potential liability or costs with respect the CNA CVA Claims, much less any attempt at valuation or estimation of that liability. *See supra* ¶ 52. CNA has utterly failed to shoulder its burden of proof as to its potential obligations, costs, or other expenses that CNA might incur in defending against the claims if the Joint Plan is confirmed. There is simply no basis to find that CNA has some claim that supports allowance in any amount.

---

the estate necessary for an administrative claim was presumed. *Third*, the court found that even if such claims were not deemed to have provided a benefit to the estate, that the permits added value to the estate post-petition warranting an administrative claim. *Finally*, the court was able to estimate the amount of the asserted claim. *In re Appalachian Fuels, LLC*, 521 B.R. 779 (Bankr. E.D. Ky. 2014). In this case, the Proposed CNA Agreement was not authorized by the Court as required by the Bankruptcy Code, did not provide a benefit to the estate, and, as in *Zurich American*, CNA would have no contractual right to payment until after it was required to pay in excess of at least $63.5 million in judgments.

[43] While CNA cannot prove either benefit of the bargain damages (the judgments and settlements for which it might eventually, possibly, maybe, have to indemnify the Diocese) or reliance damages (the costs incurred in support of the 9019 Motion), as a matter of New York law, a plaintiff can only claim reliance damages in the alternative if it cannot prove expectation damages to a reasonable certainty, and it still must prove its reliance damages to a reasonable certainty. *See Bersin Props., LLC v. Nomura Credit & Cap., Inc.*, 74 Misc. 3d 1209(A), 2022 NY Slip Op. 50084(U), at *15 (Sup. Ct. N.Y. County Feb. 7, 2022) (expectation and reliance damages are alternative; denying both as speculative); *see also* Restatement (Second) of Contracts §349.

## VI. THE COURT CANNOT ESTIMATE THE ADMINISTRATIVE CLAIM

82.     The Court was clear at the July 19, 2024 pretrial conference that, because it was trying the Administrative Claim, it would evaluate the administrative claim for purposes of allowance rather than estimation for feasibility.  Notwithstanding, CNA presented argument and testimony concerning estimation of the Administrative Claim at trial. However, as set forth in the Objection to CNA's Motion to Estimate the Administrative Claim cannot be estimated.

83.     Section 503 of the Bankruptcy Code, governing administrative expense claims, does not provide for estimation of administrative claims for allowance, unlike Bankruptcy Code § 502(c), for prepetition claims, which does provide for estimation for allowance.  *In re MacDonald,* 128 B.R. 161, 165 (Bankr. W.D. Tex. 1991).  Here, there is no point in estimating CNA's administrative expense claim in an amount certain for "feasibility" purposes at confirmation when there is no possibility that the claim will mature to an *actual* amount — an amount that is *certain* and *realized* — at the time the Joint Plan would become effective.  At the effective date, the Administrative Claim cannot possibly be "actual" — because none of the Litigation Claims can be resolved by settlement or judgment, much less the totality of CNA's obligations determined, before the Joint Plan becomes effective and the trust established by the plan becomes operational.  "Chapter 11 proceedings may not be held hostage by the filing of claims so vague and unsupported that their estimation and liquidation become one and the same process." *Aspen Limousine Servs., Inc. v. Aspen Limousine Serv., Inc.*, 193 B.R. 325, 338 (D. Colo. 1996).[44]

### CONCLUSION

84.     For all of the reasons set forth herein, and after taking into consideration the full record before this Court, including such exhibits and testimony as were presented at trial, the Court

---

[44] The Committee further notes that the Administrative Claim cannot be estimated because it is speculative, for the same reasons as set forth in Section V, *supra*.

Case 2-23-02014-PRW,    Doc 82,    Filed 08/30/24    Entered 08/30/24 15:22:52,
Description: Main Document  , Page 35 of 36

should render judgment (i) dismissing the CNA Adversary Proceeding in its entirety; (ii) denying the CNA Administrative Expense Application; and (iii) and granting such other relief as the Court deems just and proper.

Dated:  August 29, 2024                          Respectfully submitted,

                                                 */s/ Ilan D. Scharf*
                                                 PACHULSKI STANG ZIEHL & JONES LLP
                                                 James I. Stang (admitted *pro hac vice*)
                                                 Ilan D. Scharf
                                                 Iain Nasatir
                                                 Karen B. Dine
                                                 Jeffrey M. Dine
                                                 780 Third Avenue, 34th Floor
                                                 New York, NY  10017
                                                 Telephone:  (212) 561-7700
                                                 Facsimile:   (212) 561-7777
                                                 Email:    jstang@pszjlaw.com
                                                            ischarf@pszjlaw.com
                                                            inasatir@pszjlaw.com
                                                            kdine@pszjlaw.com
                                                            jdine@pszjlaw.com

                                                 *Counsel to the Official Committee of Unsecured Creditors*

                                                 BURNS BAIR LLP
                                                 Timothy W. Burns (admitted *pro hac vice*)
                                                 Jesse J. Bair (admitted *pro hac vice*)
                                                 10 E. Doty Street, Suite 600
                                                 Madison, WI 53703
                                                 Telephone: (608) 286-2302
                                                 Email:    tburns@burnsbair.com
                                                            jbair@burnsbair.com

                                                 *Special Insurance Counsel to the Official Committee of Unsecured Creditors*