UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:

 The Diocese of Rochester,                    Bankruptcy Case No. 19-20905
                                              Chapter 11
                    Debtor.
_____

 THE CONTINENTAL INSURANCE
 COMPANY, successor by merger to
 Commercial Insurance Company of Newark,
 New Jersey, and Fireman's Insurance Company
 of Newark, New Jersey,

                    Plaintiff,                 Adversary Proceeding No. 23-02014

        v.

 The Diocese of Rochester,

                    Defendant.

_____

**DECISION AND ORDER
FOLLOWING BENCH TRIAL
DISMISSING ADVERSARY PROCEEDING ON THE MERITS,
DENYING APPLICATION FOR ESTIMATION OF
ADMINISTRATIVE EXPENSE CLAIM,
AND DIRECTING THE PARTIES IN INTEREST TO
MEET AND CONFER WITH REPLACEMENT MEDIATORS
TO ESTABLISH PROCEDURES
AND TIMING FOR MEDIATION**

PAUL R. WARREN, U.S.B.J.

## I.

## INTRODUCTION

Despite the profusion of words in this Decision, the mountains of exhibits introduced in

evidence at trial, and the hours of witness testimony, this Decision dismissing The Continental

Insurance Company's ("CNA") Adversary Proceeding against the Diocese does not advance the

Chapter 11 bankruptcy case one inch. As the Court has repeatedly reminded the attorneys (who

don't need reminding), this case will be resolved only through a consensual global settlement. The impact of the Supreme Court's decision in *Purdue Pharma*[1] makes that point clear. Both CNA and the state court attorneys representing the abuse victims need to reexamine the lines in the sand they have drawn and find a way to move toward a realistic framework for settlement; if they can't or won't, then CNA and the abuse victims must be prepared to live with the consequences of their unwillingness to bend.

## II.

## SUMMARY OF HOLDING

CNA commenced this Adversary Proceeding against the Diocese by filing a complaint alleging that the Diocese breached a settlement agreement between the parties. (ECF AP Nos. 1, 3).[2] CNA then filed a motion requesting that the Court estimate its administrative expense claim, asserting that CNA's administrative expense claim would be sufficiently large to render any Chapter 11 Plan proposed by the Diocese economically infeasible. (ECF AP No. 18; ECF BK No. 2453).

After the Court denied the Diocese's motion to dismiss the complaint under Rule 12(b)(6) FRCP, both the Diocese and the Committee (as an intervenor) filed answers to the complaint. (ECF AP Nos. 19, 23, 25, 32). At the request of the parties, the Court issued an Order setting an accelerated deadline for the completion of discovery and scheduling a bench trial for July 29, 2024. (ECF AP Nos. 30, 35). A two-day trial was held as scheduled. For the reasons that follow, and after careful consideration of the testimony of the witnesses called to testify at trial and exhibits admitted in evidence at trial, CNA's Adversary Proceeding is

---

[1]     *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024).

[2]     References to the docket in Bankruptcy Case No. 19-20905 will be cited as ECF BK No. References to the docket in Adversary Proceeding No. 23-02014 will be cited as ECF AP No.

**DISMISSED** on the merits. As a necessary consequence, CNA's application for administrative claim status (ECF BK No. 2314) and CNA's motion for estimation of its alleged administrative expense claim (ECF AP No. 18; ECF BK No. 2453) are **DENIED**.

**III.**

**ISSUES AT THE HEART OF THIS LITIGATION**

The issues in dispute are whether the settlement agreement contains conditions precedent to contract formation (as the Diocese asserts) or conditions precedent to contract performance (as CNA would have it). In other words, was there a binding contract between the parties, despite both the lack of signatures by the parties and the lack of approval of the settlement agreement by the Court?

If there was no binding contract between CNA and the Diocese, then CNA's claims for breach of contract and anticipatory breach of contract fail. If there was a binding contract between the parties and if the Diocese breached that contract, has CNA suffered actual damages proximately caused by that breach, the amount of which has been proven by CNA to a reasonable degree of certainty—or are CNA's alleged damages speculative, remote and unsubstantiated? If CNA has failed at trial to prove its damages, then CNA's claims for breach of contract and anticipatory breach of contract must fail.

**IV.**

**FINDINGS OF FACT**

**A.  Facts Concerning Procedural Posture and Settlement Agreement**

Rule 7052 FRBP requires that the Court make findings of fact following the conclusion of a trial. These findings of fact are based on the exhibits admitted and testimony of witnesses at trial.

3

This Chapter 11 case was filed by the Diocese on September 12, 2019, in an attempt to deal with the multitude of sexual abuse claims anticipated to be brought as a result of the reopening of the statute of limitations by New York's Child Victims Act ("CVA"). (Trial Ex. 47 at 13). The Diocese then filed an Adversary Proceeding against a number of insurance carriers, including CNA, seeking a declaratory judgment concerning the Diocese's rights under certain insurance policies that might provide coverage for abuse claims. (AP Case No. 19-02021). Rather than allowing litigation in the Adversary Proceeding to simply move forward, the Court promptly entered an Order requiring the parties to seek a resolution through mediation. (AP Case No. 19-02021, ECF No. 39).

Following many months of mediation sessions conducted by Judge Gregg W. Zive, in late May 2021, the Diocese filed a motion requesting the Court's approval of a settlement agreement between the Diocese and two carriers—certain Underwriters at Lloyd's, London, certain London Market Companies (jointly "LMI") and Interstate Fire & Casualty Company and National Surety Corporation ("Interstate"). (AP Case No. 19-02021, ECF No. 99). The motion was also filed in the main bankruptcy case on June 17, 2021. (ECF BK No. 1101). Attached to the motion is a copy of a "Settlement Agreement and Release" dated May 26, 2021. (ECF BK No. 1101, Ex. A). The settlement agreement bears the signatures of representatives of the Diocese, LMI and Interstate. (*Id.* at 43-45). And the motion is titled "MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT . . . ." (ECF BK No. 1101 at 4). Even though it was signed by the Diocese, LMI and Interstate, the settlement agreement would not become "effective" until it was executed by all parties and the Court entered an Order approving the agreement and that Order became a final order. (ECF BK No. 1101, Ex. A at 12 ¶ aa).

4

In the face of stiff opposition to the settlement agreement by the Committee, the Court entered an Order in July 2021, denying the Diocese's settlement motion. (AP Case No. 19-02021, ECF No. 153; ECF BK No. 1213). The Order directed the parties to return to mediation with Judge Zive and attempt to reach a "global settlement." (*Id.*). The parties returned for a series of mediation sessions with Judge Zive. In the late afternoon on May 20, 2022 (a Friday), the Diocese filed a "MOTION TO APPROVE PROPOSED INSURANCE SETTLEMENTS TO FUND SURVIVOR COMPENSATION TRUST." (AP Case No. 19-02021, ECF AP No. 190). At the Committee's request, apparently to provide the Committee with standing to be heard on the motion, the Diocese filed the motion in the bankruptcy case on June 23, 2022. (ECF BK No. 1538; Trial Tr. at 142:15-20).

Attached as an exhibit to the Diocese's motion is a copy of a "Settlement Agreement and Release" between the Diocese and its Insurers, including CNA. (AP Case No. 19-02021, ECF AP No. 190, Exs. A-D). The settlement agreement obligated CNA to pay $63.5 million for the benefit of abuse claimants "after satisfaction of all conditions precedent." (*Id.* at Ex. D ¶ 1.1.40). The settlement agreement provided that: "This Settlement Agreement shall be effective on the Settlement Agreement Effective Date." (*Id.* at ¶ 8.21).

> "Settlement Agreement Effective Date" means the day following the date on which all of the following have occurred: (i) all Parties have executed this Settlement Agreement; (ii) the Approval Order shall have become a Final Order; (iii) the Plan Confirmation Order shall have become a Final Order; (iv) the Trust shall have been created pursuant to the Plan; and (v) solely in the event Continental elects to set off more than Two Million Dollars ($2,000,000) in Defense and Indemnity Costs against the Settlement Amount pursuant to Section 2.3.4, (x) Continental shall have provided written notice to the Diocese of the amount of such setoff, (y) the Diocese shall not have exercised its right pursuant to Section 5.2 to terminate this Settlement Agreement on account of such proposed setoff, and (z) ten (10) days shall have elapsed from the date of Continental's delivery of notice to the Diocese.

(*Id.* at ¶ 1.1.41).  And:

> This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party.

(*Id.* at ¶ 8.6).  The settlement agreement contains a merger clause.  (*Id.* at ¶ 8.5).  And, the settlement agreement is governed by New York law.  (*Id.* at ¶ 8.19).  The settlement agreement is not signed by either the Diocese or any of the other Diocese Parties (parishes and other Catholic entities).  (*Id.* at 24-131).  There is no dispute that the Settlement Agreement Effective Date has never occurred.

During the same time frame, on April 6, 2022, the Diocese commenced an Adversary Proceeding by filing a complaint seeking to enjoin a number of CVA claimants from moving forward with state court actions against non-debtor Catholic entities (such as parishes and schools).  (AP Case No. 22-02075, ECF No. 1).  On the same day, the Diocese filed a motion requesting that the Court issue a preliminary injunction preventing the state court actions from moving forward until resolution of the Adversary Proceeding.  (AP Case No. 22-02075, ECF No. 4).  The motion was returnable on April 27, 2022.  (*Id.*).  The Committee filed opposition to the motion.  (AP Case No. 22-02075, ECF No. 17).  A number of CVA claimants joined the Committee in opposing the Diocese's motion.  (AP Case No. 22-02075, ECF Nos. 18, 19, 21, 24, 25, 31).  In its motion, the Diocese pointed out that it may seek to confirm a Chapter 11 plan that does not have the consent of the abuse survivors.  (AP Case No. 22-02075, ECF No. 4 ¶ 5).

On May 23, 2022 (the Monday following the filing of the Diocese's motion concerning the proposed insurance settlements), the Court issued a Decision and Order denying the Diocese's motion for a preliminary injunction and dismissing the Adversary Proceeding.  (AP

Case No. 22-02075, ECF No. 48).  In that Decision, when weighing the likelihood of a successful reorganization—a factor that must be considered by the Court in ruling on a request for a preliminary injunction—the Court stated:  "While obtaining confirmation of a non-consensual plan is not impossible, it makes the likelihood of a successful reorganization much more difficult."  (*Id*. at 12).

The Committee filed timely opposition to the motion, arguing that the settlement amounts to be paid by the Insurers, including the $63.5 million to be paid by CNA, was not sufficient.  (ECF BK No. 1555 at 17).  The Diocese, Committee and Insurers then entered into a "Stipulation and Order Regarding Discovery" in connection with the motion to approve the insurance settlements, by which the Court scheduled an evidentiary hearing to commence on January 24, 2023.  (ECF BK No. 1552 at ¶ 12).  The Diocese, Committee and Insurers engaged in further settlement discussions through mediation.  Those discussions resulted in offers of increased financial contributions by the Diocese and all of the Insurers, with the exception of CNA.  (Trial Ex. 47 at 24).

While the motion seeking approval of the CNA settlement agreement was pending the completion of discovery, the Diocese and Committee entered into a "Restructuring Support Agreement" ("RSA").  The Diocese then filed a motion seeking entry of an order approving the RSA.  (ECF BK No. 1790).  In keeping with the RSA, on March 24, 2023, the Diocese and Committee filed a "Joint Chapter 11 Plan," which has been amended a number of times.  (ECF BK Nos. 2047, 2217, 2426, 2493, 2576, 2593).  In response, on August 31, 2023, CNA filed its own competing Chapter 11 plan, in which CNA increased its settlement offer from $63.5 million to $75 million.  (ECF BK No. 2214).  And then, on November 7, 2023, CNA filed a complaint against the Diocese, alleging that the Diocese breached or anticipatorily breached the settlement

agreement with CNA, and seeking damages caused by that alleged breach of contract. (ECF AP No. 1).

On December 22, 2023, the Diocese and the Committee each filed a motion to dismiss CNA's complaint, under Rule 12(b)(6) FRCP, alleging that CNA failed to state a cause of action for which relief can be granted. (ECF AP Nos. 8-10). The Court heard argument on the motions on January 30, 2024. (ECF AP Nos. 16, 17). On March 1, 2024, the Court issued a Decision and Order denying the motions to dismiss, directing the Diocese and Committee to file answers to the complaint, and directing counsel to the parties to propose an accelerated discovery schedule. (ECF AP No. 19). Answers were timely filed by the Diocese and Committee. (ECF AP Nos. 25, 32). A Trial Scheduling Order was issued by the Court on April 15, 2024, scheduling the trial of the Adversary Proceeding to commence on July 29, 2024, and continuing that week until concluded. (ECF AP No. 35). The trial began as scheduled and was concluded in two days. (ECF AP Nos. 74, 75).

**B.  Witnesses Called at Trial by CNA**

   1.  Trisha Tesmer, Esq.

Ms. Tesmer was called by CNA as its first witness. (Trial Tr. at 25). Ms. Tesmer is a Managing Director of the Environmental Mass Tort Unit at CNA. (*Id.* at 25:18-19). The primary purpose of Ms. Tesmer's testimony was to demonstrate the reasonableness of the $63.5 million offered by CNA in the settlement agreement and to provide evidence of CNA's damages. First, Ms. Tesmer testified that she believed the $63.5 million settlement offer was reasonable, in an effort to bolster CNA's claim that the difference between the $63.5 million and any amount in excess of that could properly be included in CNA's damages. (Trial Tr. at 105-106). Second, Ms. Tesmer testified that CNA's damages could be $100 million. (Trial Tr. at 97). But, Ms.

Tesmer admitted that amount was based on documents filed by the Committee, in which the Committee asserted that CNA's exposure could be hundreds of millions of dollars. (*Id.*). Third, Ms. Tesmer testified that CNA has numerous defenses to coverage that, ultimately, could result in CNA having no liability for the abuse claims. (*Id.* at 103:22-104:5, 106:19-107:9). Ms. Tesmer's testimony concerning the strength of CNA's coverage defenses was far more compelling than her testimony concerning damages. There are no facts in the record to support Ms. Tesmer's attempt to show that CNA can properly claim as damages either the hundreds of millions of dollars that the Committee (speaking for the abuse victims) asserts CNA could be held liable for, or any amount in excess of $63.5 million offered by CNA in the settlement agreement. If anything, Ms. Tesmer's testimony about the strength of CNA's coverage defenses serves to underscore the possibility that CNA may not suffer any damages in the future, and not that CNA has or will suffer measurable damages.

Finally, in an effort to offer proof of CNA's damages, occasioned by the Diocese's alleged breach of contract, Ms. Tesmer testified that she estimated that CNA incurred legal fees of $579,000 in connection with the settlement agreement. (*Id.* at 57, 109-110). Not only did Ms. Tesmer not base her estimate on any documents admitted in evidence, Ms. Tesmer admitted that CNA had refused to produce any billing records to substantiate her testimony. (*Id.* at 110:20-22). While the Court denied an objection and motion to strike Ms. Tesmer's testimony (*Id.* at 57-58), the Court finds Ms. Tesmer's testimony concerning attorneys' fees incurred by CNA is entitled to no weight. The testimony was unsupported by any proof, and CNA specifically refused to provide proof of its attorneys' fees in discovery—stating that CNA would not seek such damages at trial. (Trial Tr. at 89-91). Thus far, Ms. Tesmer's testimony provided no

measurable proof of any damages suffered by CNA as a result of the Diocese's alleged breach of contract.

Which leaves the last arrow in Ms. Tesmer's quiver: the invoices (totaling $250,000) paid by CNA to its expert, NERA (National Economic Research Associates, Inc.). CNA has alleged that the costs of retaining and utilizing NERA—the economics expert retained by CNA to testify to the reasonableness of CNA's settlement offer—should be awarded to CNA as damages proximately caused by the Diocese's alleged breach of contract. (*Id.* at 53-55). Ms. Tesmer testified that CNA hired NERA in September 2021, "because we thought if we were to settle with the Diocese, we would need somebody to testify as to the reasonableness of that settlement and do the research as to whether it was reasonable." (*Id.* at 53:13-16). In other words, CNA retained its economic expert nearly a year before the Diocese filed its motion seeking court approval of the settlement agreement. The Court finds that CNA would have incurred the expenses of retaining an expert in an attempt to show the reasonableness of any amount it ultimately was willing to offer to buy back its insurance policies. The costs associated with the retention of an economics expert was not proximately caused by the Diocese's alleged breach of contract.

As to future damages that CNA claims will (or might) result from the Diocese's alleged breach of the settlement agreement, Ms. Tesmer testified that because the Committee has alleged that CNA could face exposure of hundreds of millions of dollars, CNA based its administrative claim of $100 million on that assertion by the Committee. However, CNA introduced no evidence at trial that tended to prove the amount of post-confirmation economic damages it might incur in both defending and paying for actions brought by abuse claimants. If CNA faces such damages, they are speculative and would occur, if at all, far in the future and long after

confirmation of a plan. The Court finds that CNA failed to introduce any credible evidence of measurable damages proximately caused by the Diocese's alleged breach.

2. Bishop Salvatore Matano

Bishop Matano was called by CNA as its second witness. The Bishop testified that he understood the settlement agreement with CNA to be a proposal. (Trial Tr. at 128:12). The Bishop also testified that the Diocese's motion seeking Court approval of the settlement agreement with CNA described the agreement as a "'proposal' 30 times." (*Id.* at 138:21). Further, the settlement agreement was not signed by the Diocese or other Catholic entities. (*Id.* at 141). The Bishop testified that the RSA with the Committee was an "agreement" because it was signed by all parties but the settlement agreement with CNA was a "proposal" because it was not signed by the Diocese. (*Id.* at 150-151). While the Bishop's testimony appeared a bit rehearsed, he was steadfast in his testimony that he understood the settlement agreement with CNA to be merely a proposal, conditioned on the occurrence of a number of events before it would become effective, none of which happened. (*Id.* at 141). The Court finds that the Bishop's testimony that he understood the settlement agreement to be a proposal was credible.

3. Lisa Passero

Lisa Passero, the Chief Financial Officer of the Diocese, was CNA's next witness. Ms. Passero repeatedly referred to the settlement with CNA as "proposed." (Trial Tr. at 160:11, 160:15, 160:19, 172:8, 172:13, 173:15-16, 173:21, 175:25; 179:18, 179:21). Ms. Passero further testified that the settlement agreement would only become effective after Court approval, entry of an order confirming a plan, and signature by all parties. (*Id.* at 173:22-174:2). While Ms. Passero's testimony appeared even more rehearsed than Bishop Matano's, Ms. Passero was steadfast in her testimony that the Diocese did not intend to be bound by the agreement, and her

11

decision not to sign the agreement was a conscious one. (*Id.* at 179:16-23). The Court finds Ms. Passero's testimony to be credible.

### 4. Father Condon

CNA's final witness on the first day of trial was Father Condon, Chancellor for the Diocese. (Trial Tr. at 182:19). Father Condon is a canon lawyer, charged with coordinating the Diocese's compliance with ecclesiastical and civil requirements. (*Id.* at 182-184). Father Condon testified that he understood the settlement agreement with CNA to be a proposal requiring Court approval to be effective. (*Id.* at 210). Father Condon, while seemingly genuine and candid, did nothing to advance CNA's attempt to prove that the act of contract formation had occurred.

### 5. Julia Hilliker, Esq.

CNA's first witness on the second day of trial was Julia Hilliker, Esq., an attorney representing institutions in defense of sexual abuse claims. (Trial Tr. at 223-224). Ms. Hilliker testified as an expert, although her brief testimony did nothing to inform the Court or to advance CNA's claim for damages. Ms. Hilliker testified that resolution of abuse claims is a lengthy process, presents proof problems for both sides if a long time has elapsed between the acts of abuse and commencement of litigation (as would be the case with claims brought under the CVA), and are risky for both sides. (*Id.* at 240). Ms. Hilliker testified that of the 11,000 CVA actions commenced in New York, less than 10 have proceeded to trial. (*Id.* at 227:22-228:3).

### 6. Timothy Delahunt, Esq.

CNA's next witness was Timothy Delahunt, Esq, offered as an expert with experience in insurance coverage litigation for policyholders (early on in his career) and insurers (for the past 20 years). (Trial Tr. at 249-251). Mr. Delahunt's professional experience did not include

12

litigating many of the defenses to sexual abuse claims that CNA has asserted in response to the Diocese's declaratory judgment action, such as the expected or intended defense, notice of occurrence defense, or the late notice defense. (*Id.* at 280-281). Mr. Delahunt's testimony was that CNA's defenses to coverage were viable. (*Id.* at 282-286). Mr. Delahunt's brief testimony did nothing to help establish CNA's claim that it will be damaged in the future by the Diocese's alleged breach of contract. In fact, in the Court's view, it tended to do just the opposite.

### 7. Denise Martin, PhD

The final expert witness called by CNA was Dr. Denise Martin, a Senior Managing Director at NERA. (Trial Tr. at 311-312). Dr. Martin offered her expert opinion concerning the "reasonableness" of the $147.75 million amount offered in the settlement agreement at issue, as compared to settlement amounts approved in other diocesan bankruptcy cases over the past two decades. (*Id.* at 313-331). Dr. Martin testified that all of the settlements in prior diocesan bankruptcies were approved by a court after negotiated settlements were reached, with the consent of the abuse victims. (*Id.* at 336). None of the cases to which Dr. Martin referred involved the Court approving a settlement that was not consensual. Dr. Martin did not offer an opinion as to whether potential settlements in current diocesan Chapter 11 cases might be affected by the unavailability of non-consensual third-party releases, as a result of the Supreme Court's *Purdue Pharma* decision, a prominent feature of every one of the 22 earlier diocesan Chapter 11 cases considered by Dr. Martin. The Court gives little weight to Dr. Martin's testimony and finds that her testimony was only marginally relevant, if at all.

Following the testimony of Dr. Martin, CNA rested. No motion was made requesting dismissal of CNA's complaint at the close of CNA's case, so we pressed on.[3]

## C. **Witnesses Called at Trial by the Committee**[4]

### 1. Professor Tom Baker

The Committee called Professor Baker as an expert witness to rebut the testimony of Ms. Hilliker and Mr. Delahunt. (Trial Tr. at 353:10-11). In a nutshell, Professor Baker opined that the resolution of abuse claims through litigation would take less time than Ms. Hilliker had predicted. (*Id.* at 362-364). An unremarkable opinion, in the Court's view. Additionally, Professor Baker testified about the strength of various defenses to which Mr. Delahunt testified. (*Id.* at 370-376). Professor Baker testified that the strength of an insurer's defense depends on the particular facts of each CVA claim. (*Id.* at 373-374). The Court, while mindful of Professor Baker's qualifications in academia, finds that Professor Baker (like Mr. Delahunt) simply stated the obvious when it comes to insurance defense litigation—it is highly fact dependent.

### 2. Catherine McNally

The Committee's second and final witness was Catherine McNally, Managing Director at Stout Risius Ross, focusing on claim valuation and insurance recovery for mass tort claims. (Trial Tr. at 395-397). Ms. McNally typically is retained by institutional claimants and committees in Chapter 11 cases involving claims of sexual abuse. (*Id.* at 397-398). Ms.

---

[3]     Deposition testimony from James Murray, Esq., insurance coverage counsel for the Diocese, was admitted into evidence as Mr. Murray was unavailable to testify at trial. Mr. Murray's testimony was intended to demonstrate that the insurance settlements—including CNA's agreement—"were within a range of reasonableness." (Trial Tr. at 9; Deposition Tr. of James Murray at 21-36). Mr. Murray's deposition designations and counter designations did not address alleged damages suffered by CNA.

[4]     The Diocese did not call any witnesses, allowing the Committee to pull the laboring oar.

McNally was called to rebut the opinions offered by Dr. Martin. (*Id.* at 395:13-14). Ms. McNally testified that Dr. Martin's opinion was flawed because her analysis failed to account for variables that might impact the valuation of claims—such as whether the statute of limitations was open or closed. (*Id.* at 404-405). Like the testimony of Dr. Martin—aimed at demonstrating that the amount to be paid by CNA under the disputed settlement agreement was reasonable— Ms. McNally's testimony was aimed at demonstrating that the amount to be paid by CNA in the disputed settlement agreement was unreasonable. The Court ascribes little weight to Ms. McNally's testimony. Both Dr. Martin and Ms. McNally testified about settlements in prior diocesan Chapter 11 cases. But whether this Court would or would not have approved the disputed settlement agreement calls for a level of speculation best left to a fortune teller, not Dr. Martin or Ms. McNally.

## V.

## CONCLUSIONS OF LAW

### A. CNA Failed to Prove the Formation of a Binding Contract with the Diocese

In its complaint, CNA has asserted two causes of action: (1) breach of contract; and (2) anticipatory breach of contract. (ECF AP No. 1 at 9-15). "Under New York law, the elements of a breach of contract claim are: (1) an agreement; (2) performance by the plaintiff; (3) breach by the other party; and (4) damages suffered as a result of the breach."[5] *Schoninger v. Green*, 763 Fed. Appx. 1, 4 (2d Cir. 2019). "An anticipatory breach of contract by a promisor is a repudiation of [a] contractual duty before the time fixed in the contract for . . . performance has arrived." *Princes Point LLC v. Muss Dev. LLC*, 87 N.E.3d 121, 124 (N.Y. 2017) (quoting 10-54

---

[5] The disputed settlement agreement had a choice of law provision, selecting New York law as governing interpretation of the agreement. (ECF AP No. 3, ¶ 8.19).

Corbin on Contracts § 54.1 (2017)). Here, CNA alleges that the Diocese breached a litigation settlement agreement. "An agreement to settle litigation is a 'contract that is interpreted according to general principles of contract law.'" *In re Motors Liquidation Co.*, 580 B.R. 319, 343 (Bankr. S.D.N.Y. 2018) (quoting *Omega Eng'g, Inc. v. Omega S.A.*, 432 F.3d 437, 444 (2d Cir. 2005)). "The party seeking to enforce a purported settlement agreement bears the burden of proving that such a binding and enforceable agreement exists." *In re Motors Liquidation Co.*, 580 B.R. at 343 (quoting *Grgurev v. Licul*, Case No. 1:15-cv-9805-GHW, 2016 U.S. Dist. LEXIS 156162, at *3 (S.D.N.Y. Nov. 10, 2016)). "For a contract to exist, there must be mutual assent to be bound . . . ." *Schoninger*, 763 Fed. Appx. at 4 (citations omitted). "Moreover, under well-settled New York law, the existence of a binding contract is not dependent on the subjective intent of either party. Rather, it depends upon the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Id.* (internal quotation marks omitted) (quoting *Brown Bros. Elec. Contractors v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977)).

Here, it is undisputed that the written settlement agreement was not signed by the Diocese or any of the dozens of Catholic entities identified as parties to the settlement agreement. As Judge Martin Glenn, in a *tour de force*, framed the issue in *Motors Liquidation*:

> When . . . one party seeks to enforce a written but unexecuted settlement agreement that an opposing party contends is not binding, the court must determine, based on the parties' intent, whether the agreement . . . is . . . binding. The intention of the parties on this issue is a question of fact, to be determined by examination of the totality of the circumstances. The key question before the court is whether there was a meeting of the minds of the parties both to the material terms of the settlement, and to be bound orally [by the unsigned agreement].

*In re Motors Liquidation Co.*, 580 B.R. at 344 (internal quotation marks and citations omitted).

Looking to the Second Circuit's holding in *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78

(2d Cir. 1985), Judge Glenn continued:

> Courts in the Second Circuit consider four factors articulated in *Winston* to determine whether the parties intended to be bound to a settlement agreement without an executed written contract:
>
> 1. whether there has been an express reservation of the right not to be bound in the absence of a writing;
>
> 2. whether there has been partial performance of the contract;
>
> 3. whether all of the terms of the alleged contract have been agreed upon; and
>
> 4. whether the agreement at issue is the type of contract that is usually committed to writing.
>
> No one *Winston* factor is decisive, and the analysis ultimately hinges on the parties' intent demonstrated through their objective communications and conduct.

*In re Motors Liquidation Co.*, 580 B.R. at 344 (citing *Winston*, 777 F.2d at 80 and *Ciamarella v.*

*Reader's Digest Ass'n, Inc.*, 131 F.3d  320, 323 (2d Cir. 1997)).

1. *Winston* Factor #1:  Reservation Not to Be Bound

Here, the settlement agreement provides that "[t]his Settlement Agreement shall be

effective on the Settlement Agreement Effective Date."  (ECF BK No. 1538, Ex. D at ¶ 8.21).

The settlement agreement defines the "Settlement Agreement Effective Date" as "the day

following the date on which all of the following have occurred:  (i) all Parties have executed this

Settlement Agreement; (ii) the Approval Order shall have become a Final Order; (iii) the Plan

Confirmation Order shall have become a Final Order; (iv) the Trust shall have been created

pursuant to the Plan . . . ."  (*Id.* at ¶ 1.1.41).   The settlement agreement includes a host of

conditions, all of which point to the "Settlement Agreement Effective Date" as the point at which

those conditions and the agreement itself become effective. (*Id.* at ¶¶ 2.3.4, 2.10, 2.11, 2.12, 3.1,

3.3, 4.1, 4.2, 4.3, 4.4, 5.2, 7.1.1, 7.2). Further, the settlement agreement provides that it "may be modified only by a written amendment signed by all of the Parties." (*Id.* at ¶ 8.6). CNA did not introduce any evidence tending to prove that the settlement agreement didn't mean exactly what it said—namely, that the agreement was not *effective* until all of the conditions included under the definition of "Settlement Agreement Effective Date" had actually taken place. Not one of those conditions ever occurred.

"Courts in the Second Circuit have placed great importance on the language in the written agreement itself as evidence of the parties' implied reservations not to be bound until the execution of a written agreement. For example, language stating that the agreement is only effective upon signature of the parties has repeatedly been found to indicate parties did not intend to be bound [until it is signed]." *In re Motors Liquidation Co.*, 580 B.R. at 344 (citing *Ciamarella*, 131 F.3d at 324). "[W]ording in a settlement agreement that places great significance on the execution date evinces an intent not to create a binding settlement until some formal date of execution." *Kaczmarcysk v. Dutton*, 414 Fed. Appx. 354, 355 (2d Cir. 2011) (quoted in *In re Motors Liquidation Co.*, 580 B.R. at 353).

The Court finds that the settlement agreement, with its numerous references to the "Settlement Agreement Effective Date" as the measuring point from which the agreement would become effective, is evidence of the parties' objective intent to be bound only upon the occurrence of all of the conditions enumerated in Paragraph 1.1.41—the first of which is signature by all of the parties to the agreement. The first *Winston* factor weighs heavily against finding that an enforceable contract was formed by the parties.

18

2. *Winston* Factor #2:  Partial Performance of the Contract

CNA makes much of the fact that the Diocese filed a motion seeking the Court's approval of the settlement agreement.  CNA argues that the filing of the motion under Rule 9019 FRBP by the Diocese, together with the filing of a memorandum of law in support of the motion and a request to authorize the manner of providing notice of the motion, are all acts of partial performance by the Diocese.  (Trial Tr. at 5:16-6:2).  The Court disagrees.

As the *Motors Liquidation* Court found, "the Settlement Motion and the Notice Procedures Motion are ancillary paperwork which preparation and exchange only constitute steps toward formation of the Settlement Agreement, not performance of the Settlement Agreement itself."  *In re Motors Liquidation Co.*, 580 B.R. at 358-59 (citing *Edwards v. City of New York*, Case No. 08-CV-2199, 2009 U.S. Dist. LEXIS 75607, at *13 (E.D.N.Y. May 22, 2009)).  "The second *Winston* factor is whether there has been partial performance *of the contract* . . . not whether there has been partial performance of the actions necessary to form the contract."  *Edwards*, Case No. 08-CV-2199, 2009 U.S. Dist. LEXIS 75607, at *13 (internal quotation marks omitted) (quoting *Winston*, 777 F.2d at 80).  While the *Motors* Court indicated that its analysis would have been different had the Court scheduled a hearing seeking the Court's approval of the settlement agreement under Rule 9019 (*In re Motors Liquidation Co.*, 580 B.R. at 359), that observation does not alter this Court's conclusion that no partial performance *of the contract* took place here.  Yes, the Diocese did file a motion under Rule 9019.  Yes, the Diocese did file a memorandum in support of the motion.  Yes, the Diocese also filed a request for approval of the manner of giving notice of the motion.  But, in the face of opposition by the Committee, the motion was adjourned several times without objection by CNA and ultimately held in abeyance by the Court.  (ECF BK No. 1938).  CNA made no effort to request that the

19

Case 2-23-02014-PRW,  Doc 91,  Filed 10/07/24,  Entered 10/07/24 15:48:59,  Description: Main Document , Page 19 of 28

Court convene a hearing on the Rule 9019 motion. Instead, CNA sat quietly as the days ticked by—perhaps in recognition of the manner in which the Diocese's Rule 9019 motion was styled (seeking approval of *proposed* insurance settlements), presumably with CNA's approval.

The Rule 9019 motion, to which the settlement agreement was appended as an exhibit, is titled: "MOTION TO APPROVE **PROPOSED** INSURANCE SETTLEMENTS TO FUND SURVIVOR COMPENSATION TRUST." (ECF BK No. 1538 at 1 (emphasis added)). The motion itself describes the settlement agreement with CNA (and other Insurers) as "proposed" a total of 56 times. The proposed order attached to the motion included a decretal paragraph by which the Court was asked to approve the proposed settlement agreement and to authorize the Diocese to enter into the proposed settlement agreements. (ECF BK No. 1538, Ex. D at ¶ 3). And, the settlement agreements attached to the motion were not signed by the Diocese or any of the Catholic entities.

The style of the Rule 9019 motion appears to have been intentional on the part of the Diocese, as the long history of this case seems to demonstrate. Specifically, in June of 2021, the Diocese filed a motion under Rule 9019, seeking the Court's approval of a settlement agreement with LMI and Interstate. (ECF BK No. 1101). That motion, in stark contrast to the June 2022 Rule 9019 motion, was titled "MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT." (*Id.* at 4). And, very much unlike the settlement agreement with CNA, the June 2021 settlement agreement was signed by the Diocese and the Insurers. (*Id.* at 43-45).

The Court finds that the second *Winston* factor weighs against finding that a binding contract was formed between CNA and the Diocese.

3. *Winston* Factor #3:  The Terms of Settlement Were Agreed Upon

There was no evidence introduced at trial indicating that all of the material terms of the settlement agreement had not been agreed upon by CNA and the Diocese.  Neither the Diocese nor the Committee have suggested that there were any material terms left to negotiate.  The Court finds that this *Winston* factor weighs in favor of finding a binding contract.

4. *Winston* Factor #4:  The Settlement Agreement Is the Kind Usually Committed to Writing and Was Committed to Writing

There is no question that the settlement agreement between the parties is the type that is usually committed to writing.  The settlement agreement is a 23-page, single-spaced document with 52 defined terms.  (ECF BK No. 1538).  The settlement agreement contemplates a payment of $63.5 million by CNA, the formation of a Trust to make disbursements to abuse claimants, and the granting of third-party releases, exculpation of third parties, and the issuance of a channeling injunction by the Court.  (*Id.*).  It is beyond any reasonable dispute that the settlement agreement is the type of complicated agreement committed to writing.

The Committee asserts that because the settlement agreement is governed by New York law, CPLR 2104 requires that an agreement to settle litigation in New York must be either made on the record in open court or reduced to a written agreement that is signed by the parties.  (ECF AP No. 81 at 23 n.32.).  The Second Circuit has not ruled on the issue of whether NY CPLR 2104 applies in federal courts sitting in New York.  *See Upstate Metrology v. Maggiulli*, Case No. 6:16-cv-06402-MAT, 2017 U.S. Dist. LEXIS 234916, at *15 (W.D.N.Y. Mar. 17, 2017) (Telesca, J.).  However, District Courts in the Second Circuit have held that CPLR 2104 is at least relevant in applying the fourth *Winston* factor.  *Id.*; *see also Clark v. Gotham Lasik, PLLC*, Case No. 11 Civ. 1307 (BSJ) (JCF), 2012 U.S. Dist. LEXIS 40290, at *13-14 (S.D.N.Y. Mar. 2, 2012).  Here, the settlement agreement was reduced to writing, but it was not signed by the

Diocese or other Catholic entities.  The Court finds that this *Winston* factor supports enforcement of the agreement, but is entitled to little weight.

   5.  Application of *Winston* Factors

The Court finds that the application of the *Winston* factors weighs against finding that the settlement agreement is an enforceable contract.  Here, the first and second *Winston* factors weigh heavily against finding that the settlement agreement is an enforceable contract.  While the third and fourth factors weigh in favor of finding that an enforceable contract exists, those factors are given far less weight by the Court.  "Courts generally apportion the most weight to the first element—whether the parties expressly reserved the right not to be bound in the absence of a writing."  *In re Motors Liquidation Co.*, 580 B.R. at 364.  Here, it's not enough that the settlement agreement was reduced to a written document, by its plain and express terms it was not effective unless and until it was signed by all parties.  And that never happened.  The words of Judge Glenn are on point and apply with equal force here:

> The Court is unaware of any contract principle that would nevertheless enable the Court to enforce an unsigned written agreement absent a finding that the parties intended to be bound orally.  If the parties here did not have that intent, any party had the right for any reason . . . to refuse to sign the Settlement Agreement.  An analysis of the evidence using the *Winston* factors and, in particular, the parties' objective intent expressed in the plain terms of the Settlement Agreement, establishes that the parties never had an oral agreement in place before they negotiated the terms of the written Settlement Agreement, instead contemplating that they would only be bound once the parties signed the written draft. . . . [C]ourts have consistently refused to bind parties to their unexecuted agreements.

*In re Motors Liquidation Co.*, 580 B.R. at 328.

Here, the settlement agreement unambiguously provides that the settlement agreement would only become effective when all the parties signed it.  That is a condition precedent to the formation of an enforceable contract—and it never occurred.  As a consequence, CNA has failed to prove the necessary first element to both its breach of contract and anticipatory breach of

contract causes of action, namely, the existence of a contract. The Court finds that the unexecuted settlement agreement is not enforceable. As a result, CNA's Adversary Proceeding must be **DISMISSED**.

**B.** **CNA Failed to Prove that It Was Damaged as the Proximate Cause of the Diocese's Alleged Breach**

In the event that an appellate court disagrees with the Court's holding that no contract was formed between the parties, the Court holds, in the alternative, that CNA failed to prove at trial that it was damaged as the proximate cause of the Diocese's alleged breach. It is well-settled that, under New York law, to succeed on an action for either breach of contract or anticipatory breach of contract, the plaintiff must prove that the defendant's breach resulted in damages proximately caused by the defendant. *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022); *Kenford Co. v. County of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989). The alleged damages must be "capable of measurement based upon known reliable factors without undue speculation." *Ashland Mgmt. v. Janien*, 624 N.E.2d 1007, 1011 (N.Y. 1993).

Here, CNA has alleged as damages: (1) its attorneys' fees ($579,000) incurred in attempting to obtain approval of the settlement agreement; (2) its expert witness fees ($250,000) paid to NERA to negotiate and assist CNA in supporting the reasonableness of the settlement amount; and (3) its consequential damages for any amount in excess of $63.5 million that CNA may have to pay to defend abuse claim litigation or pay under its insurance policies to settle abuse claims or satisfy judgments, as a result of litigation occurring some time after plan confirmation. (ECF AP No. 78 at 1, 16-17). CNA failed to prove its damages at trial.

First, in pre-trial discovery conducted in this Adversary Proceeding, CNA expressly refused to provide proof of its attorneys' fees in answer to interrogatories. "To the extent evidence of Continental's fees and expenses is either privileged or would require disclosure of

invoices from Continental's counsel or consultants, Continental will not seek to recover such damages." (Trial Ex. C at 32). However, in her direct examination at trial, Ms. Tesmer testified (over objection) that CNA's attorneys' fees associated with the settlement agreement amounted to $579,000. (Trial Tr. at 57:19-58:4). Ms. Tesmer's testimony was not only contrary to CNA's announced intention not to seek damages for the cost of its attorneys' fees, her testimony was based on her recollection of a review of invoices from attorneys. (*Id.* at 56:3-57, 91). No invoices were offered at trial to support Ms. Tesmer's testimony, depriving the Diocese of the ability to cross-examine Ms. Tesmer concerning the undisclosed invoices. While the Court allowed Ms. Tesmer to testify, the Court finds that her testimony concerning CNA's attorneys' fees is entitled to no weight. In the alternative, the Court finds that CNA waived the right to seek attorneys' fees by its refusal to provide proof in response to a pre-trial discovery demand.

Second, with respect to the sum of $250,000, billed by NERA for Dr. Martin's work, that CNA seeks as damages, the Court finds that NERA's retention and much of its work took place in 2021 and early 2022, long before the Diocese filed the Rule 9019 motion seeking the Court's approval of the settlement agreement. (Trial Tr. at 87-88). The costs of CNA's expert economics witness were not incurred as a direct consequence of the Diocese's alleged breach of contract. CNA would have retained an economics expert to attempt to prove that CNA's $63.5 million offer was reasonable for purposes of a buy-back of CNA's policies under § 363(b) of the Code. As Judge Poslusny observed recently, in rejecting a similar damage claim in the Diocese of Camden case:

> Because the Insurers took an active role supporting the Insurance Motion, they would have incurred much of these costs regardless of the Debtor's alleged breach, and so these costs are not compensable because they are not a consequence of the alleged breach. For example, the costs of the experts that the Insurers retained prior to the Debtor's alleged breach, and the amounts spent preparing those experts for trial are likely not compensable, as the Insurers would

have incurred those costs regardless of whether the Debtor supported the Insurance Settlement.

*In re Diocese of Camden*, 653 B.R. 309, 347 (Bankr. D.N.J. 2023) (emphasis in original).

So too here. The costs incurred by CNA in retaining NERA were not proximately caused by the Diocese's alleged breach.

Third, CNA seeks to recover consequential damages it alleges will flow from the Diocese's alleged breach. Those damages are described by CNA as any amount it may be required to pay, in excess of $63.5 million, to defend each abuse claim in the state court tort system, plus any amounts CNA might have to pay to settle abuse claims or satisfy judgments. (ECF AP No. 78 at 16-18). Of course, CNA could not produce any evidence of those costs because they would be incurred, if at all, some time after confirmation of a Chapter 11 plan—most likely very far in the future. Ms. Tesmer testified that the cost to defend an abuse claim typically ranges from $100,000 to $250,000. (Trial Tr. at 59). But, that spitball number was nothing more than a guesstimate of the cost to defend claims which may never be brought by abuse victims or defended by CNA. Next, Ms. Tesmer testified that CNA's consequential damages could be $100 million. (*Id.* at 97). Ms. Tesmer arrived at that number by testifying (somewhat sarcastically) that because the Committee had repeatedly alleged in its papers that CNA's exposure could be in the hundreds of millions of dollars, CNA could rightly claim damages of $100 million. Not only was that testimony nothing more than speculation, it was churlish. Further, if CNA's defenses to coverage prove to be as strong as suggested by Ms. Hilliker and Mr. Delahunt, CNA's expert witnesses, then CNA's consequential damages would be inconsequential.

After careful consideration of the testimony of the witnesses at trial, as well as the exhibits admitted in evidence, the Court finds that CNA has failed to prove any measurable

damages proximately caused by the Diocese's alleged breach of contract. Consequently, even if there was an enforceable contract between the parties, CNA has failed to prove any damages proximately caused by that breach—a necessary element to any breach of contract or anticipatory breach of contract action under New York law. As a result, CNA's Adversary Proceeding must be **DISMISSED** on this independent ground.

**C. CNA's Motion for Estimation of its Administrative Claim Cannot Survive the Dismissal of the Adversary Proceeding**

Immediately after filing the complaint commencing this Adversary Proceeding, CNA filed an "APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE PRIORITY CLAIMS FOR DEBTOR'S BREACH OF CONTINENTAL SETTLEMENT AGREEMENT." (ECF BK No. 2314). CNA subsequently filed a motion requesting estimation of its administrative claim. (ECF BK No. 2453; ECF AP No. 18). The application and motion were filed as a belt-and-suspenders device, in the event that the Court did not issue a final order or judgment addressing the merits of CNA's complaint. (ECF BK No. 2453 at 4 n.2). Because the Court will, by this Decision, issue a final order followed by entry of a judgment dismissing CNA's complaint on the merits, CNA's application and motion for estimation of its administrative claim necessarily fail and are **DENIED**. The Court has determined that there is no merit to CNA's Adversary Proceeding and that CNA's complaint must be dismissed on the merits. There is no administrative claim by CNA left to be estimated.

The Clerk of Court is directed to enter a judgment dismissing CNA's Adversary Proceeding on the merits as required by Rule 58 FRCP, as incorporated by Rule 7058 FRBP, without costs to either party.

## VI.

## CNA, COMMITTEE COUNSEL,
## COMMITTEE MEMBERS AND STATE COURT
## ATTORNEYS REPRESENTING MULTIPLE ABUSE CLAIMANTS
## ARE TO ENGAGE IN GOOD FAITH MEDIATION
## TO BE CONDUCTED BY
## HON. SHELLEY C. CHAPMAN (Ret.) AND PAUL A. FINN
## AT THE MEDIATORS' EARLIEST CONVENIENCE

The Court ends this Decision where it began—observing that dismissal of CNA's Adversary Proceeding does not advance the underlying Chapter 11 case one inch. Unless CNA and the abuse victims (acting through the Committee and their state court attorneys) are able to reach a prompt settlement, the prospect of enduring years of litigation (in both federal and state court) seems likely. The Court is sensitive to the frustration, expressed by many abuse victims, with the fact that this bankruptcy case has lingered for over five years. But the abuse victims need to understand and accept the fact that this Court cannot *force* either CNA or the abuse victims to settle.[6] Both sides have expressed to the Court great confidence in the strength of their diametrically opposing positions. But, unless *both* sides are willing to make concessions—and those must be significant concessions—ending this Chapter 11 with a confirmable plan will probably not happen, and it most assuredly will not happen anytime soon.

Early on in this case, the Court appointed Judge Gregg W. Zive to serve as mediator, charged with helping the parties reach a global settlement. (AP Case No. 19-02021, ECF Nos. 36, 39). The Court subsequently appointed Paul Van Osselaer as an additional mediator. (AP Case No. 19-02021, ECF No. 200). The outstanding efforts of Judge Zive and Mr. Van Osselaer

---

[6] The abuse victims have also publicly expressed disdain for the amount spent by the Diocese for attorneys and other professionals so far. Of the more than $14 million spent by the Diocese for attorneys and professionals, *approximately $6.5 million of that amount was paid to professionals representing the abuse victims*—a fact seemingly overlooked by both the media and the abuse victims.

27

helped the Diocese, the Committee, and all but one Insurer (CNA) to reach a settlement in principle. And despite the best efforts of Judge Zive and Mr. Van Osselaer as recently as July 2024, there remains a huge chasm between CNA and the abuse victims. The time has come for the Court to appoint a new team of mediators to try to bring the abuse victims and CNA to a settlement. CNA and the abuse victims are urged not to waste this opportunity to finally settle their differences.

The Court will, contemporaneously with the issuance of this Decision, enter an Order appointing Hon. Shelley C. Chapman (Ret.) and Paul A. Finn, Esq. as mediators, and discharging Judge Zive and Mr. Van Osselaer with the Court's unending gratitude for their efforts. The Order will require the physical attendance of: representatives of CNA with settlement authority and CNA's counsel, the members of the Creditors' Committee and Committee counsel, and those state court attorneys representing multiple abuse claimants *(in person and not by an emissary)* including, but not limited to: Jeff Anderson, Stephen Boyd, Mitchell Garabedian, Leander James, unless directed otherwise by the mediators in their sole discretion.[7] The representatives of the Diocese (and any other person or entities as directed by the mediators) may also attend.

**IT IS SO ORDERED.**

Dated: October 7, 2024         _____/s/_____
      Rochester, New York        **HON. PAUL R. WARREN**
                              United States Bankruptcy Judge

---

[7]     The Court will take the liberty of fashioning the order appointing the replacement mediators from the Order issued by Judge Glenn earlier this year in the Diocese of Rockville Centre, New York bankruptcy.